Adam Kraut
Attorney Id. No. 318482
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 476-2342
E: akraut@fpclaw.org

William Sack
Attorney Id. No. 325863
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: wsack@fpclaw.org

Joshua Prince, Esq.
Attorney ID: 306521
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
P: 888-202-9297 ext. 81114
F: 610-400-8439
E: Joshua@Civilrightsdefensefirm.com

Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com
*App. for Pro Hac Vice Forthcoming*

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEITH FETSURKA;** | : | Civil Rights Complaint |
| **TIMOTHY SIECK,** and, | : | 42 U.S.C. § 1983 |
| **FIREARMS POLICY** | : | |
| **COALITION, INC.,** | : | |
| Plaintiffs | : | |
| | : | |
| **v.** | : | Case No. – 2:20-cv- 5857 |
| | : | |
| **DANIELLE OUTLAW,** | : | |
| Philadelphia Police Commissioner; | : | |
| **CITY OF PHILADELPHIA,** | : | |
| **PENNSYLVANIA;** and, | : | |
| **COLONEL ROBERT** | : | |
| **EVANCHICK,** | : | |
| Commissioner of Pennsylvania | : | |
| State Police, | : | |
| Defendants | : | |

## COMPLAINT

COME NOW Plaintiffs Keith Fetsurka, Timothy Sieck, and Firearms Policy Coalition, Inc., on behalf of themselves and those similarly situated, by and through their attorneys, Adam Kraut and William Sack of Firearms Policy Coalition, Inc., Joshua Prince of Civil Rights Defense Firm, P.C., and Raymond M. DiGuiseppe of The DiGuiseppe Law Firm, P.C. and complain of Defendants Danielle Outlaw, City of Philadelphia, Pennsylvania, and Colonel Robert Evanchick as follows:

## INTRODUCTION

1. The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II. When the People, by enacting that amendment, enshrined in their Nation's fundamental charter the right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense," *District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008), they did not mean to leave the freedom to exercise that right at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.*

2. State and local governments, whether legislatively or by executive decree, cannot simply suspend the Constitution. Authorities may not, by decree or

otherwise, enact and/or enforce a suspension or deprivation of constitutional liberties. And they certainly may not use a public health crisis as political cover to impose bans and restrictions on rights they do not like. Yet, for the *second time this year*, Defendants City of Philadelphia, Pennsylvania ("Philadelphia") and Philadelphia Police Commissioner Danielle Outlaw (collectively "Philadelphia Defendants") have done exactly that.

3.     Plaintiffs Keith Fetsurka, Timothy Sieck, and all typical, law-abiding citizens, have a fundamental, constitutionally guaranteed right to carry loaded, operable handguns on their person, outside their homes, while in public and in motor vehicles, for lawful purposes including immediate self-defense.

4.     In *District of Columbia v. Heller*, the U.S. Supreme Court held that to "bear arms" includes the "carry [of a firearm] ... in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." 554 U.S. 570 (2008) at 584.

5.     The Commonwealth of Pennsylvania generally bars the carrying of loaded firearms by ordinary citizens in public for self-defense, including in Defendant City of Philadelphia, unless they first acquire a license to carry a firearm under 18 Pa.C.S. § 6109 ("LTCF"). But two days ago, the Philadelphia Defendants once more enacted and began enforcing a policy completely closing their Philadelphia Police Department's Gun Permit Unit

("GPU"), making it impossible for Plaintiffs Keith Fetsurka, Timothy Sieck, Firearms Policy Coalition's members and supporters, and all similarly situated individuals who are legally eligible to possess and acquire firearms, to acquire a LTCF, thus completely shuttering access to the right to bear arms.

6. Adding further insult to constitutional injury, should an unlicensed person be convicted for exercising his rights by carrying a handgun in public, he would lose his Second Amendment rights under federal law.

7. Indeed, Defendants' laws, regulations, policies, and enforcement practices individually and collectively prevent law-abiding adults like Plaintiffs from exercising their fundamental, individual right to bear loaded, operable handguns outside the home through oppressive criminal statutes combined with a licensing system that is both required and closed to law-abiding people—and even when available, imposes severe delays and burdens upon them.

8. Defendants' laws, regulations, policies, and enforcement practices thus violate the right to keep and bear arms expressly protected under the Second and Fourteenth Amendments to the United States Constitution.

9. Uncertain times such as the present are precisely when Plaintiffs and Plaintiffs' members must be able to exercise their fundamental rights to keep and bear arms. The challenges we all face because of the COVID-19

Coronavirus, election, social unrest, or other social ills do not, cannot, and must not justify or excuse government infringements upon fundamental human rights. The declaratory and injunctive relief that Plaintiffs have been forced to seek through this action is necessary to uphold this bedrock principle of the United States Constitution.

## **PARTIES**

10. Plaintiff Keith Fetsurka ("Mr. Fetsurka") is a natural person, 29 years of age, a citizen of Philadelphia, Pennsylvania and the United States, and a member of Firearms Policy Coalition.

11. Plaintiff Timothy Sieck ("Mr. Sieck") is a natural person, 35 years of age, a citizen of Philadelphia, Pennsylvania and the United States, and a member of Firearms Policy Coalition.

12. Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a 501(c)(4) non-profit organization incorporated under the laws of Delaware, with a place of business in Sacramento, California. The purposes of FPC include defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC's members reside

both within and outside Pennsylvania. FPC represents its members and supporters—who include gun owners, prospective gun owners, licensed firearm retailers, and others—and brings this action on behalf of itself, its members, including the named Plaintiffs herein, and supporters who possess all the indicia of membership. FPC's members have been adversely and directly harmed by Defendant's enforcement of the laws, regulations, policies, practices, and customs challenged herein. FPC has expended and diverted resources because of the Defendant's enforcement and resultant policies, practices, and customs challenged herein.

13. Defendant Philadelphia Police Commissioner Danielle Outlaw ("Commissioner Outlaw" or "Outlaw") is the head and Commissioner of Defendant City of Philadelphia, Pennsylvania's Police Department ("PPD"). As Commissioner of the PPD, which includes the City's Gun Permit Unit, Commissioner Outlaw formulates, enacts, and is currently enforcing the City's policies and practices as to applications for and issuance of LTCF, as well as the Commonwealth's and the City's criminal laws. Defendant Outlaw has and continues to enforce laws and policies denying law-abiding adult citizens in Philadelphia their fundamental, individual right to bear arms. Defendant Outlaw is sued in her official capacity.

14.     Defendant City of Philadelphia, Pennsylvania is a municipal corporation incorporated under the laws of the Commonwealth of Pennsylvania. Defendant City is sued under 42 U.S.C. § 1983 because it has enacted and is enforcing laws and policies that deprive, under color of law, Plaintiffs' and similarly situated persons' federal constitutional rights, privileges, and immunities secured by the Constitution.

15.     The City of Philadelphia Police Department is an agency of the City that is not amenable to suit in its own name.

16.     Defendant Colonel Robert Evanchick ("Evanchick") is the head and Commissioner of the Pennsylvania State Police ("PSP"). As Commissioner of the PSP, Defendant Evanchick, in addition to being responsible for assisting the Pennsylvania Governor in enforcing the laws of the Commonwealth of Pennsylvania, is responsible for the implementation, execution, and administration of the laws, regulations, customs, practices, and policies of the PSP and the Commonwealth, *inter alia*, in relation to the Uniform Firearms Act, 18 Pa.C.S. § 6101, *et seq*. and the Pennsylvania Instant Check System. As Commissioner of the PSP, Defendant Evanchick is presently enforcing the Commonwealth's laws, regulations, customs, practices, and policies complained of in this action, including the Commonwealth's laws on the keeping and bearing of firearms especially, but

not limited to, on public roads and in other public places. Defendant Evanchick is sued in his official capacity.

