# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **KEITH FETSURKA,** et al., | : |
| Plaintiffs | : |
| | : Case No. - 2:20-cv-05857 |
| **v.** | : |
| **DANIELLE OUTLAW, et al.,** | : |
| Defendants | : |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# Table of Contents

**Introduction** ...........................................................................................................1

**Background** ..............................................................................................................2

   I.   A LTCF IS AN ABSOLUTE NECESSITY FOR ALL ORDINARY LAW-ABIDING CITIZENS TO LAWFULLY EXERCISE THEIR RIGHT TO BEAR ARMS IN PHILADELPHIA. .............................................................................................2

   II.  PHILADELPHIA DEFENDANTS' LAWS, POLICIES, AND ENFORCEMENT PRACTICES DENY, DELAY, AND SEVERELY BURDEN THE CONSTITUTIONAL RIGHT TO BEAR ARMS. ......................................................................................................4

   III. THE DIRECT AND CONTINUING INJURY TO PLAINTIFFS' FUNDAMENTAL RIGHTS. ...........................................................................................................7

**Argument** ..............................................................................................................10

   I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................................10

     A.  The Second Amendment Protects the Right of Ordinary, Law-Abiding Philadelphians to Carry Firearms Outside the Home for Self-Defense. ...11

     B.  Especially Given Defendant Evanchick's Broad Criminal Bans on Carry, Philadelphia Defendants' Infringements of the Fundamental Right to Bear Arms for Self-Defense Are Categorically Unconstitutional. ...................17

     C.  The Challenged Regulations Fail Any Level of Heightened Scrutiny. ......19

        1.  Under the two-prong analysis, strict scrutiny should apply. ..................19

        2.  The challenged laws, policies, and enforcement practices are unconstitutional under intermediate scrutiny. ......................................20

   II.  PLAINTIFFS HAVE AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT PRELIMINARY INJUNCTIVE RELIEF....................................................22

   III. THE OTHER EQUITABLE FACTORS FAVOR THE ISSUANCE OF A PRELIMINARY INJUNCTION....................................................................................................23

   IV. THE COURT SHOULD WAIVE THE BOND, OR SET IT AT A NOMINAL AMOUNT.24

**Conclusion**............................................................................................................24

# Table of Authorities

## Cases

*ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008) ....................................................20

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ...............................................13

*Borough of Palmyra, Bd. of Educ. v. F.C. Through R.C.*, 2 F. Supp. 2d 637 (D.N.J. 1998) ...................................................................................................................24

*Brown v. Board of Ed.,* 347 U.S. 483 (1954) ..........................................................14

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ...............................21, 22

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) .................................................16

*Castle Rock v. Gonzales*, 545 U.S. 748 (2005) ..........................................................1

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................passim

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) .......................................................1, 16

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857) ..........................................15

*Elliott v. Kiesewetter*, 98 F.3d 47 (3d Cir. 1996) ...................................................24

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................................23

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ...........................11

*In re Slaughter-House Cases*, 1873, 16 Wall. 36 ....................................................14

*Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017) .................................23

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99 (3d Cir. 2013) ......23

*Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971) .......................................................23

*McCullen v. Coakley*, 573 U.S. 464 (2014) ....................................21, 22

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)........................passim

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)............................passim

*Nunn v. State*, 1 Ga. 243 (1846) ...............................................17

*Pileggi v. Aichele*, 843 F.Supp.2d 584 (E.D. Pa. 2012) .........................10

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017)......................10

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686) ...............................13

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973)..............20

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003)..............................22

*Simpson v. State*, 13 Tenn. 356 (1833)........................................15

*State v. Huntly*, 25 N.C. 418 (1843) ..........................................15

*Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991) ...........................24

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) .........10, 17, 21

*United States v. Sprague*, 282 U.S. 716 (1931)...............................13

*United States v. Virginia*, 518 U.S. 515 (1996)...............................20

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...........................21

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017).............1, 16, 19, 23

**Statutes**

18 Pa.C.S. § 6106 .................................................3, 9, 18, 19

18 Pa.C.S. § 6107 ..................................................3, 18, 19

18 Pa.C.S. § 6108 ...................................................................3, 9, 18, 19

18 Pa.C.S. § 6109 ......................................................................2, 4, 8, 18

18 Pa.C.S. § 6119 ..........................................................................3, 9, 19

18 U.S.C. § 922(g)(1).............................................................................3

53 P.S. § 101 .........................................................................................3

**Other Authorities**

4 WILLIAM BLACKSTONE, COMMENTARIES *180 ....................................13

**Treatises**

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716) ..........13

**Secondary Materials**

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804) ....15

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN
    KENTUCKY 482 (1822) ........................................................................15

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young*
    *Adults*, 43 S. ILL. U. L.J. 495 (2019) ..................................................14

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous*
    *Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020) ...........14

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an*
    *Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991) ..............15

**Ordinances**

Phila. Code § 10-818 ...........................................................................3, 19

Phila. Code § 10-830 ...............................................................................9

Phila. Code § 10-833 .......................................................................3, 9, 19

**INTRODUCTION**

The Second Amendment right "to keep and bear Arms," U.S. CONST. amend. II, guarantees "the individual right to possess and carry weapons in case of confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The text of that provision, as informed by history and tradition, as well as binding precedent, demonstrates that it applies outside the home and places of business, and *guarantees* ordinary law-abiding citizens the right to *bear* arms by carrying a loaded, operable handgun in public for self-defense. Indeed, several federal courts of appeals have held that the Second Amendment protects the right to carry arms outside the home, *Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017); *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012); and the Third Circuit has itself acknowledged that "it is possible to conclude that *Heller* implies such a right," *Drake v. Filko*, 724 F.3d 426, 430 (3d Cir. 2013).