## JURISDICTION AND VENUE

17. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

18. This action for violation of Plaintiffs' constitutional rights is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees pursuant to 42 U.S.C. § 1988.

19. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Pennsylvania.

## STATEMENT OF FACTS

### *The Laws, Policies, And Enforcement Actions Affecting Plaintiffs*

20. The foregoing paragraphs are incorporated herein as if set forth in full.

21. The Commonwealth of Pennsylvania has broadly criminalized the carrying of loaded firearms by ordinary citizens under 18 Pa.C.S. §§ 6106 and 6107, making it a serious crime for law-abiding citizens to exercise their

fundamental right to bear arms in public for self-defense unless they first acquire a license to carry a firearm under 18 Pa.C.S. § 6109.

22. Arrest and prosecution for unlawfully carrying a firearm under the Commonwealth's laws could result in a person's losing their Second Amendment rights for the rest of their life.[1]

23. 18 Pa.C.S. § 6107 prohibits the "carry[ing of] a firearm upon the public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive" unless they possess a license to carry a firearm under 18 Pa.C.S. § 6109.

24. Pennsylvania has been under a constant state of emergency, proclaimed by Governor Tom Wolf, since January 10, 2018.[2]

---

[1] *See* 18 Pa.C.S. §§ 6106(a)(1) (making it a felony of the third degree for an individual to carry a firearm concealed on or about his person, except in his place of abode or fixed place of business without a LTCF) and 6106(a)(2) (grading the same offense as a misdemeanor of the first degree if the individual is eligible to receive a LTCF and has not committed any other criminal violations). *See also* 18 Pa.C.S. § 106(b)(6) (classifying a misdemeanor of the first degree as punishable by a term of imprisonment "of which is not more than five years"), 18 U.S.C. § 921(a)(20) (defining "crime punishable by imprisonment for a term exceeding one year" to include a state law misdemeanor punishable by *more than* two years imprisonment), and 18 U.S.C. § 922(g)(1) (making it unlawful for anyone convicted of a crime punishable for a term exceeding one year to possess firearms or ammunition).

[2] *See* https://www.governor.pa.gov/newsroom/governor-wolf-declares-heroin-and-opioid-epidemic-a-statewide-disaster-emergency and https://www.governor.pa.gov/newsroom/gov-wolf-signs-8th-opioid-disaster-declaration-renewal-vows-continued-concerted-efforts.

25.   Pennsylvania has been under an additional state of emergency, proclaimed by Governor Wolf, related to COVID-19 since March 6, 2020.[3]

26.   Because of those proclamations by Governor Wolf, 18 Pa.C.S. § 6107 additionally and currently restricts the Plaintiffs, and all those similarly situated, from transporting or carrying firearms in public, and upon public streets and public property, even for lawful purposes, including self-defense.

27.   A violation of 18 Pa.C.S. § 6107, pursuant to 18 Pa.C.S. § 6119, is a misdemeanor of the first degree, for which a conviction would prohibit the Plaintiffs, and those similarly situated, from being able to purchase, possess, and utilize firearms and ammunition, pursuant to 18 U.S.C. § 922(g)(1).

28.   Defendant Evanchick enforces the Commonwealth's laws pertaining to the keeping and bearing of firearms especially on, but not limited to, public roads and in other public places.

29.   Under the Uniform Firearms Act ("UFA"), the term "firearm" is generally defined to mean "[a]ny pistol or revolver with a barrel length less than 15 inches, any shotgun with a barrel length less than 18 inches or any rifle with a barrel length less than 16 inches, or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches. The barrel length of a firearm

---

[3] *See* https://www.governor.pa.gov/newsroom/gov-wolf-signs-covid-19-disaster-declaration-to-provide-increased-support-for-state-response.

shall be determined by measuring from the muzzle of the barrel to the face of the closed action, bolt or cylinder, whichever is applicable." 18 Pa.C.S. § 6102.

30.   18 Pa.C.S. § 6107 further provides that the term "firearm" "includes any weapon that is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of any weapon," a substantially broader definition than that found in 18 Pa.C.S. § 6102.

31.   The Commonwealth of Pennsylvania generally allows individuals to openly carry firearms without a license.

32.   However, pursuant to 18 Pa.C.S. § 6108, "[n]o person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless: (1) such person is licensed to carry a firearm; or (2) such person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license)."

33.   Defendant Philadelphia is the only "city of the first class". 53 P.S. § 101 (defining city of the first class to be those which contain a population of one million or more).[4]

---

[4] See also U.S. Census Bureau QuickFacts for Philadelphia, Pennsylvania, (showing Philadelphia to have an estimated population of ~1,584,000, and Pittsburgh, the second largest estimated population of a city in the Commonwealth, having a population of ~300,000), online at

34.     Under Defendant Philadelphia's Code, the term 'firearms' "means any revolver, pistol, rifle, shotgun or other weapon capable of propelling a projectile by means of an explosive material or charge." Phila. Code § 10-818(1).

35.     Defendant Philadelphia's Code further provides: "No person shall carry a firearm upon the public streets or upon any public property at any time unless that person is: (a) either (.1) a resident of Pennsylvania licensed by a political subdivision of the Commonwealth of Pennsylvania to carry a firearm or licensed to hunt; or (.2) a resident of another state, which state has a reciprocity agreement with Pennsylvania under 18 Pa. C.S. § 6109(k) or has statutory reciprocity under § 6106(b), and is licensed by such state to carry a firearm or to hunt; (b) actively engaged in a defense of his life or property from imminent peril or threat; or (c) a police officer or member of the State or Federal militia on active duty." Phila. Code § 10-818(2) (paragraph breaks omitted).

36.     "The penalty for violation of" Defendant Philadelphia's ban "shall be a fine of not less than three hundred dollars ($300) and imprisonment of not less than ninety days." Phila. Code § 10-818(4).

---

https://www.census.gov/quickfacts/geo/chart/philadelphiacitypennsylvania/PST045219.

37.   The Philadelphia Defendants have a manual of policies and practices that serve "as a standard of conduct for all [police] personnel. It consists of the rules, policies, and procedures which are necessary for the consistent and professional operation of the Philadelphia Police Department," online at http://www.phillypolice.com/accountability.

38.   According to the Philadelphia Defendants' Directive Index, also available at http://www.phillypolice.com/accountability, Philadelphia Defendants have and are currently enforcing a policy on "Firearms" as set forth in "Directive 5.27" (effective 10-31-01 and last updated 09-22-10) ("Directive 5.27").[5]

39.   Under Philadelphia Defendants' Directive 5.27, "It is the responsibility of all members of the Philadelphia Police Department to ensure that all laws and regulations pertaining to the carrying of concealed firearms are properly enforced."

40.   Thus, under Philadelphia Defendants' Directive 5.27, "all members of the Philadelphia Police Department" must enforce "all laws and regulations pertaining to the carrying of" handguns against individuals, including Plaintiffs Fetsurka, and Sieck, Plaintiff FPC's members and supporters, and similarly situated members of the public.

---

[5] Directive 5.27 is available online at https://www.phillypolice.com/assets/directives/D5.27-Firearms.pdf.

41.   On information and belief, such "laws and regulations" include the Commonwealth's and Philadelphia Defendants' criminal and procedural laws and policies, which include but are not limited to the Commonwealth's and Philadelphia Defendants' general ban on carrying firearms, as well as the requirements that a person acquire a LTCF in order to be exempt from prosecution, fines, and other penalties for carrying a loaded, operable handgun on the person, in public places and motor vehicles.

42.   On information and belief, Defendants' and their officers can and do enforce the Commonwealth's laws and regulations, and the Philadelphia Defendants' ordinances and directives, including 18 Pa. C.S. §§ 6106, 6107, 6108, Phila. Code § 10-818, and Defendant City PPD's Directive 5.27.

43.   Under Directive 5.27, "All processing of applications for License to Carry Firearms in Philadelphia County is the responsibility of the Gun Permits and Tracking Unit of the Philadelphia Police Department."