Defendants' laws, policies, and enforcement practices prevent Plaintiffs and other typical law-abiding citizens from exercising their right to bear arms on pain of criminal sanctions, loss of liberty, and the lifetime loss of the Second Amendment rights. And though Plaintiffs and others like them are disarmed by Defendants' laws and policies, even when seconds count, Defendants' police are minutes or hours away, if they come at all—they certainly have no obligation to. *See*, *e.g.*, *Castle Rock v. Gonzales*, 545 U.S. 748 (2005). Defendants' laws, policies, and enforcement practices disarm and leave effectively defenseless the very same people to whom the Constitution guarantees the right to keep and bear arms for self-defense. Under Defendants' laws and policies, typical law-abiding individuals are prohibited from carrying loaded, operable firearms in public in Defendant City of Philadelphia, Pennsylvania, for any reason, including self-defense, unless they have a License to Carry Firearms ("LTCF") under 18 Pa.C.S. § 6109. But Defendants Outlaw and Philadelphia ("Philadelphia Defendants") have enacted, and are currently enforcing, laws and

policies which make LTCF licenses unavailable to Plaintiffs and Plaintiff FPC's members, and other similarly situated members of the public, thus denying them their right to bear arms in violation of the Second and Fourteenth Amendments. The Philadelphia Defendants have and continue to refuse to issue Plaintiffs and other law-abiding citizens a LTCF, both through complete closures of their Gun Permit Unit ("GPU"), by considering firearm-related services "non-essential," and with other policies and practices which severely burden or deny access to the rights at stake. Defendants' laws, policies, and enforcement practices deny and infringe upon the exercise of the right to bear arms. And, under *Heller*, their infringements are impermissible. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636.

Because the possession of a LTCF is the *only* mechanism through which ordinary law-abiding Philadelphians may lawfully exercise their constitutionally protected right to bear arms in public, Defendants may not both ban the carry of loaded handguns under its criminal laws and place the only exemption to those laws for typical law-abiding citizens like Plaintiffs—a LTCF—out of reach. One or the other must give. The constitutional injuries here are as real as they are undeniable. This Court should temporarily restrain and preliminarily enjoin Defendants from continuing to perpetuate the irreparable harms that are increasing every minute of every hour.

## BACKGROUND

**I.**   **A LTCF IS AN ABSOLUTE NECESSITY FOR ALL ORDINARY LAW-ABIDING CITIZENS TO LAWFULLY EXERCISE THEIR RIGHT TO BEAR ARMS IN PHILADELPHIA.**

In Pennsylvania, it is a serious crime for a typical law-abiding citizen to carry a loaded firearm in any vehicle "or concealed on or about his person, except in his place of abode or fixed place of business" without a valid LTCF. 18 Pa.C.S. § 6106(a)-(b). Moreover, without a LTCF, it is also a crime for a law-abiding person to carry a firearm "at any time upon the public streets or

upon any public property" within the City of Philadelphia, 18 Pa.C.S. § 6108, because it is a "city of the first class," 53 P.S. § 101. The Commonwealth separately and additionally criminalizes any carrying of a firearm "upon the public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive" unless the person has a LTCF. 18 Pa.C.S. § 6107(a). Any violation of the prohibitions established for individuals in Philadelphia and carrying a loaded firearm in public during a state of emergency constitutes a misdemeanor of the first degree, 18 Pa.C.S. § 6119, conviction for which will result in a loss of liberty and a lifetime ban on and disqualification from the exercise of Second Amendment rights—forever—under federal law, 18 U.S.C. § 922(g)(1).

Pennsylvania Governor Tom Wolf has caused the Commonwealth to be in a constant state of emergency since January 10, 2018. Consequently, for almost three years now, Philadelphians have been subjected to a trifecta of criminal laws acting against their right to bear arms, as all three of the State's major criminal statutes targeting the exercise of such rights are and remain simultaneously in effect. On top of this, the Philadelphia Defendants separately proscribe the "carry [of] a firearm upon the public streets or upon any public property at any time" by typical law-abiding individuals unless they are licensed to carry firearms under 18 Pa.C.S. § 6109. Phila. Code § 10-818 (2),(a).[1] The Philadelphia Defendants additionally criminally ban the carry of firearms "within one hundred (100) feet of" a school, including but not limited to while walking or driving. Phila. Code § 10-833 (2).[2] And the Philadelphia Defendants have a manual of policies and practices that serve "as a standard of conduct for all [police] personnel. It consists of the rules,

---

[1] *See also* the GPU's "LICENSE TO CARRY FAQs" at https://bit.ly/ppd-ltcf-faqs.
[2] There are at least 342 schools in the City of Philadelphia. https://bit.ly/phila-sch-facts. In a City of approximately 142 square miles, there are, at least, an average of 2.4 schools per square mile located alongside the City's sidewalks and roadways that Plaintiffs and others regularly travel for lawful reasons—and have a right to lawfully bear arms while doing so.

policies, and procedures which are necessary for the consistent and professional operation of the Philadelphia Police Department," online at http://www.phillypolice.com/accountability. According to the Philadelphia Defendants' Directive Index, Philadelphia Defendants have and are currently enforcing a policy on "Firearms" as set forth in their "Directive 5.27" (effective 10-31-01 and last updated 09-22-10) ("Directive 5.27"). Under Directive 5.27, "It is the responsibility of all members of the Philadelphia Police Department to ensure that all laws and regulations pertaining to the carrying of concealed firearms are properly enforced." Thus, under Directive 5.27, "all members of the Philadelphia Police Department" must enforce "all laws and regulations pertaining to the carrying of" handguns against individuals, including Plaintiffs Fetsurka and Sieck, Plaintiff FPC's members and supporters, and similarly situated members of the public.