44.   On information and belief, the "Gun Permits and Tracking Unit of the Philadelphia Police Department" is also called the "Gun Permit Unit".[6]

45.   18 Pa.C.S. § 6109 requires that an individual make an application for a LTCF "with the sheriff of the county in which he resides, or if a resident of a city of the first class, with the chief of police of that city."

---

[6] *See, e.g.,* https://www.phillypolice.com/forms/gun-permit-unit/index.html.

46.   18 Pa.C.S. § 6109 and Defendants' policies and enforcement practices prevent Plaintiffs and others from applying for and being issued a LTCF by a sheriff of any other county in the Commonwealth, leaving Plaintiffs and others like them with no alternative means of acquiring a LTCF to lawfully exercise their right to bear arms in public.

47.   Philadelphia Defendants have at least once previously, and currently are, enforcing a policy that completely closes their GPU's operations with respect to timely accepting, processing, and issuing LTCFs.

48.   A public notice posted on or about November 18, 2020, in a door window at the official office of Philadelphia Defendants' GPU (photograph at Figure 1, below) states: "ATTENTION!!! Keeping in accordance with the Mayor's announcement to halt all non-essential City government operations, in order to reduce the spread of the COVID-19 coronavirus the Gun Permit Unit will remain closed until further notice. Anyone who received an approval notice to pick-up your permit during this closure, your notice will be honored when the unit begins operation again." (Underline in red for emphasis in original.)

**Figure 1**



49.     Thus, the Philadelphia Defendants have enacted and are currently enforcing a

policy declaring, and treating, constitutionally necessary firearm-related

services as "non-essential" and less important than other programs and

services they offer the public.

50.   On information and belief, the Philadelphia Defendants previously closed their GPU from some time in March 2020 through late July 2020.

51.   And even after the Philadelphia Defendants' GPU was limitedly re-opened in late July 2020, phone calls to those numbers were "only [] accepted between the hours of 8:30 AM and 2:00 PM.," rather than during normal business hours.

52.   On Philadelphia Defendants' other Web page for their GPU, it states, in pertinent part:

IMPORTANT NOTICE**
* * *

(Last Updated October 21st, 2020) For additional information, visit the Philadelphia Police Gun Unit website https://www.ppd-ltc.com/

RE-OPENING INFORMATION
July 8th, 2020

In accordance with C.D.C. protocols the Gun Permit Unit will no longer provide walk up service at this time.

The Unit will be open Monday, Tuesday and Wednesday for applications by appointment only, pickups, Lost & Stolen Reports, Status Checks and Other inquires will be processed Thursday and Friday by appointment only.

These changes are to ensure the safety of the public and unit personnel.

The Unit has the following phone numbers designated for making appointments, (215) 685- 3661 and (215) 685-3662.

On July 8th, 2020 the Gun Permit Unit will begin to accept appointments for the Re-opening of the Unit.  Phone calls will only be accepted between the hours of 8:30 AM and 2:00 PM.

THE UNIT WILL BEGIN SERVICE ON THE FOLLOWING DATES:

JULY 16TH & 17TH - PICKUPS LOST & STOLEN REPORTS STATUS CHECKS OTHER INQUIRES

JULY 20TH, 21ST & 22ND - APPLICATIONS (ONLY)
JULY 23RD & 24TH - PICKUPS LOST & STOLEN REPORTS STATUS CHECKS OTHER INQUIRES

THIS WILL BE THE SCHEDULE GOING FURTHER.

THE UNIT WILL STILL BE CLOSED ON ALL FEDERAL, STATE AND LOCAL HOLIDAYS.

THE UNIT WILL BE CLOSED DECEMBER 20TH TO JANUARY 3RD EACH YEAR.

 A FACE COVERING MUST BE WORN AT ALL TIMES UNLESS DIRECTED TO REMOVE IT BY UNIT PERSONNEL.
YOU MUST BE ON TIME FOR YOUR APPOINTMENT.

IF YOU ARE LATE YOU WILL NOT BE SEEN AND WILL HAVE TO OBTAIN ANOTHER APPOINTMENT DATE.

IF YOU DO NOT HAVE ALL THE ITEMS REQUIRED TO APPLY, YOU WILL NOT BE PERMITTED TO LEAVE AND RE-ENTER, YOU WILL HAVE TO OBTAIN ANOTHER APPOINTMENT DATE.

ONLY THE APPLICANT WILL BE PERMITTED TO ENTER THE BUILDING (IF AN INTERPRETER IS NEEDED THEY CAN ENTER WITH THE APPLICANT).  NO ONE UNDER THE AGE OF 21 WILL BE ALLOWED TO ENTER THE BUILDING.

53.   On or about November 18, 2020, the Philadelphia Defendants once again completely closed their GPU and ceased accepting, processing, and issuing LTCFs.

54.   On information and belief, in addition to Philadelphia Defendants' prior and currently enforced GPU closure policies, Defendants Outlaw and City of Philadelphia have and are enforcing policies that, even when the City's Gun Permit Unit is not fully closed, those seeking access to the Unit's constitutionally necessary services—including Plaintiffs and their members and supporters, and similarly situated members of the public—require individuals to spend hours or days trying to call the GPU on a generally unmanned telephone, with no website or electronic means of scheduling an appointment, to schedule an appointment with the GPU months or longer into the future to merely begin the process of applying for a LTCF, provide limited to no access to staff and services, impose severe delays, and force applicants to complete a long, burdensome process that may or may not result in the issuance of a carry license because the Philadelphia Defendants' policies and practices "decide on a case-by-case basis" whether the applicants' right "*is really worth* insisting upon."

55.     The Philadelphia Defendants' GPU's "Directions for Completion of Application" (GPU Directions"), online at https://www.ppd-ltc.com/application-information, states, in pertinent part:

FIREARMS ARE NOT PERMITTED ON THE PREMISES.

INSTRUCTIONS FOR COMPLETION OF AN APPLICATION FOR A

PENNSYLVANIA LICENSE TO CARRY FIREARM

DIRECTIONS FOR COMPLETION OF APPLICATION

All applications must be completed to their entirety. Do not write in the shaded area at the top of the application that says "For Use By Issuing Authority". Should a box not apply to you, enter "N/A" in that box. DO NOT sign and date the application until you are in the presence of a member of the Gun Permit Unit when you submit your application. The following is a list of common errors made by applicants when applying for a License to Carry Firearms:

• Box 4 (Middle Name): Full middle name is required, no initials

• Box 16 (Street Address): Enter full street address; If you also have a post office box, enter your PO box as well; This address MUST be the same as what is on your photo identification

• Box 28 (Reason): Check one reason which you would like to have displayed on your License to Carry Firearms; The License covers your for all of the reasons regardless of which reason you choose

• Box 7b (Place of Birth): Enter the city and state in which you were born

• Box 29 (References): List two references who are 21 years of age or older and are of no relation to you; full names, mailing addresses and phone numbers are required

• Box 31 (question regarding citizenship): If you are a registered alien, check "NO" and enter your country of birth, country of citizenship, and alien registration or I-94 number; You must also submit documentation proving your registration

Only applicants 21 years of age or older, residing in the county of Philadelphia, may apply for a Pennsylvania license to carry a firearm through the Philadelphia Police Department. Out of county residents must apply in their county of residence.

If you live out of state and are applying for a Pennsylvania License to Carry Firearms, be sure to bring your driver's license from your state of residence, your license/permit to carry firearms issued by that state, and proof the residency from the state you reside. If you live out of state, are not 21 years of age or older, or do not possess an out-of-state license/permit to carry firearms from your resident state, you do not qualify for a Pennsylvania License to Carry Firearms.