II.  **PHILADELPHIA DEFENDANTS' LAWS, POLICIES, AND ENFORCEMENT PRACTICES DENY, DELAY, AND SEVERELY BURDEN THE CONSTITUTIONAL RIGHT TO BEAR ARMS.**

By their design, Philadelphia Defendants' LTCF process is severely burdensome, complicated, and lengthy, subjecting applicants to unnecessary costs and delays throughout the process, during which time law-abiding citizens are needlessly, totally, and unconstitutionally denied their fundamental, individual right to bear arms in public. As more specifically detailed in the Complaint, ¶¶ 54-70, even though Philadelphia Defendants utilize alternative electronic forms of communication and transmitting information which are accessible to the public at all times (e.g., the Internet, web-based electronic forms, email, text messaging, etc.) in providing other public services, they force LTCF applicants to utilize only *paper*-based application materials (even including "(1) Color Photo 2" x 2" (inch) Passport Type" rather than a digital photograph) and *in-person* procedures during *limited* business hours when many citizens are at work and unable to go to the Gun Permit Unit ("GPU"). Fetsurka Decl. ¶¶ 21. And this is true despite the existence of alternative means of accepting and processing applications, such as a readily available, entirely

online platform proven to be an effective and efficient means of processing LTCF applications in several counties within the Commonwealth.[3] Defendant Evanchick and the Pennsylvania State Police further provide the Philadelphia Defendants with E-PICS, an online background check system, at https://epics.pa.gov/Pics. The Philadelphia Defendants' policies and practices delay the process, unnecessarily burden applicants, and go far beyond what is required for them to determine if an applicant for a LTCF is "disqualified from exercising Second Amendment rights," *Heller*, 554 U.S. 570 at 635.

It is evident through reports[4] and publications that the Philadelphia Defendants have policies and enforcement practices that have and continue to neglect the GPU's constitutionally required public services, leave the GPU severely understaffed and underfunded, and cause severe delays and other burdens upon applicants. Writing for The Washington Free Beacon, Stephen Gutowski reported on September 22, 2020, that another prospective LTCF applicant in Philadelphia attempted contacting the Philadelphia Defendants' GPU for ten straight days, only to be relegated to an initial appointment on January 19, 2021—about four months later—when he finally reached the GPU.[5] Gutowski further reported that someone else he interviewed about the "months-long wait to apply for gun-carry permits" said GPU personnel told him that "he would have to wait at least a year for an appointment." *Id.* These well-known and documented policies

---

[3] *I.e.*, Permitium's PermitDirector online LTCF platform, https://permitium.com/products.html.
[4] On the popular website REDDIT, one prospective GPU applicant stated that, after "calling the gun permit unit numbers continuously since 8am this morning," "I took the earliest appointment time of January 11th 2021. That's almost 6 months from now." *See* https://www.reddit.com/r/PAguns/comments/hyrg36/philly_ltcf_woes. On August 11, 2020, another person posted the following message on the Pennsylvania Firearm Owners Association forum: "Just managed to finally get a human on the phone after days of busy signals. Got my appointment time for May 2021." *See* https://forum.pafoa.org/showthread.php?t=363525.
[5] *See* https://freebeacon.com/coronavirus/philadelphia-residents-face-months-long-wait-to-apply-for-gun-carry-permits/.

and practices evince that the Philadelphia Defendants treat the right to bear arms as a mere "second-class right." Combs Decl. ¶ 15.

Worse, the Philadelphia Defendants have completely shuttered their GPU twice this year. Earlier this year, the Philadelphia Defendants closed their GPU for four months and five days (March 17, 2020 through July 22, 2020). Fetsurka Decl. ¶ 24, Sieck Decl. ¶¶ 19-20. During this time, no one in Philadelphia could submit an application for or receive a LTCF, and therefore no typical law-abiding person in Philadelphia who did not already have a LTCF could lawfully exercise the right to bear arms through carrying a handgun or any other firearm in public for self-defense. When the GPU was finally allowed to re-open in July—on an inadequate and insufficient basis—appointments for the *submission* of a LTCF application were delayed six or more months into the future, as illustrated through the public reports and declarations cited herein.

And now, continuing their pattern and practice of denying, delaying, and severely burdening the rights of law-abiding people, the Philadelphia Defendants have closed their GPU again, once more completely eliminating the only way for law-abiding citizens to carry loaded, operable firearms on their person, in public, for self-defense. Just days ago, on or about November 18, 2020, a public notice posted at the GPU announced in pertinent part: "ATTENTION!!! Keeping in accordance with the Mayor's announcement to halt all non-essential City government operations, in order to reduce the spread of the COVID-19 coronavirus the Gun Permit Unit will remain closed until further notice." Compl. ¶ 48. During that first closure, and now again during this latest one, the Philadelphia Defendants refused to provide any alternative means of applying for, processing, and issuing LTCFs. Indeed, they are—again—treating access to and exercise of the right to bear arms as "non-essential," singling that fundamental right "out for special—and specially unfavorable—treatment." *McDonald v. City of Chicago*, 561 U.S. 742, 778-79 (2010).