Applications may be picked up at the Gun Permit Unit, 660 East Erie Ave, Monday through Friday, 8:30 AM to 1:00 PM. This Unit is Closed on Saturdays, Sundays, and Holidays, and from December 20th to January 3rd. Only 1 application per person. This information can also be found at the following website: www.phillypolice.com/ forms (click on License to Carry). (If downloaded from the internet applicant must bring all paperwork, including this instruction sheet.)

Applicants must have an APPLICATION FILLED OUT COMPLETELY and APPLICABLE ITEMS LISTED BELOW or they will not be accepted. (Do not use pencil)

When completed, the entire application must be returned IN PERSON BY THE APPLICANT to the above location, Monday through Friday, 8:30 AM to 1:00 PM. (New applications and renewals will only be handled during this time

Also needed at this time of RENEWAL OR NEW APPLICATION:

One (1) 2" x 2" (inch) Passport Type color photo of the applicant's head and shoulders, (NO SUNGLASSES, HATS, BANDANNAS, ETC.).

A recently purchased $20.00 money order that is valid for at least 1 year or longer is the only form of payment that will be accepted. (Payable to "City of Philadelphia").

FYI – A Postal money order has no expiration date.

A VALID Pennsylvania Drivers License or Non-Drivers ID, along with two (2) acceptable forms of proof of residence, all names and addresses must match. NO PO BOXES WILL BE ACCEPTED, (see below for examples).

ALL APPLICANTS WILL BE FINGERPRINTED.

Applicants, who have had a NAME CHANGE, must submit legal documents to show the name change. (i.e., Marriage License, Court Orders)

If you were previously a member of the Armed Forces, a copy of your discharge papers (DD-214) must accompany the application.

Foreign born applicants who are presently American citizens must bring either their naturalization papers or a passport

Registered aliens must have their current alien registration identification card, i.e., GREEN CARD.

Must show current or expired permits at time of application. Expired permits to carry will be retained by the Gun Permits Unit.

If all paperwork is in order, the applicant will then be interviewed by Gun Permits Unit personnel. When the interview is completed, an investigation will be conducted. All applicants will receive written notice by U.S. mail of either approval or disapproval of their application for a Pennsylvania license to carry a firearm. Upon approval, the applicant has thirty (30) days to pick-up their License to Carry.

ALL APPLICANTS SHOULD BE AWARE THAT FALSE STATEMENTS (WHETHER ORAL OR WRITTEN) WILL BE CAUSE FOR DENIAL AND MAY RESULT IN ARREST.

PLEASE NOTE THAT THE SAME PROCEDURES ARE APPLICABLE FOR RENEWALS.

Below are examples of, but not limited to, acceptable forms for proof of your residency:

• Current Utility Bills: (within the last three months / 90 DAYS)
• Phone Bill – Home/Cellular
• Electric Bill
• Gas Bill
• Water Bill
• Cable/Satellite Bill
• Current Credit Card Statements

- Current Bank/Student Loan Statements
- Valid Vehicle Registration
- Valid Vehicle Insurance Card
- Voters Registration Card

JUNK MAIL IS NOT ACCEPTABLE

56.   The Philadelphia Defendants' have and use various modern technologies to communicate with the public about official business, including telephones and phone calls, text messages, e-mail, and Internet-based Web forms. *See*, *e.g.*, https://www.phillypolice.com/forms/submit-a-tip, which states in pertinent part:

> Tips via Phone, Text Message, and Email
>
> In addition to this online form (which you may use to remain anonymous), you can also submit tips using any of the below methods.
>
> Via Telephone
> Dial 215.686.TIPS (8477).
>
> Photo/Video Tips via Email
> If you would like to submit a tip, including photo or video, via email, send to tips@phillypolice.com. Include as many details as you can, such as the physical address and names of any known persons. Include your contact information if you would like us to follow up with you directly.

57.   The Philadelphia Defendants use secure Web-based forms, e-mail, and text messages for official business and submissions. For example, a person can "File an Official Complaint on Philadelphia Defendants' website, online at https://www.phillypolice.com/forms/official-complaint-form/index.html.

58.    Even though the Philadelphia Defendants provide and allow the public to use Web-based forms, e-mail, and text messages for official business, submissions, and communicating with Philadelphia Defendants and their officers and staff, they do not provide or allow individuals needing and using the constitutionally necessary services of their GPU to do the same.

59.    The Schuylkill County, Pennsylvania Sheriff's Office has an online LTCF application system where applicants can complete all of the application requirements and pay the necessary fees online.[7]

60.    And the Schuylkill County Sheriff's Department is not alone in utilizing an efficient, accessible, and easy to use online LTCF application form, email, or other alternative means of accepting applications rather than in-person visits by applicants.

---

[7] *See* http://www.co.schuylkill.pa.us/offices/sheriff/index.asp. See also the online Web based LTCF form at https://schuylkillpaso.permitium.com/ccw/start?.

61.     The county sheriffs for the counties of Berks, Blair, Bucks, Cambria, Monroe,

Montgomery, Pike, and Wayne all currently offer online applications.[8] [9]

---

[8] *See*, https://www.co.berks.pa.us/Dept/Sheriff/Pages/FirearmsSection.aspx
(declaring that "Firearm licensing through the Berks County Sheriff's Office can
now be completed online by using the link below," online at
https://berkspaso.permitium.com/ccw/start");
http://www.blairco.org/Dept/Sheriff/Pages/default.aspx (declaring that "YOU
CAN NOW APPLY FOR YOUR CONCEALED CARRY LICENSE ONLINE!
(CLICK HERE TO APPLY FOR YOUR LICENSE ONLINE!)");
http://www.buckscounty.org/government/RowOfficers/Sheriff/CarryLicense
(declaring "Effective October 14, 2020 we will be starting a new on-line procedure
to provide the most efficient way of processing gun permit applications. To apply
for a License to Carry Firearms in Bucks County, Pa., please visit:
https://buckspa.permitium.com/ccw/start");
https://www.cambriacountypa.gov/sheriff-office.aspx (declaring "*LICENSE TO
CARRY PERMIT INFO* You can now apply for your License to Carry Permit
Online! Click HERE to Apply Online Today!!");
http://www.monroecountypa.gov/Dept/Sheriff/Pages/ConWeapons.aspx (declaring
"Due to the COVID-19 pandemic we will be accepting applications for concealed
carry permits via email or regular mail until further notice.");
https://www.montcopa.org/401/Gun-Permits (declaring "Effective September 9,
2020 we have started a new on-line procedure to provide the most efficient way of
processing gun permit applications. Emailed applications are no longer accepted.
To apply for a License to Carry Firearms in Montgomery County, Pa., please visit:
https://montgomerypa.permitium.com/ccw/start");
http://www.pikepa.org/Sheriffs/LTCApp.pdf (declaring that the Pike County
Sheriff's Office accepts LTCF applications via email); and,
https://www.waynecountypa.gov/509/License-to-Carry-Information-Application
(declaring that Wayne County Sheriff Mark Steelman "has moved part of the
License to Carry a Firearm application process online. New applicants and
renewing permit holders may now start the application process online.").
[9] Additionally, the Adams, Columbia, Fayette, Luzerne, McKean, Mercer,
Schuylkill, and York County sheriff departments are all in the process of
implementing electronic submission options for LTCF applications.

62.  Permitium PermitDirector is a Web-based system "for weapon permits [that] serves as an end-to-end online solution that includes the application, background check tracking, processing, payment and issuance of gun and concealed carry permits". *See* https://permitium.com/products.html.

63.  The Permitium PermitDirector product has "913,070 CCW permits issued" and serves 200 counties in 13 states, including but not limited to Schuylkill County, Pennsylvania. *See* https://permitium.com/stats.html.

64.  Philadelphia Defendants could, but do not, use an online, Web-based application system, such as Permitium, email, Web forms, or even electronically fill-able and sign-able PDF files to accept and process LTCF applications.

65.  The Commonwealth of Pennsylvania, by and through Defendant Evanchick and his Pennsylvania State Police, provide issuing authorities, such as Philadelphia Defendants' GPU, access to the Pennsylvania Instant Check System (PICS).