Consequently, all ordinary, law-abiding Philadelphians who do not have a valid LTCF are *completely* prohibited from *even applying* for a LTCF—and exercising their rights—"until further notice." Not only is their policy and enforcement practice affecting new applicants, even those whose applications *were already approved* before the closure are *indefinitely* barred from being issued the LTCF since the GPU will not issue them their license until after "the unit begins operation again."[6] Philadelphia Defendants' unconstitutional laws, policies, and enforcement practices cannot be allowed to be enforced any longer.

## III. THE DIRECT AND CONTINUING INJURY TO PLAINTIFFS' FUNDAMENTAL RIGHTS.

Plaintiffs Fetsurka and Sieck are typical law-abiding residents of Philadelphia who are not disqualified from exercising Second Amendment rights, are fully eligible for a LTCF under 18 Pa.C.S § 6109, and require a LTCF in order to lawfully carry a loaded, operable firearm on their person in public for lawful purposes including self-defense, as they are guaranteed under the Constitution's Second and Fourteenth Amendments. Fetsurka Decl. ¶ 6; Sieck Decl. ¶ 6. Plaintiffs Fetsurka and Sieck wish to acquire a LTCF from the Philadelphia Defendants. Fetsurka Decl. ¶ 45; Sieck Decl. ¶ 31. Plaintiffs Fetsurka and Sieck are especially concerned about their safety in public because of the recent civil unrest, violent protests, riots, and looting in the City of Philadelphia. Fetsurka Decl. ¶ 14; Sieck Decl. ¶ 14. Indeed, a large department store immediately adjacent to Plaintiff Sieck's place of employment has been "looted and destroyed" *twice* in recent months. Sieck Decl. ¶ 18. Plaintiffs Fetsurka and Sieck are not exempt from Defendant Evanchick's laws, policies, and enforcement practices applying the Commonwealth's criminal laws banning the carry of firearms generally, in Philadelphia specifically, and during states of emergency. Plaintiffs Fetsurka and Sieck are not exempt from the Philadelphia Defendants' laws,

---

[6] Plaintiffs note too that the Philadelphia Defendants *could* utilize U.S.P.S. mail or some other common carrier to send an issued LTCF to the approved applicant but *refuse* to do so.

policies, and enforcement practices applying the City's criminal laws banning the carry of firearms generally and also within 100 feet of schools. Because of the Philadelphia Defendants' laws, policies and enforcement practices, neither Plaintiffs Fetsurka and Sieck, nor any other similarly situated Philadelphians, can acquire a LCTF to be exempt from the prosecutorial hammer of the Commonwealth's and City's criminal laws.

Plaintiff Fetsurka's experience with the Philadelphia Defendants' LTCF application process *before* their latest closure of the GPU is emblematic of Defendants' general practices and patterns of imposing severe delays and burdens that substantially delay and/or deny issuance of the necessary LTCF license, and which chill exercise of the right to bear arms by discouraging residents from applying for a license they may not ultimately acquire for months or longer. When Plaintiff Fetsurka contacted the GPU in August 2020 to schedule the initial application appointment necessary to initiate the LTCF process, the Philadelphia Defendants' GPU set his appointment for September 15, 2021—almost an entire year later. Fetsurka Decl. ¶¶ 25-29. Sometime in October 2020, someone within the GPU contacted Plaintiff Fetsurka and stated that an appointment had opened up for November 19, 2020. *Id.* at ¶ 31. He took that appointment, but then, on November 18, 2020, he received another call from the GPU advising him that his appointment was canceled and must be rescheduled. *Id.* at ¶¶ 32-33. To date, Plaintiff Fetsurka has been unable to attend an appointment at Philadelphia Defendants' GPU to submit his application for a LTCF. *Id.* at ¶ 35.

The Philadelphia Defendants' laws, policies, and enforcement practices deny and severely burden the right to bear arms, preventing Plaintiffs, Plaintiff FPC's members and supporters, and all similarly situated Philadelphians from lawfully exercising their rights. But for enforcement of Defendants' laws, policies, and enforcement practices, Plaintiffs Fetsurka and Sieck would carry

loaded, operable firearms on their person in public for lawful purposes including of self-defense. Fetsurka Decl. ¶ 52; Sieko Decl. ¶ 38. Plaintiffs Fetsurka and Sieck refrain from doing so only because of their reasonable fears of arrest and prosecution under 18 Pa.C.S. §§ 6106-6108 and 6119, which subject them not only to criminal sanctions in the form of incarceration and fines, but also a lifetime ban on the exercise their Second Amendment rights upon conviction, as well as the Philadelphia Defendants' criminal prohibitions under Philadelphia Code §§ 10-830(2) and 10-833(s), and their Directive 5.27. Fetsurka Decl. ¶ 52; Sieko Decl. ¶ 38.