66.  Defendant Evanchick's online E-PICS system "is intended for use by Pennsylvania Licensed Firearm Dealers and County Sheriffs to verify an applicant's eligibility to legally purchase/transfer a firearm or obtain a License to Carry." *See* https://epics.pa.gov/Pics/.

67.  Defendants can use the Commonwealth's E-PICS "Instant Check System" to quickly verify that Plaintiffs are not disqualified from exercising Second Amendment rights and issue a LTCF immediately thereafter.

68.  Philadelphia Defendants require LTCF applicants to provide documents and other materials that are not necessary for them to determine if an applicant is "disqualified from exercising Second Amendment rights."

69.  The Philadelphia Defendants have the ability to accept and use other forms of payment beyond the single method allowed by their GPU. ("A recently purchased $20.00 money order that is valid for at least 1 year or longer is the only form of payment that will be accepted. (Payable to "City of Philadelphia")." GPU Directions, *supra*.

70.  For example, requests to Philadelphia Defendants for copies of police reports, "[a]cceptable forms of payment are cash, money order, business or bank check payable to the City of Philadelphia." *See* https://www.phila.gov/records/PoliceFire/Traffic_Accident_Reports.html.

71.  On information and belief, Philadelphia Defendants also accept common credit and debit cards for payments for other services.

72.  Following their prior closure, it was not until July 8, 2020 that the GPU began to accept calls to make appointments for LTCF services, which, on

information and belief, were restarted by Philadelphia Defendants in a limited capacity on or about July 22, 2020.

73.   It has been reported that the Philadelphia Defendants' GPU was unable to schedule LTCF application appointments for any time sooner than six or more months into the future.

74.   Journalist Stephen Gutowski, writing for The Washington Free Beacon, published an article on September 22, 2020, that recounted an individual attempting to contact the Philadelphia Defendants' GPU for ten (10) straight days before being able to schedule an LTCF initial application appointment for January 19, 2021.[10]

75.   In that same article, Gutowski reported that he interviewed another individual who told him that they were told by Philadelphia Defendants' GPU it would be a full calendar year before their GPU would be able to schedule an LTCF initial application appointment.

76.   On information and belief, the Philadelphia Defendants and their GPU cause such delays and burdens on a regular basis.

77.   Indeed, because the Philadelphia Defendants treat the right to keep and bear arms as a second-class right, singled out for special—and specially

---

[10] *See* https://freebeacon.com/coronavirus/philadelphia-residents-face-months-long-wait-to-apply-for-gun-carry-permits/.

unfavorable—treatment, Plaintiffs and members of the public who are required to communicate with and use the GPU in order to access their fundamental, individual right to bear arms in public are provided with limited or no access and inadequate services, thus delaying and/or denying access to and further burdening their rights.

78.   Moreover, on information and belief, Philadelphia Defendants' policies and practices cause: 1) their GPU to have less staff, resources, and capabilities than necessary to timely provide constitutionally required services that are necessary to access and exercise a fundamental, individual right; 2) their GPU to add burden far beyond what is required to determine if the applicant is "disqualified from exercising Second Amendment rights"; and 3) their GPU to treat the GPU's firearm-related services dis-favorably compared to the Philadelphia Defendants' other services, thus making the right to keep and bear arms a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees" that is "singled out for special—and specially unfavorable—treatment."

### *Facts Specific to Plaintiff Fetsurka*

79.   The foregoing paragraphs are incorporated herein as if set forth in full.

80.   Plaintiff Fetsurka is not disqualified from exercising Second Amendment Rights.

81.    Plaintiff Fetsurka:

    a.    Is a United States citizen;

    b.    Is over the age of 21;

    c.    Is not under indictment;

    d.    Has never been convicted of a felony or misdemeanor crime of domestic violence;

    e.    Has never been convicted of a crime punishable by more than one (1) year;

    f.    Is not a fugitive from justice;

    g.    Is not an unlawful user of, or addicted to, any controlled substance;

    h.    Has not been adjudicated a mental defective or been committed to a mental institution;

    i.    Has not been discharged from the Armed Forces under dishonorable conditions;

    j.    Has never renounced his citizenship; and,

    k.    Is not the subject of a restraining order relating to an intimate partner.

82.    Plaintiff Fetsurka has never been charged with nor convicted of any misdemeanor or felony offense and is not prohibited from possessing firearms and ammunition, nor prohibited from receiving a LTCF under 18 Pa.C.S. § 6109(e).

83. Plaintiff Fetsurka intends and desires to lawfully carry a loaded, operable handgun on his person, in public, including for purposes of self-defense and in case of confrontation.

84. Plaintiff Fetsurka intends and desires to acquire a LTCF from the Philadelphia Defendants.

85. As a result of the Philadelphia Defendants' policies and enforcement practices, including their closure of their GPU, Plaintiff Fetsurka is precluded from applying for and obtaining a LTCF and therefore is subject to the carry restrictions specified in 18 Pa.C.S. §§ 6106, 6107, and 6108, which Defendants are actively enforcing and thereby, *inter alia*, preventing him from carrying a loaded, operable handgun on his person, in public, and in case of confirmation, for all lawful purposes including self-defense.

86. Plaintiff Fetsurka is currently employed as a range safety officer, where he is responsible for ensuring the safety of individuals using the firearms range at his place of employment.

87. Prior to being employed as a range safety officer, Mr. Fetsurka was a member of the United States Army, where he honorably served for twelve years as a combat medic.

88. Throughout his time in the Army, Mr. Fetsurka held permits to carry handguns in Georgia, Colorado, North Carolina, and Texas. These permits have since lapsed as he is no longer a resident of those states.

89. Since about May 2020, and with the violent mobs and riots which consumed many cities across the United States, including Defendant Philadelphia, Plaintiff Fetsurka has become particularly concerned about his safety, especially when he is outside of his home in public.

90. Plaintiff Fetsurka moved to Defendant Philadelphia in or about in December 2019.

91. Due to a strict time off policy and work schedule than ran Monday through Fridays, Mr. Fetsurka was unable to get to Philadelphia Defendants' GPU prior to its closure in March 2020, which lasted for a period of approximately four months and five days.

92. Plaintiff Fetsurka learned in or about August 2020 that Defendants' GPU was operational and attempted to call in order to schedule an appointment.

93. In or about August 2020, Plaintiff Fetsurka was able to establish contact with an individual at Defendants GPU only to be informed that there was no availability for an appointment to apply for a LTCF until "next year."

94. Plaintiff Fetsurka accepted an appointment date of September 15, 2021, over a year from the date of his phone call.

95.  In or about October 2020, Mr. Fetsurka received a phone call from an unknown individual at Defendants' GPU stating that they had an opening on November 19, 2020 at 10:30 AM.

96.  Mr. Fetsurka confirmed he would take that appointment slot.

97.  On or about November 18, 2020, Mr. Fetsurka received another phone call from an unknown individual at Defendants' GPU during which he was told his November 19, 2020 appointment was canceled and had to be rescheduled.

98.  To date, Plaintiff Fetsurka has been unable to attend an appointment at Defendants' GPU to submit a LTCF application, thereby preventing him from exercising his constitutionally enumerated right to bear arms.

### *Facts Specific to Plaintiff Sieck*

99.  The foregoing paragraphs are incorporated herein as if set forth in full.

100.  Plaintiff Sieck is not disqualified from exercising Second Amendment rights.

101.  Plaintiff Sieck:

   a.  Is a United States citizen;

   b.  Is over the age of 21;

   c.  Is not under indictment;

   d.  Has never been convicted of a felony or misdemeanor crime of domestic violence;

    e.  Has never been convicted of a crime punishable by more than one (1) year;

    f.  Is not a fugitive from justice;

    g.  Is not an unlawful user of, or addicted to, any controlled substance;

    h.  Has not been adjudicated a mental defective or been committed to a mental institution;

    i.  Has not been discharged from the Armed Forces under dishonorable conditions;

    j.  Has never renounced his citizenship; and,

    k.  Is not the subject of a restraining order relating to an intimate partner.