Plaintiff Firearms Policy Coalition, Inc. is a 501(c)(4) non-profit organization incorporated under the laws of Delaware. Combs Decl. ¶ 3. The purposes of FPC include defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty, and restoring freedom. Combs Decl. ¶ 5. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. Combs Decl. ¶ 6. FPC has members who reside in Pennsylvania. Combs Decl. ¶ 8. Some of those Pennsylvania members—including Plaintiffs Fetsurka and Sieck—are law-abiding residents of Philadelphia who do not have a LTCF, are subject to the Commonwealth's and City's criminal laws prohibiting carry of firearms in public, and wish to carry loaded firearms in public for lawful purposes including self-defense, and would do so forthwith but for the challenged laws, policies, and enforcement practices. Combs Decl. ¶ 9. FPC's members and supporters in Philadelphia have been adversely and directly harmed by Defendant's enforcement of the laws, regulations, policies, practices, and customs challenged herein. Combs Decl. ¶ 10. Plaintiff FPC represents the interests of all its members and supporters who, like Plaintiffs Fetsurka and Sieck, are completely prohibited, on pain of criminal punishment and permanent deprivation of Second Amendment

rights, from carrying firearms in public in Philadelphia for lawful purposes including self-defense. Because of Defendant's enforcement of the laws, regulations, policies, practices, and customs challenged herein, FPC has suffered a diversion of resources to identify and/or counteract the unlawful actions, as well as a frustration of the organization's mission. Combs Decl. ¶ 12.

## ARGUMENT

Preliminary injunctive relief is appropriate and should be granted pending this Court's ruling on the merits of their claim so long as the facts and circumstances demonstrate (1) a likelihood of success on the merits and (2) a prospect of irreparable injury if the injunction is not granted. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). In addition, "the district court . . . should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* "The standard for granting a temporary restraining order under Federal Rule of Civil Procedure 65 is the same as that for issuing a preliminary injunction." *Pileggi v. Aichele*, 843 F.Supp.2d 584, 592 (E.D. Pa. 2012). Here, as is already apparent from the factual and legal background outlined above, all four factors strongly favor such preliminary injunctive relief and a temporary restraining order.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

As Plaintiffs show herein, Defendants' laws, policies, and enforcement practices fail *Heller*'s categorical test. Notwithstanding the foregoing, the Third Circuit has established "a two-pronged approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). "First, [courts] ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee . . . . [Second,] [i]f it does, [they]

evaluate the law under some form of means-end scrutiny."[7] *Id.* Here, the Second Amendment's text, as it may be informed by history and tradition, uniformly shows that the Second Amendment squarely protects the rights of ordinary, law-abiding individuals to carry loaded, operable firearms in public for self-defense. And Defendants' individual and collective laws and policies denying, severely delaying, and otherwise needlessly burdening the exercise of this right—including but not limited to Philadelphia Defendants' closure of their GPU, setting LTCF appointments months into the future, and refusing to use alternative means of accepting and processing licenses—are flatly unconstitutional under any test. Because these laws and actions severely burden the right to keep and bear arms for self-defense, they should be subject to strict scrutiny, which Defendants' laws, policies, and enforcement actions cannot survive. But because they are so clearly repugnant to the Constitution and have no reasonable fit with their governmental interests, they unquestionably fail intermediate scrutiny as well. Thus, plaintiffs are likely to succeed on the merits.

> A. **The Second Amendment Protects the Right of Ordinary, Law-Abiding Philadelphians to Carry Firearms Outside the Home for Self-Defense.**

The United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II. The Second Amendment is fully applicable to the States and local governments through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805 (Thomas, J., concurring). "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District*

---

[7] Plaintiffs reserve the right to argue for categorical *per se* invalidation of Defendants' laws, policies, and enforcement practices, an approach consistent with that employed by the Supreme Court in *Heller. See also Heller v. District of Columbia*, 670 F.3d 1244, 1271–85 (D.C. Cir. 2011) (*Heller II*) (Kavanaugh, J., dissenting).

*of Columbia v. Heller*, 554 U.S. 570, 634 (2008). And "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-35.

The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). Because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d  933, 936 (7th Cir. 2012). Interpreting the Second Amendment as confined to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text altogether, for the right to keep arms standing alone would be sufficient to protect the right to have arms in the home.

The U.S. Supreme Court in *Heller* held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. This is " 'a natural right which the people have reserved to themselves, confirmed by the Bill of Rights,' " *Heller*, 554 U.S. at 594 (quoting A Journal of the Times: Mar. 17, NEW YORK JOURNAL, Supp. 1, Apr. 13, 1769). And the meaning of the right during the founding-era—which the high court has commanded must still control today—"unambiguously" "refer[red] to the carrying of weapons outside of an organized militia." *Id.* at 584. It is clear that, "[a]t the time of the founding, as now, to 'bear' meant to "carry." *Id.*

As *McDonald v. City of Chicago* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. 742, 767 (2010) . And because the need for self-defense may *arise* in public, it has long been recognized that the right to self-

defense may be *exercised* in public. Thus, "[i]f any person attempts a robbery or murder of another, *or* attempts to break open a house in the night time, . . . and shall be killed in such attempt, the slayer shall be acquitted and discharged." 4 WILLIAM BLACKSTONE, COMMENTARIES *180 (emphasis added). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), likewise explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to rob or murder him," 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716). And because the right to self-defense was understood to extend beyond the home, the right to *armed* self-defense naturally was as well. Accordingly, by the late seventeenth century the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686).

*Heller* commands that the fundamental right to *bear* arms for self-defense and in case of confrontation—as part and parcel of "the natural right of resistance and self-preservation," *Heller*, 554 U.S. at 594—is of particular importance when it comes to ensuring citizens' ability to carry *handguns* for such purposes, because the court explicitly recognized the handgun as "the quintessential self-defense weapon" in this country and that any complete prohibition against their carry and use is necessarily invalid. *Id.* at 629. And *Heller* mandates that the constitutionality of restrictions on the rights enshrined in the Second Amendment be scrutinized under the text of the Constitution, looking to the history and tradition to inform its original meaning. The high court has directed the analysis be "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). We look to "the historical background of the Second Amendment"

because "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *Id.* at 592.