102.  Plaintiff Sieck has never been charged with nor convicted of any misdemeanor or felony offense and is not prohibited from possessing firearms and ammunition, nor prohibited from receiving a LTCF under 18 Pa.C.S. § 6109(e).

103.  Plaintiff Sieck intends and desires to acquire a LTCF from the Philadelphia Defendants.

104.  Plaintiff Sieck intends and desires to lawfully carry a loaded, operable handgun on his person, in public, including for purposes of self-defense and in case of confrontation.

105.   As a result of the Philadelphia Defendants' policies and enforcement practices, including their closure of their GPU, Plaintiff Sieck is precluded from applying for and obtaining a LTCF and therefore is subject to the carry restrictions specified in 18 Pa.C.S. §§ 6106, 6107, and 6108, which Defendants are actively enforcing and thereby, *inter alia*, preventing him from carrying a loaded, operable handgun on his person, in public, and in case of confirmation, for all lawful purposes including self-defense.

106.   Plaintiff Sieck is employed by a brewery in Philadelphia and considered to be an "essential employee". Because of his work, he must leave his home and travel from his residence to his employer's place of work.

107.   Since about May 2020, and with the violent mobs and riots which consumed many cities across the United States, including Defendant Philadelphia, Plaintiff Sieck has become particularly concerned about his safety, especially when he is outside of his home in public.

108.   During these recent acts of public violence and domestic terrorism, Plaintiff Sieck has become aware that the Target located immediately adjacent to his place of employment that been looted and destroyed not once, but twice, by violent rioters.

109.   Plaintiff Sieck is concerned about the social unrest that plagues Defendant Philadelphia, fears for his safety, and desires and intends to carry a loaded,

operable handgun on his person, in public, for all lawful purposes including self-defense.

110. Plaintiff Sieck wished to apply to the Philadelphia Defendants for a LTCF on or about May 2020, but has been unable to because of the Philadelphia Defendants' policies and enforcement practices, including but not limited to the closure of their GPU, extreme backlog of appointments to just submit an application, GPU's lack of adequate staff and processing timeliness, and other such burdens and delays.

111. On information and belief, Plaintiff Sieck could not have obtained an appointment to even submit an application to obtain a LTCF and begin the Philadelphia Defendants' application process until at least some time in 2021, and perhaps into 2022, even if he had been able to schedule an appointment with their GPU prior to Philadelphia Defendants' most recent closure of the GPU, thereby preventing him from exercising his constitutionally enumerated right to bear arms.

### The Controlling Constitutional Text, and the History and Tradition that Informs It

112. The United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II.

113. The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or

immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

114. The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805 (Thomas, J., concurring).

115. "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008). "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35.

116. In *Heller*, the Supreme Court also held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

117. This is " 'a natural right which the people have reserved to themselves, confirmed by the Bill of Rights,' " *Heller*, 554 U.S. at 594 (quoting A Journal of the Times: Mar. 17, NEW YORK JOURNAL, Supp. 1, Apr. 13, 1769).

118. And the meaning of the right during the founding-era—which the high court

has commanded must still control today—"unambiguously" "refer[red] to the carrying of weapons outside of an organized militia." *Id.* at 584. It is clear that, "[a]t the time of the founding, as now, to 'bear' meant to "carry." *Id.*

119. *Heller* commands that the fundamental right to *bear* arms for self-defense and in case of confrontation—as part and parcel of "the natural right of resistance and self-preservation," *Heller*, 554 U.S. at 594—is of particular importance when it comes to ensuring citizens' ability to carry *handguns* for such purposes, because the court explicitly recognized the handgun as "the quintessential self-defense weapon" in this country and that any complete prohibition against their carry and use is necessarily invalid. *Id.* at 629.

120. *Heller* mandates that the constitutionality of restrictions on the rights enshrined in the Second Amendment must be scrutinized under the text of the Constitution itself, looking to the history and tradition to inform its original public meaning. The high court has directed the analysis be "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731). We look to "the historical background of the Second Amendment" because "it has always been widely understood that the Second Amendment, like the First and Fourth

Amendments, codified a pre-existing right." *Id.* at 592.

121. The U.S. Supreme Court in *Heller* held that to "bear arms" means to "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *District of Columbia et al. v. Heller*, 554 U.S. 570, 584 (2008) (quoting *Muscarello v. United States*, 524 U.S. 125 at 143) (internal quotations omitted).

122. Throughout American history, arms carrying was a right as to all peaceable citizens. Sometimes, it was even a duty. *See e.g.*, David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 573–577, 587 (2019) (listing statutes requiring arms carrying by members of the general public to travel, work in the fields, work on roads and bridges, attend church, and attend court).

123. Historically, under the Constitution's relevant history and tradition, only dangerous persons have historically been acceptably deprived of the right to bear arms. Peaceable persons have always been free to carry arms for self-defense and other lawful purposes. *See generally* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020).

124. The tradition of disarming violent and dangerous persons was practiced from medieval England through mid-20th century America, but there is no tradition of disarming nonviolent people like Plaintiffs Fetsurka and Sieck, and those similarly situated. *Id.*

125. No laws requiring government permission for American citizens to carry a firearm existed before the twentieth century—including at the time of the ratification of the Second Amendment in 1791. What laws did exist were indisputably unconstitutional, as they were the product of racist views long since abandoned as antithetical to the core purposes of the rights guaranteed all citizens under the Constitution. As the high court declared in *Brown v. Board of Ed.,* 347 U.S. 483, n. 5 (1954), quoting *In re Slaughter-House Cases*, 1873, 16 Wall. 36, 67-72:

> [The Fourteenth Amendment] 'ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society,

lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race.'.

126. When the Supreme Court of North Carolina upheld the "Act to prevent Free Persons of Colour from carrying Fire-arms" in 1844, its opinion was based on the now clearly untenable rationale that "Free people of color in this State are not to be considered as citizens, in the largest sense of the term, or, if they are, they occupy such a position in society, as justifies the legislature in adopting a course of policy in its acts peculiar to them—so that they do not violate those great principles of justice, which lie at the foundation of all laws." *State v. Newsom*, 27 N.C. 250, 250 (1844).

127. Defendants' laws, policies, and practices are, in pedigree, substance, and effect, the same kind of racist regulations that prevented African-American freedmen from exercising their right to keep and bear arms under Jim Crow and similar suspect-class-based restrictions.

### *The Defendants' Impermissible Infringement of the Right to Bear Arms*

128. As detailed above, nothing in the text itself nor the applicable history or tradition of the Second or Fourteenth Amendments supports the infringement and burdens that the enforcement of Defendants' laws and policies impose on the ability of law-abiding citizens, like Plaintiffs and those similarly situated, to otherwise lawfully and peaceably carry loaded handguns for all lawful

purposes, including self-defense in case of confrontation, in the exercise of their fundamental right to bear arms.

129. Taken together, Defendants' enforcement of their policies, laws, and regulations amounts to a total ban on Plaintiffs, Plaintiffs' members and supporters, and those who are similarly situated right to bear loaded, operable handguns on their person in public for all lawful purposes including self-defense and in case of confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles.

130. Plaintiffs, Plaintiffs' members and supporters, and those similarly situated are forced to choose between compliance with the law in order to avoid prosecution which, if convicted, would result in a lifetime prohibition on the exercise of their Second Amendment right or to "unlawfully" carry a firearm for self-defense as guaranteed by the Second Amendment of the United States Constitution.

## COUNT ONE
## DEPRIVATION OF CIVIL RIGHTS
## RIGHT TO KEEP AND BEAR ARMS
## U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983
### *(Plaintiffs v. Defendants)*

131. Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

132. There is an actual and present controversy between the parties.

133.   42 U.S.C. § 1983 prohibits state actors from depriving a person of federal constitutional rights under color of state law.