Throughout American history, arms carrying in public was a right as to all peaceable citizens. Sometimes, it was even a duty. *See e.g.*, David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 573–577, 587 (2019) (listing statutes requiring arms carrying by members of the general public to travel, work in the fields, work on roads and bridges, attend church, and attend court). Historically, under the Constitution's relevant history and tradition, only dangerous persons have been acceptably deprived of the right to bear arms. Peaceable persons have always been free to carry arms for self-defense and other lawful purposes. *See generally* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020). The tradition of disarming violent and dangerous persons was practiced from medieval England through mid-20th century America, but there is no tradition of disarming nonviolent people like Plaintiffs and those similarly situated. *Id.* No laws generally requiring government permission for American citizens to carry a firearm in public existed before the twentieth century—including at the time of the ratification of the Second Amendment in 1791. What laws did exist were indisputably unconstitutional, as they were the product of racist views long since abandoned as antithetical to the core purposes of the rights guaranteed all citizens under the Constitution. *Brown v. Board of Ed.,* 347 U.S. 483, n. 5 (1954) (quoting *In re Slaughter-House Cases*, 1873, 16 Wall. 36, 67-72).

Early American courts and commentators clearly understood that the right to bear arms extended outside the home. James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON,

THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). As another commentator explained, "in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also State v. Huntly*, 25 N.C. 418, 422–23 (1843); *Simpson v. State*, 13 Tenn. 356, 359–60 (1833).

For decades before the Civil War, the southern States had schemed at every turn to prevent their enslaved and free black populations from bearing arms. *See* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) (discussing laws in various states which denied "freed negroes" the right to keep and bear arms). Indeed, Chief Justice Taney recoiled from recognizing African Americans as citizens in the infamous *Dred Scott* case precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857). The Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See McDonald*, 561 U.S. at 770–77. Congress's efforts culminated in the adoption of the Fourteenth Amendment, which ensured the right of every American, regardless of race, to "bear arms for the defense of himself and family and his homestead." CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also McDonald*, 561 U.S. at 775–76.

Confining the right to keep and bear arms to the home would also be at war with judicial precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Moore*, 702 F.3d at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person

or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *id.* at 584 (alteration in original) (quoting *Muscarello*, 524 U.S. at 143 (Ginsburg, J., dissenting)). *Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a *general* right to bear arms in public; otherwise there would be no need to identify these or any other exceptions. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id.* at 612; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (vacating state court ruling that the Second Amendment does not protect the right to carry a stun gun in public).

In *Drake v. Filko*, the Third Circuit "decline[d] to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home," choosing instead to assume for the sake of analysis that the Amendment has "some application beyond the home." 724 F.3d 426, 431 (3d Cir. 2013). The Third Circuit's decision not to draw any firm conclusions itself does not undermine the existence of such a right. Its assumption that the right does apply outside the home is entirely consistent with the Supreme Court's precedents in *Heller* and *McDonald* and with the persuasive authority from other federal courts. Two circuit courts have directly held that the Second Amendment right to armed self-defense does not end at the doorstep. *See Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017), and *Moore v. Madigan*, 702 F.3d at 935, 942. And *no* federal court of appeals has held that the Amendment *does not* apply outside the home.

As announced by its own "prefatory" clause, the Second Amendment was designed in part "to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the

home would be ill-suited to "rearing up and qualifying a well-regulated militia," *id.* at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), for citizens prohibited from carrying arms in public simply could not act as the militia at all. Of course, the militia was not "the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 599. Hunting obviously cannot be conducted by those bearing arms within their homes. And the same reasoning applies with even more force to the right to self-defense—"the *central component*" of the Second Amendment, *id.* at 599, which "is as important outside the home as inside," *Moore*, 702 F.3d at 942. Indeed, according to 2019 nationwide data from the Bureau of Justice Statistics, less than a third of violent crimes occur in or near the victim's home.[8]

The Constitution's text, our Nation's history and tradition, and Supreme Court precedents show that the average, law-abiding person has a fundamental, individual right to bear arms in public for self-defense. Philadelphia Defendants' laws, policies, and practices—including their closure of the GPU, preventing Plaintiffs and others from acquiring a LTCF under 18 Pa.C.S § 6109—coupled with Defendant Evanchick's laws and enforcement practices subjecting all ordinary, law-abiding residents who do not already have a LTCF to criminal sanctions for violations of 18 Pa.C.S §§ 6106, 6107, and 6108, prevent Plaintiffs and all similarly situated people from carrying firearms on their person in public, and thus unquestionably burden "conduct falling within the scope of the Second Amendment's guarantee." *Marzzarella*, 614 F.3d at 89.

### B. Especially Given Defendant Evanchick's Broad Criminal Bans on Carry, Philadelphia Defendants' Infringements of the Fundamental Right to Bear Arms for Self-Defense Are Categorically Unconstitutional.

Given that the Second Amendment protects the rights of ordinary law-abiding Philadelphians to carry loaded, operable firearms for self-defense in public and outside the home,

---

[8] Bureau of Justice Statistics, *Percent of violent victimizations by location of incident, 1993-2019*, (Nov. 11, 2020), generated using the NCVS Victimization Analysis Tool at www.bjs.gov.