134.   The Second Amendment states that "the right of the people to keep and bear arms shall not be infringed."

135.   The Supreme Court has held that the right to keep and bear arms is a fundamental right, the core of which is for self-defense.  *Heller*, 554 U.S. at 581.

136.   In *Heller*, the U.S. Supreme Court defined "bear arms" as to "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584.

137.   In *McDonald*, the Supreme Court held that the Second Amendment is incorporated as applicable to the states through the Fourteenth Amendment. 561 U.S. at 791; *Id*. at 806 (Thomas, J., concurring).

138.   The Supreme Court has made clear the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms as among those fundamental rights *necessary* (i.e., essential) to our system of ordered liberty, *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010), and as a privilege and immunity of citizenship, *id*. at 805 (Thomas, J., concurring).

139. "The very enumeration of the [Second Amendment] right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 635 (emphasis in original).

140. The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S., at 780, and it cannot "be singled out for special—and specially unfavorable—treatment." *Id.* at 778–79.

141. The Constitution elevates Plaintiffs' rights above Defendants' convenience or administrative concerns. "[T]he prospect of additional administrative inconvenience has not been thought to justify invasion of fundamental constitutional rights." *Carey v. Population Servs. Int'l*, 431 U.S. 678, 691 (1977).

142. And "it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963).

143. The Defendants' laws, policies, enforcement practices, and customs challenged herein that individually and collectively violate the constitutional right to bear arms are not longstanding, have no historical pedigree, and are not rooted in our Nation's traditions.

144. Defendants' laws, policies, and enforcement practices prevent law-abiding individuals not prohibited from possessing or acquiring firearms from carrying loaded, operable firearms on their person in public for all lawful purposes including self-defense and in case of confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles.

145. Defendants' laws, policies, and enforcement practices are more extensive than necessary and are not the least restrictive means of addressing the carriage of firearms by persons who are disqualified from exercising Second Amendment rights under state and/or federal laws.

146. In *Heller*, the Supreme Court declared unconstitutional the District of Columbia's laws that, *inter alia*, prevented Mr. Heller from having a handgun on his person that was "operable for the purpose of immediate self-defense." 554 U.S. at 635.

147. By preventing legally eligible adults, like and including Plaintiffs, Plaintiffs' members and supporters, and others similarly situated to them, from bearing arms as they are constitutionally entitled, Defendants have violated the Plaintiffs' rights protected under the Second and Fourteenth Amendments and denied them those arms for the purpose of immediate self-defense and all lawful purposes.

148.  Plaintiffs and other adults like them have been and will continue to be subject to the Defendants' laws, policies, and enforcement practices which deny access to, exercise of, and violates their right to bear arms, including but not limited to the right to immediate self-defense in case of confrontation.

149.  As to all claims made in a representative capacity herein, there are common questions of law and fact that substantially affect the rights, duties, and liabilities of many similarly-situated Pennsylvania and Philadelphia residents and visitors who knowingly or unknowingly are subject to the Defendants' laws, regulations, policies, and enforcement practices at issue.

150.  Defendants' laws and enforcement policies, practices, and customs preventing legally eligible individuals from bearing loaded, operable handguns on their person in public for all lawful purposes including self-defense and in case of confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles violates the enumerated, fundamental, individual right to bear arms.

151.  Defendants have and will continue to enforce their laws, policies, practices, and customs against Plaintiffs, Plaintiffs' members and supporters and similarly situated persons.

152.  Plaintiffs reasonably fear that Defendants will enforce against them their laws and Defendants' related enforcement policies, practices, and customs.

153.  Plaintiffs thus seek declaratory, preliminary, and permanent injunctive relief, as this action involves matters of substantial public interest.

154.  The Second and Fourteenth Amendments to the United States Constitution guarantee adult citizens of States their fundamental right to keep and bear arms, both in the home and in public places, including but not limited to while on public streets, sidewalks, and spaces or in a motor vehicle.

155.  The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty, and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

156.  The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire, keep, and carry loaded, operable handguns on their person in public for all lawful purposes including self-defense and in case of confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles.

157.  Plaintiffs Fetsurka and Sieck are law-abiding citizens who are not disqualified from exercising their rights under the Second Amendment.

158.  Plaintiffs Fetsurka and Sieck desire to obtain a LTCF so that they would be exempt from the restrictions, criminal sanctions, and penalties imposed by Pa.C.S. §§ 6106, 6107, and 6108, and thus lawfully carry a loaded, operable

handgun on their person, in public and in motor vehicles, for self-defense and all lawful purposes.

159.  Plaintiffs Fetsurka and Sieck meet all the eligibility requirements for the issuance of a LTCF as provided for by 18 Pa.C.S. § 6109(e).

160.  Plaintiffs Fetsurka and Sieck, Plaintiff FPC's members and supporters, and those similarly situated to them, wish to exercise their fundamental, individual right to bear arms and would, but for Defendants' laws, policies, and enforcement practices and reasonable fear of enforcement, including but not limited to arrest, prosecution, loss of liberty, and lifetime loss of their enumerated right to keep and bear arms should they be convicted of an offense under 18 Pa.C.S. §§ 6106, 6107, and 6108.

161.  Philadelphia Defendants, and their PPD, are, by and through their policies and enforcement practices of closing the GPU, and/or limiting or inadequately providing GPU staff and other resources, and/or limiting the public's access to their rights through the GPU, and/or dis-favorably treating the GPU and its services relative to other units and services, singling out the fundamental, individual right to keep and bear arms for "special—and specially unfavorable—treatment." *McDonald v. City of Chicago*, 561 U.S. 742, 779 (2010).

162. Philadelphia Defendants, and their PPD, have and are currently enforcing laws and policies denying law-abiding adult citizens in Philadelphia their fundamental, individual right to bear arms, including but not limited to by their closure and restrictions placed upon the GPU, severe and undue delays in the acceptance and processing of LTCF applications, severe and undue burdens in the acceptance and processing of LTCF applications, and the enforcement of 18 Pa.C.S. §§ 6106, 6107, and 6108, which prevents those individuals from carrying a loaded, operable handgun on their person, in public on public streets, sidewalks, and spaces and in motor vehicles, in case of confrontation, and for the purpose of immediate self-defense.

163. As a result of Philadelphia Defendants' GPU closure policy, and active and continuing enforcement of that policy, Plaintiffs Fetsurka and Sieck cannot apply for and be issued a LTCF.

164. By operation of 18 Pa.C.S. § 6109(b), an otherwise qualified, law-abiding individual, including Plaintiffs Fetsurka and Sieck, may not make an application for a LTCF with a sheriff of another county that has not ceased to process LTCF applications.

165. As a result of Defendants Outlaw and City's active enforcement of their laws and policies, Plaintiffs Fetsurka and Sieck cannot apply for and timely be issued a LTCF under 18 Pa.C.S. § 6109, therefore subjecting Plaintiffs and

others like them to the restrictions specified in 18 Pa.C.S. §§ 6106, 6107, 6108, Phila. Code § 10-818(2), and Directive 5.27, which Defendants have at all relevant times enforced, and are actively enforcing today.

166. Plaintiffs Fetsurka and Sieck would acquire a LTCF for lawful purposes, including self-defense, in order to be exempt from the Defendants' criminal laws and associated penalties, but cannot due to Philadelphia Defendants' active enforcement of their laws and policies, including but not limited to the GPU closure, treating the GPU and the services it provides as "non-essential," limited and/or inadequate public access to the GPU, limited and/or inadequate resources provided to the GPU, and their refusal to institute an online LTCF permitting system, like Permitium's PermitDirector, such that it cannot timely accept and process applications for and issue LTCFs under 18 Pa.C.S. § 6109.