*Heller* makes the next analytical steps clear. Because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon," Defendants' laws, policies, and enforcement practices—including Philadelphia Defendants' closure of their GPU, imposing severe delays and unnecessary burdens, and refusing other means of accepting and processing applications and payments—preventing Plaintiffs and law-abiding individuals like them from exercising their right to carry a handgun in public are *per se* invalid.

*Heller* requires categorical invalidation of infringements that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court expressly considered and rejected an invitation to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," 554 U.S. at 689–90 (Breyer, J., dissenting), holding instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* had "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

The complete deprivation of any ability to apply for, much less hope to soon obtain, the license necessary to avoid the severe criminal consequences imposed by 18 Pa. C.S. §§ 6106, 6107, 6108, and 6119 is just as extensive and categorical as the one struck down in *Heller*. Except for those favored few who fall into one of Pennsylvania's atypical exceptions for law-enforcement officers, military personnel, and the like, *see* 18 PA. C.S. § 6106(b), *all* typical law-abiding Philadelphia citizens who do not already have a LCTF—like and including Plaintiffs Fetsurka and

Sieck, and Plaintiff FPC's members who are similarly situated—are, at present, *flatly prohibited* from carrying an operable firearm in public for self-defense. *Compare Heller*, 554 U.S. at 575 n.1 (noting that D.C.'s ban contained "minor exceptions"), *with id.* at 636 (categorically invalidating the ban anyway). Even if, *arguendo*, Pennsylvania were *not* under a state of emergency declared by Governor Wolf, Philadelphia Defendants decision to close their GPU without providing any alternative for Philadelphia County residents to apply for a LTCF presents the same prohibition— namely, that if the individual does not have a valid LTCF, they are *flatly prohibited* from carrying an operable firearm in public for self-defense in the City of Philadelphia. *See* 18 Pa.C.S. §§ 6106, 6108; *see also* Phila. Code §§ 10-818(2), 10-833(2).

In short, the Second Amendment takes Philadelphia Defendants' policies and political preferences "off the table," 554 U.S at 636, including and especially those treating the constitutionally necessary services their GPU provides as "non-essential" and not important enough to properly staff and execute, singling out the right to carry firearms in public for self-defense as a second-class right subjected to "special—and specially unfavorable—treatment," *McDonald*, 561 U.S. at 778-79. Because Defendants' actions effect a *complete ban* on protected Second Amendment conduct, *Heller*'s categorical approach applies and the Defendants' laws and policies are categorically unconstitutional. *See Wrenn*, 864 F.3d at 665 (striking down flat ban on carrying arms categorically despite circuit precedent applying levels-of-scrutiny analysis in other Second Amendment cases); *Moore*, 702 F.3d at 942 (same).

### C. The Challenged Regulations Fail Any Level of Heightened Scrutiny.

#### 1. Under the two-prong analysis, strict scrutiny should apply.

Under the two-pronged approach the Third Circuit has applied in other Second Amendment cases, if tiered scrutiny is applied, the challenged laws, policies, and enforcement actions should be evaluated under strict scrutiny. As the Supreme Court has explained, "strict judicial scrutiny

[is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). The right at stake here is unquestionably *fundamental* in being considered "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. Defendants' actions in effecting a total ban on this right to promote their policy and political preferences stand no chance of surviving strict scrutiny. *See ACLU v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008) ("To survive strict scrutiny analysis, a statute must: (1) serve a compelling governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of advancing that interest."). Because *Heller* forecloses rational basis review, Plaintiffs undertake further analysis using intermediate scrutiny since, as Defendants' laws and enforcement practices cannot survive that test, they necessarily fail under strict scrutiny as well.

2. **The challenged laws, policies, and enforcement practices are unconstitutional under intermediate scrutiny.**

Ultimately, the challenged laws, policies, and enforcement practices preventing Plaintiffs and law-abiding citizens from lawfully carrying a handgun in public are unconstitutional under intermediate scrutiny. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of an important government objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* Under this test, the government need not demonstrate the restriction constitutes "'the least restrictive or least intrusive means of serving its interests,' [citation], 'but it must, in some meaningful way, demonstrate that alternative measures that burden substantially less [protected conduct] would fail to achieve the government's interests.'" *Bruni v. City of Pittsburgh*, 824 F.3d

353, 369 (3d Cir. 2016) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) & *McCullen v. Coakley*, 573 U.S. 464, 495 (2014), respectively).[9]

While the Defendants may claim a generalized public safety interest regarding the carry of firearms by dangerous convicted criminals and the adjudicated mentally ill, and Philadelphia Defendants may claim a generalized interest in protecting and preserving the public safety and welfare with restrictions related to the COVID-19 pandemic (even assuming a principal motivation behind their challenged actions was to curb the spread of this disease), they cannot carry their burden of demonstrating substantially less burdensome restrictions "would fail" to achieve the same ends. Indeed, as discussed above and detailed in the Complaint, an entirely online program for processing carry license applications already exists and has been proven effective not only in numerous other states with similar licensing schemes but in 13 counties in Pennsylvania which use it to process LTCF applications. And the Philadelphia Defendants have and use other means of communicating with the public, including Internet-based forms, electronic PDF documents, e-mail, and even text messaging. The idea that a *complete and total shutdown* of the process city-wide in Philadelphia is a truly necessary means of addressing concerns about in-person contacts at the GPU because any other means *would fail* to do so is unfounded in light of the readily available alternatives for processing applications efficiently and safely through electronic methods. And even if the Philadelphia Defendants did not already have ample means of providing alternatives to complete closures and stoppages of services, they could still accept applications sent by U.S. Mail, common carriers such as UPS, FedEx, or DHL, courier service, or even a secure drop box. There