167. Plaintiffs Fetsurka and Sieck, Plaintiff FPC's members and supporters, and similarly situated members of the public who do not currently possess a valid LTCF cannot lawfully carry handguns, in any manner (i.e., openly or concealed), in Defendant City of Philadelphia because of the Defendants' laws, policies, and active enforcement of them.

168. Plaintiffs Fetsurka and Sieck, Plaintiff FPC's members and supporters, and similarly situated members of the public cannot lawfully carry handguns, in

any manner, outside of Defendant City of Philadelphia because of Defendant Evanchicks' laws, policies, and active enforcement of them.

169. Plaintiffs Fetsurka and Sieck wish to, but have abstained from, carrying a loaded, operable handgun on their person, in public and in motor vehicles, in case of confrontation, and for the purpose of immediate self-defense, for fear of arrest, prosecution, incarceration, and/or fine under Defendants' laws and their enforcement of them.

170. Plaintiffs Fetsurka and Sieck reasonably fear arrest and prosecution for exercising their rights by carrying a loaded, operable handgun on their person outside the home, in public, because of the Defendants' laws, policies, and active enforcement of them.

171. Defendant Evanchick is responsible for the formulation, issuance, and/or implementation of the Commonwealth's laws, policies, practices, and customs at issue in this case.

172. Defendant Evanchick has and continues to enforce the Commonwealth's laws, policies, customs, and practices against Plaintiffs and is in fact presently enforcing and threatening to enforce the challenged laws, policies, customs, and practices against Plaintiffs and others like them.

173. Philadelphia Defendants, and their PPD, have and continue to enforce the challenged laws, policies, customs, and practices against Plaintiffs and are in

fact presently enforcing and threatening to enforce the challenged laws, policies, customs, and practices against Plaintiffs and others like them.

174. Plaintiff FPC has an associational interest in defending and asserting the rights of their members and similarly situated members of the public against Defendants' laws, policies, and enforcement practices.

175. Because of Defendants' laws, policies, and enforcement practices complained of herein, Plaintiff FPC has had to expend time and resources to review and investigate Defendants' laws, policies, and enforcement practices, and respond to public inquiries made to it by members of the public seeking information and advice on how to exercise their right to bear arms and legal remedies, thereby causing damages and diversion of resources that FPC could have used to engage in other efforts and programs.

176. Defendants' laws, policies, and enforcement practices target and impact normal, legally eligible adults who are constitutionally entitled to bear, carry, and lawfully use arms for all lawful purposes, including self-defense, in public.

177. Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the Commonwealth of Pennsylvania, including Plaintiffs Fetsurka and Sieck, all

similarly situated members and supporters of Plaintiff FPC, and all other similarly situated individuals, through their enforcement and implementation of the Commonwealth's laws and regulations.

178. Philadelphia Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the Commonwealth of Pennsylvania, including Plaintiffs Fetsurka and Sieck, all similarly situated members and supporters of Plaintiff FPC, and all other similarly situated individuals, through their enactment and enforcement of the City's laws, policies, practices, and customs, including but not limited to the criminal laws banning carry of firearms, the closure of the GPU, the GPU's appointment scheduling and other delaying policies, the lack of resources dedicated to the GPU sufficient for it to perform its duties and provide constitutionally necessary services, their policy treating the GPU as "non-essential" and "second class" to other City services, their refusal to provide alternative means of accepting and processing LTCF applications and issuing LTCF licenses, unnecessary and severe burdens on applicants, delays, and other such policies and practices, which have denied, and will continue to deny and prevent by criminal sanction, the exercise of the fundamental right

to bear arms in public for self-defense and in case of confrontation unless and until redressed through the relief Plaintiffs seek herein.

179.   Plaintiffs have incurred nominal damages, attorney fees, and costs as a direct result of Defendants' laws and policies, and their enforcement of them, as well as filing and prosecuting the present action.

180.   42 U.S.C. § 1983 creates a cause of action against state and local government actors who deprive individuals of federal constitutional rights under color of state law.

181.   Defendants' laws, policies, practices, customs, and ongoing enforcement of them violates the rights of Plaintiffs Fetsurka and Sieck, Plaintiff FPC's members and supporters, and similarly situated members of the public, are thus causing injury and damage actionable under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant, as follows:

a)   A declaratory judgment that Philadelphia Defendants' policies and practices treating constitutionally necessary firearm-related services as "non-essential" or "second class" to other City services is unconstitutional under the Second and Fourteenth Amendments to the United States Constitution

b)  An order temporarily, preliminary, and permanently restraining and enjoining Philadelphia Defendants' policies and practices  of treating constitutionally necessary firearm-related services as "non-essential" or "second class" to other City and/or Police Department services;

c)  A declaratory judgment that Defendants' laws, regulations, policies, enforcement practices, and actions individually and collectively prevent Plaintiffs, Plaintiffs' members and supporters, and similarly situated individuals not prohibited from acquiring and possessing firearms and ammunition, from carrying loaded, operable firearms, including handguns, on their person, in public and in their vehicles, for all lawful purposes including self-defense, and violate the right to keep and bear arms protected under Second and Fourteenth Amendments to the United States Constitution;

d)  An order temporarily, preliminary, and permanently restraining and enjoining Defendants and their officers, agents, servants, employees, all persons in concert or participation with them, and all who have notice of the injunction, from enforcing Defendants' laws, regulations, policies, enforcement practices, and actions that individually and collectively prevent Plaintiffs, Plaintiffs' members and supporters, and similarly situated individuals not prohibited from acquiring and possessing firearms and ammunition, from

carrying loaded, operable firearms, including handguns, on their person, in public and in their vehicles, for all lawful purposes including self-defense;

e)  An order requiring Philadelphia Defendants', their Police Department, and their respective units, employees, officers, and agents, and all those with such powers delegated to them, to accept applications for a LTCF at all times during normal business hours, and require Defendants Outlaw and City of Philadelphia, their Police Department, and their respective units, employees, officers, and agents, and all those with such powers delegated to them to process such applications and immediately issue a LTCF to Plaintiffs Fetsurka and Sieck, and to similarly situated members of Plaintiff FPC and the public upon application as soon as they can submit their information to Defendant Evanchick's Pennsylvania Instant Check System (PICS) E-PICS system and confirm that they are not "disqualified from exercising Second Amendment rights";

f)  An order requiring Philadelphia Defendants' to provide one or more alternative electronic means for the submission and processing of LTCF applications;

g)  Nominal damages against Defendant Outlaw;

h)  All other and further legal and equitable relief, including injunctive relief, against Defendants as necessary to effectuate the Court's judgment, and/or as the Court otherwise deems just and equitable; and,

i)   Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other

    applicable law.

                               Respectfully Submitted,


| | |
|---|---|
| | /s/ Adam Kraut |
| William Sack | Adam Kraut |
| Attorney Id. No. 325863 | Attorney Id. No. 318482 |
| FIREARMS POLICY COALITION | FIREARMS POLICY COALITION |
| 1215 K Street, 17th Floor | 1215 K Street, 17th Floor |
| Sacramento, CA 95814 | Sacramento, CA 95814 |
| (916) 596-3492 | (916) 476-2342 |
| wsack@fpclaw.org | akraut@fpclaw.org |
| | |
| Joshua Prince, Esq. | Raymond M. DiGuiseppe |
| Attorney ID: 306521 | THE DIGUISEPPE LAW FIRM, P.C. |
| CIVIL RIGHTS DEFENSE FIRM, P.C. | 4320 Southport-Supply Road |
| 646 Lenape Rd | Suite 300 |
| Bechtelsville, PA 19505 | Southport, NC 28461 |
| 888-202-9297 ext. 81114 | P: 910-713-8804 |
| 610-400-8439 | E: law.rmd@gmail.com |
| Joshua@Civilrightsdefensefirm.com | *App. for Pro Hac Vice Forthcoming* |