---

[9] While these cases specifically concern restrictions on free speech, "we look to other constitutional areas for guidance in evaluating Second Amendment challenges," "the First Amendment is the natural choice," and thus "the structure of First Amendment doctrine should inform our analysis of the Second Amendment." *U.S. v. Marzzarella*, 614 F.3d at 89.

is no evidence that the Philadelphia Defendants *even considered* these alternatives—which is alone

fatal under intermediate scrutiny. *McCullen*, 573 U.S. at 495; *see also Bruni v. City of Pittsburgh*,

824 F.3d 353, 371 (3d Cir. 2016).

At the very least, the Philadelphia Defendants cannot demonstrate in any *meaningful way*

that their wholesale stoppage of the processing of LTCF applications bears any real relation, much

less a necessary one, to the generalized interest in promoting public safety during this pandemic—

especially when they cannot even credibly demonstrate that the now well-established safety

protocols for  preventing the spread of the virus during in-person contacts (face masks, social

distancing, sanitizers, gloves, etc.) would not adequately meet concerns about continuing with the

burdensome paper-based, in-person application process that they themselves have irrationally

established.

Even if the specific nature of the present emergency is set aside, the challenged actions still

fail. Far from becoming somehow *less* important during a time of disaster or upheaval, these

periods of crises are when the rights secured by the Second Amendment *are needed most*. "The

Second Amendment is a doomsday provision," *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir.

2003) (Kozinksi, J., dissenting from denial of rehearing en banc), designed to enable ordinary

citizens to protect themselves and their families when all else fails. It is thus precisely during an

emergency—when the social fabric is strained, and law-enforcement resources are stretched thin

by the urgent need to address the crisis immediately at hand—that law-abiding citizens must be

able to act as they indeed are—*their own* first, and perhaps only, responder.

## II.    PLAINTIFFS HAVE AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT PRELIMINARY INJUNCTIVE RELIEF.

The conclusion that Plaintiffs have a probability of success on their constitutional claims

compels the conclusion that Plaintiffs face continuing irreparable injury in the absence of

injunctive relief. It is well-accepted that the deprivation of a constitutional right constitutes irreparable harm. *See, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013); *see also* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). The Third Circuit has recognized this rule in the context of a variety of constitutional rights. *See, e.g.*, *K.A. ex rel. Ayers*, 710 F.3d at 113 (First Amendment); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971) (Fourth Amendment). Rights under the Second Amendment are no different. *McDonald*, 561 U.S. at 780; *Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011).

## III. THE OTHER EQUITABLE FACTORS FAVOR THE ISSUANCE OF A PRELIMINARY INJUNCTION.

The public interest and balance of equities likewise favor Plaintiffs. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), for "the enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel. Ayers*, 710 F.3d at 114; *see Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017) ("[I]f a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."); *see also Wrenn*, 864 F.3d at 667. The public-safety *costs* of preventing ordinary law-abiding Philadelphians from engaging in effective self-defense in public are substantial. In the leading study on the issue, the National Self-Defense Survey, "indicate[s] that each year in the U.S. there are about 2.2 to 2.5 million [defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." NATIONAL

RESEARCH COUNCIL, *supra*, at 103. Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that the challenged actions may well *harm* the public safety. On the other side of the scale, the challenged actions could offer little, if any, demonstrable benefit to the public because they cannot be justified as necessary much less effective in preserving the public safety given the far less restrictive alternatives available in either maintaining the same application process with the now-standard safety protocols for in-person contacts and/or by migrating to online application procedures proven effective for conducting these programs in general and the LCTF application program specifically.

## IV. THE COURT SHOULD WAIVE THE BOND, OR SET IT AT A NOMINAL AMOUNT.

The Third Circuit has recognized that the district court may dispense with the normal requirement that the court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991). In "noncommercial cases" such as this one, the court should "balance the equities" implicated by the request for an injunction, *Elliott v. Kiesewetter*, 98 F.3d 47, 59–60 (3d Cir. 1996), and "should also consider whether the applicant seeks to enforce a federal right and, if so, whether imposing the bond requirement would unduly interfere with that right," *Borough of Palmyra, Bd. of Educ. v. F.C. Through R.C.*, 2 F. Supp. 2d 637, 646 (D.N.J. 1998). Here, any injunction would not financially harm the Defendants, while imposing a more than *de minimis* bond would unduly interfere with Plaintiffs' Second Amendment Rights. Plaintiffs should therefore not be required to post security or should be required to post only a nominal amount of one dollar (U.S. Currency).

## CONCLUSION

For all these reasons, this Court should enjoin Defendants from enforcing Defendants' laws, policies, and enforcement practices which individually and/or collectively prohibit Plaintiffs

and other similarly situated law-abiding adults from exercising the Second Amendment right to carry loaded, operable firearms in public for lawful purposes, including self-defense.

Dated: November 23, 2020

Respectfully submitted,

s/ Adam Kraut_____

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com
*Appearing Pro Hac Vice*

Adam Kraut
Attorney Id. no. 318482
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 476-2342
E: akraut@fpclaw.org

Attorneys for Plaintiffs