Adam Kraut
Attorney Id. No. 318482
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 476-2342
E: akraut@fpclaw.org

William Sack
Attorney Id. No. 325863
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: wsack@fpclaw.org

Joshua Prince, Esq.
Attorney Id. No. 306521
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
P: 888-202-9297 ext. 81114
F: 610-400-8439
E: Joshua@Civilrightsdefensefirm.com

Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com
*Appearing Pro Hac Vice*

Attorneys for Plaintiffs

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEITH FETSURKA;** | : | Civil Rights Complaint |
| **TIMOTHY SIECK;** | : | 42 U.S.C. § 1983 |
| **NICOLAS DEFINA;** | : | |
| **ANDREW SCOTT;** and, | : | |
| **FIREARMS POLICY** | : | |
| **COALITION, INC.,** | : | |
| Plaintiffs | : | |
| | : | |
| **v.** | : | Case No. – 2:20-cv- 05857 |
| | : | |
| **DANIELLE OUTLAW,** | : | |
| Philadelphia Police Commissioner; | : | |
| **CITY OF PHILADELPHIA,** | : | |
| **PENNSYLVANIA;** and, | : | |
| **COL. ROBERT EVANCHICK,** | : | |
| Commissioner of Pennsylvania | : | |
| State Police, | : | |
| Defendants | : | |

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs Keith Fetsurka, Timothy Sieck, Nicolas Defina, Andrew Scott, and Firearms Policy Coalition, Inc., on behalf of themselves and those similarly situated, by and through their attorneys, Adam Kraut and William Sack of Firearms Policy Coalition, Inc., Joshua Prince of Civil Rights Defense Firm, P.C., and Raymond M. DiGuiseppe of The DiGuiseppe Law Firm, P.C., and complain of Defendants Philadelphia Police Commissioner Danielle Outlaw, the City of Philadelphia, Pennsylvania, and Pennsylvania State Police Commissioner Colonel Robert Evanchick as follows:

## INTRODUCTION

1.  The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST., AMEND. II. When the People, by enacting that amendment, enshrined in their Nation's fundamental charter the right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense," *District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008), they did not mean to leave the freedom to exercise that right at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*.

2

2.      In *Heller*, the U.S. Supreme Court held that to "bear arms" includes the "carry
[of a firearm] ... in a pocket, for the purpose ... of being armed and ready for
offensive or defensive action in a case of conflict with another person." 554
U.S. at 584. Plaintiffs Keith Fetsurka, Timothy Sieck, Nicolas Defina,
Andrew Scott, (collectively, the "individual Plaintiffs"), and Plaintiff
Firearms Policy Coalition's similarly situated members and supporters, wish
to exercise their fundamental, constitutionally guaranteed right to carry
loaded, operable firearms on their person, outside their homes, while in public
and in motor vehicles, for lawful purposes including immediate self-defense.
But because of the Defendants' laws and policies they have been and continue
to actively enforce today, they cannot.

3.      The Commonwealth of Pennsylvania broadly prohibits the carrying of loaded
firearms by ordinary citizens in public for self-defense, including in
Defendant City of Philadelphia, unless they have a valid license to carry a
firearm under 18 Pa.C.S. § 6109 ("LTCF"). 18 Pa.C.S. § 6106.

4.      That is especially so during declared states of emergency, when the
Commonwealth further prohibits all carry of firearms in public unless a person
has a valid LTCF. 18 Pa.C.S. § 6107. Because of three declarations of
emergency by Governor Tom Wolf, Pennsylvania has been in a state of
emergency since 2018.

5.      Since this action was filed, Governor Wolf vetoed an act passed by the
Commonwealth's Legislature, House Bill 1747,[1] that would have lifted the
carry ban under § 6107. Accordingly, despite an express opportunity to
change the State's policy in this limited regard, the Commonwealth's state-
of-emergency-based ban on firearms is firmly fixed into the regulatory
scheme.

6.      Unless a law-abiding person has a valid LTCF, he or she is further specifically
prohibited from carrying firearms in Defendant City of Philadelphia
("Philadelphia") under State law. 18 Pa.C.S. § 6108.

7.      Defendant Philadelphia and Philadelphia Police Commissioner Danielle
Outlaw ("Outlaw") (collectively "Philadelphia Defendants"), through their
Philadelphia Code ("Phila. Code") §§ 10-818, 10-833, Philadelphia Police
Department ("PDD") Directive 5.27, policies, and enforcement practices,
additionally ban the carry of firearms in public unless a person has a valid
LTCF.

8.      State and local governments, whether legislatively or by executive decree,
cannot simply suspend or ignore the Constitution. And they certainly may not

---

[1] HB 1747 is online at https://bit.ly/pa-hb1747. Gov. Wolf's veto message online at
https://bit.ly/pa-hb1747-veto.

use a public health crisis as political cover to impose bans and restrictions on rights they do not like.

9.     Yet, just like New York Governor Andrew Cuomo in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U. S. ____ (2020), 2020 WL 6948354,[2] Defendants have done exactly that—imposing "especially harsh" treatment of the right to bear arms—a total ban—through their enforcement of the Commonwealth's criminal laws prohibiting the carry of firearms without a license as well as Philadelphia Defendants' local policies and practices, including but not limited to the closure of their Gun Permit Unit ("GPU"), that individually and collectively prevent law-abiding adults from exercising their Second Amendment right to bear arms in public.

10.    Recently, Philadelphia Defendants enacted and began enforcing a policy treating their GPU as "non-essential," and completely closing their GPU for at least the second time this year, all while providing the public with access to other City services through alternative means, like U.S. Mail, Internet website forms, email, and even text messaging.

11.    Even when Philadelphia Defendants' GPU is not completely closed, it is woefully understaffed, underfunded, and enforces policies and practices that are designed to, and do, chill, discourage, and severely burden the exercise of

---

[2] Online at https://www.supremecourt.gov/opinions/20pdf/20a87_4g15.pdf.

the right to bear arms, such as through long delays, unnecessary paper-based applications, in-person-only submission of applications, requiring from applicants more than is necessary to determine if they are disqualified from exercising Second Amendment rights and issue a LTCF, refusing alternative forms of payment, and other such practices.

12. Adding further insult to constitutional injury, should an unlicensed person be convicted for exercising his rights by carrying a handgun in public, he would lose his Second Amendment rights under federal law.

13. Indeed, Defendants' laws, regulations, policies, and enforcement practices individually and collectively prevent law-abiding adults like Plaintiffs from exercising their fundamental, individual right to bear loaded, operable handguns outside the home through oppressive criminal statutes combined with a licensing system that is both required and closed to law-abiding people—and even when available, imposes severe delays and burdens upon them.

14. There are "many other less restrictive rules that could be adopted to minimize the risk to those" applying for LTCF licenses, *Roman Catholic Diocese of Brooklyn v. Cuomo*, slip opn. at 2, as well as the GPU's staff, such as through online systems designed to accept and process carry license applications— indeed, such a system has been successfully implemented in many other

counties in Pennsylvania.

15.   But throughout the COVID-19 pandemic, Philadelphia Defendants have stubbornly refused to implement such less restrictive and more rational systems. To this day, in the age of COVID-19, with the ubiquitous forms of electronic communication and information processing through the Internet, email, and Zoom classrooms and video-conference court hearings, they require and accept only paper-based applications and in-person appointments.

16.   Defendants' laws, regulations, policies, and enforcement practices thus violate the right to keep and bear arms expressly protected under the Second and Fourteenth Amendments to the United States Constitution.

17.   Just as "[g]overnment is not free to disregard the First Amendment in times of crisis," *Roman Catholic Diocese of Brooklyn v. Cuomo*, slip opn. at 4 (Gorsuch, J., concurring), the Defendants here cannot ignore the Plaintiffs' fundamental, individual Second Amendment right to bear arms in public for lawful purposes including self-defense.

18.   Plaintiffs, and all typical, law-abiding citizens, have a fundamental, constitutionally guaranteed right to carry loaded, operable firearms on their person, outside their homes, while in public and in motor vehicles, for lawful purposes including immediate self-defense.

19.   Uncertain times such as the present are precisely when Plaintiffs and

7

Plaintiffs' members must be able to exercise their fundamental rights to keep and bear arms. The challenges we all face because of the COVID-19 Coronavirus, social unrest, or other social ills do not, cannot, and must not justify or excuse government infringements upon fundamental human rights.

20.    As our high court just reminded us, "even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo,*, slip opn. at 5 (Gorsuch, J., concurring). "The restrictions at issue here, by effectively barring many from" exercising their right to bear arms, "strike at the very heart of the" Second Amendment's guarantee of liberty. *Id.*

21.    The declaratory and injunctive relief that Plaintiffs have been forced to seek through this action is necessary to uphold this bedrock principle of the United States Constitution.

## **PARTIES**

22.    Plaintiff Keith Fetsurka is a natural person, 39 years of age, a citizen of Philadelphia, Pennsylvania and the United States, and a member of Firearms Policy Coalition.

23.    Plaintiff Timothy Sieck is a natural person, 35 years of age, a citizen of Philadelphia, Pennsylvania and the United States, and a member of Firearms Policy Coalition.

24. Plaintiff Nicolas Defina is a natural person, 27 years of age, a citizen of Philadelphia, Pennsylvania and the United States, and a member of Firearms Policy Coalition.

25. Plaintiff Andrew Scott is a natural person, 31 years of age, a citizen of Philadelphia, Pennsylvania and the United States, and a member of Firearms Policy Coalition.

26. Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a 501(c)(4) non-profit organization incorporated under the laws of Delaware, with a place of business in Sacramento, California. The purposes of FPC include defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC's members reside both within and outside Pennsylvania. FPC represents its members and supporters—who include gun owners, prospective gun owners, licensed firearm retailers, and others—and brings this action on behalf of itself, its members, including the named Plaintiffs herein, and supporters who possess all the indicia of membership. FPC's members have been adversely and directly harmed by Defendant's enforcement of the laws, regulations, policies,

9

practices, and customs challenged herein. Because of Defendant's enforcement of the laws, regulations, policies, practices, and customs challenged herein, FPC has and continues to suffer a diversion of resources to identify and/or counteract the unlawful actions, as well as a frustration of the organization's mission.

27.    Defendant Philadelphia Police Commissioner Danielle Outlaw ("Commissioner Outlaw" or "Outlaw") is the head and Commissioner of Defendant City of Philadelphia, Pennsylvania's Police Department ("PPD"). As Commissioner of the PPD, which includes the City's Gun Permit Unit, Commissioner Outlaw formulates, enacts, and is currently enforcing the City's policies and practices as to applications for and issuance of LTCF, as well as the Commonwealth's and the City's criminal laws. Defendant Outlaw has and continues to enforce laws and policies denying law-abiding adult citizens in Philadelphia their fundamental, individual right to bear arms. Defendant Outlaw is sued in her official capacity.

28.    Defendant City of Philadelphia, Pennsylvania is a municipal corporation incorporated under the laws of the Commonwealth of Pennsylvania. Defendant City is sued under 42 U.S.C. § 1983 because it has enacted and is enforcing laws and policies that deprive, under color of law, Plaintiffs' and

similarly situated persons' federal constitutional rights, privileges, and immunities secured by the Constitution.

29.   The City of Philadelphia Police Department is an agency of the City that is not amenable to suit in its own name.

30.   Defendant Colonel Robert Evanchick ("Evanchick") is the head and Commissioner of the Pennsylvania State Police ("PSP"). As Commissioner of the PSP, Defendant Evanchick, in addition to being responsible for assisting the Pennsylvania Governor in enforcing the laws of the Commonwealth of Pennsylvania, is responsible for the implementation, execution, and administration of the laws, regulations, customs, practices, and policies of the PSP and the Commonwealth, *inter alia*, in relation to the Uniform Firearms Act, 18 Pa.C.S. § 6101, *et seq*. and the Pennsylvania Instant Check System. As Commissioner of the PSP, Defendant Evanchick is presently enforcing the Commonwealth's laws, regulations, customs, practices, and policies complained of in this action, including the Commonwealth's laws on the keeping and bearing of firearms especially, but not limited to, on public roads and in other public places. Defendant Evanchick is sued in his official capacity.

## JURISDICTION AND VENUE

31.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

32.  This action for violation of Plaintiffs' constitutional rights is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees pursuant to 42 U.S.C. § 1988.

33.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Pennsylvania.

## STATEMENT OF FACTS

### *The Commonwealth of Pennsylvania's Regulatory Scheme*

34.  The foregoing paragraphs are incorporated herein as if set forth in full.

35.  The Commonwealth of Pennsylvania generally allows individuals to openly carry firearms[3] without a license. But Pennsylvania has broadly criminalized

---

[3] Under the Uniform Firearms Act ("UFA"), the term "firearm" is generally defined to mean "[a]ny pistol or revolver with a barrel length less than 15 inches, any shotgun with a barrel length less than 18 inches or any rifle with a barrel length less than 16 inches, or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches. The barrel length of a firearm shall be determined by measuring from the muzzle of the barrel to the face of the closed action, bolt or cylinder, whichever is applicable." 18 Pa.C.S. § 6102.

the carrying of loaded concealed firearms in public and in motor vehicles by ordinary citizens unless they have a valid LTCF under 18 Pa.C.S. § 6109.

36.   LTCFs under 18 Pa.C.S. § 6109 are issued "for the purpose of carrying a firearm concealed on or about one's person or in a vehicle throughout [the] Commonwealth."

37.   Except as provided in 18 Pa.C.S. § 6106(a)(2), "any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree." 18 Pa.C.S. § 6106(a)(1).

38.   "A person who is otherwise eligible to possess a valid license under this chapter but carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license and has not committed any other criminal violation commits a misdemeanor of the first degree." 18 Pa.C.S. § 6106(a)(2).

39.   Pennsylvania further prohibits the "carry[ing of] a firearm upon the public streets or upon any public property during an emergency proclaimed by a State

or municipal governmental executive" unless they possess a valid LTCF under 18 Pa.C.S. § 6109. 18 Pa.C.S. § 6107.[4]

40.    Pennsylvania has been under a constant state of emergency, proclaimed by Governor Tom Wolf, since January 10, 2018.[5]

41.    Pennsylvania has been under an additional state of emergency, proclaimed by Governor Wolf, related to COVID-19 since March 6, 2020.[6]

42.    Because of those proclamations by Governor Wolf, 18 Pa.C.S. § 6107 additionally and currently restricts the Plaintiffs, and all those similarly situated, from transporting or carrying firearms in public, and upon public streets and public property, even for lawful purposes, including self-defense.

43.    Governor Wolf vetoed an act passed by the Commonwealth's Legislature, House Bill 1747,[7] that would have lifted the carry ban under § 6107.

---

[4] 18 Pa.C.S. § 6107 further provides that the term "firearm" "includes any weapon that is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of any weapon," a substantially broader definition than that found in 18 Pa.C.S. § 6102.
[5] *See* https://www.governor.pa.gov/newsroom/governor-wolf-declares-heroin-and-opioid-epidemic-a-statewide-disaster-emergency and https://www.governor.pa.gov/newsroom/gov-wolf-signs-8th-opioid-disaster-declaration-renewal-vows-continued-concerted-efforts.
[6] *See* https://www.governor.pa.gov/newsroom/gov-wolf-signs-covid-19-disaster-declaration-to-provide-increased-support-for-state-response.
[7] The text of House Bill 1747 is online at https://bit.ly/pa-hb1747. Gov. Wolf's veto message is online at https://bit.ly/pa-hb1747-veto.

44.     Moreover, the State's statutes further provide that: "No person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless: (1)  such person is licensed to carry a firearm; or (2)  such person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license)." 18 Pa.C.S. § 6108.

45.     Defendant Philadelphia is the only "city of the first class," 53 P.S. § 101 (defining city of the first class to be those which contain a population of one million or more), with a population of approximately ~1,584,000 in 2010.[8]

46.     Arrest and prosecution for unlawfully carrying a firearm under the Commonwealth's statutes could result in serious penalties, including one's imprisonment, loss of liberty, fines, and losing Second Amendment rights for life.[9]

---

[8] U.S. Census Bureau QuickFacts for Philadelphia, Pennsylvania, online at https://www.census.gov/quickfacts/philadelphiacitypennsylvania.

[9] *See* 18 Pa.C.S. §§ 6106(a)(1) (making it a felony of the third degree for an individual to carry a firearm concealed on or about his person, except in his place of abode or fixed place of business without a LTCF) and 6106(a)(2) (grading the same offense as a misdemeanor of the first degree if the individual is eligible to receive a LTCF and has not committed any other criminal violations). *See also* 18 Pa.C.S. § 106(b)(6) (classifying a misdemeanor of the first degree as punishable by a term of imprisonment "of which is not more than five years"), 18 U.S.C. § 921(a)(20) (defining "crime punishable by imprisonment for a term exceeding one year" to include a state law misdemeanor punishable by *more than* two years imprisonment), and 18 U.S.C. § 922(g)(1) (making it unlawful for anyone convicted of a crime punishable for a term exceeding one year to possess firearms

47.     The Commonwealth's statutes further provide that, if an LTCF applicant "is a resident of this Commonwealth, he shall make application with the sheriff of the county in which he resides or, if a resident of a city of the first class, with the chief of police of that city." 18 Pa.C.S. § 6109(b).

48.     Thus, law-abiding individuals like Plaintiffs, Plaintiff FPC's similarly situated members and supporters, and other law-abiding, typical adults residing in Philadelphia can only apply for a LTCF by submitting their application to Philadelphia Defendants.

49.     The Commonwealth has laws restricting access to and possession of firearms by prohibited persons it could enforce with respect to specific proscribed conduct. *See generally* 18 Pa.C.S. § 6105.

### *The City of Philadelphia Defendants' Regulatory Scheme and GPU Policies*

50.     As of 2010, Defendant City of Philadelphia had a population of approximately ~1,584,000 and a land area of approximately 134 square miles.[10]

51.     There are at least 342 schools in Philadelphia.[11]

---

or ammunition). A violation of 18 Pa.C.S. § 6107, pursuant to 18 Pa.C.S. § 6119, is a misdemeanor of the first degree, for which a conviction would prohibit the Plaintiffs, and those similarly situated, from being able to purchase, possess, and utilize firearms and ammunition, pursuant to 18 U.S.C. § 922(g)(1).

[10] U.S. Census Bureau QuickFacts for Philadelphia, Pennsylvania, online at https://www.census.gov/quickfacts/philadelphiacitypennsylvania.

[11] *See*, *e.g.*, https://bit.ly/phila-sch-facts.

52.    In a City of approximately 134 square miles, there are, at least, an average of 2.55 schools per square mile located alongside the City's sidewalks and roadways that Plaintiffs and other law-abiding adults regularly travel for lawful reasons.

53.    According to the U.S. Census Bureau, about 25% of Philadelphians live in poverty.[12]

54.    Philadelphia Defendants have only one GPU office in the entire City, at 660 E. Erie Ave., Philadelphia, Pennsylvania, 19140.

55.    Philadelphia Defendants' GPU is located over five (5) miles from City Hall and the Center City area.

56.    Philadelphia Defendants have and continue to enforce an ordinance that provides: "No person shall carry a firearm upon the public streets or upon any public property at any time unless that person" has a LTCF, is "actively engaged in a defense of his life or property from imminent peril or threat," or is "a police officer or member of the State or Federal militia on active duty." Phila. Code. § 10-818(2).[13]

---

[12] *Id.*

[13] Under Philadelphia Defendant's Code, the term 'firearms' "means any revolver, pistol, rifle, shotgun or other weapon capable of propelling a projectile by means of an explosive material or charge." Phila. Code § 10-818(1).

57.   "The penalty for violation of" Defendant Philadelphia's ban "shall be a fine of not less than three hundred dollars ($300) and imprisonment of not less than ninety days." Phila. Code § 10-818(4).

58.   Philadelphia Defendants have and continue to enforce an ordinance that provides in pertinent part: "No person shall knowingly possess a weapon or knowingly cause a weapon to be present, whether openly or concealed, [] within one hundred (100) feet of, or in any conveyance providing transportation to or from any elementary or secondary publicly-funded educational institution, any elementary or secondary private school licensed by the Pennsylvania Department of Education or any elementary or secondary parochial school." Phila. Code. § 10-833(2).

59.   Philadelphia Defendants also have and continue to enforce an ordinance that provides in pertinent part: "No person shall possess any weapon in any educational institutions except" security guards, law enforcement, military forces on active duty, and the like. Phila. Code § 10-822.

60.   Philadelphia Defendants have a manual of policies and practices that serve "as a standard of conduct for all [police] personnel. It consists of the rules, policies, and procedures which are necessary for the consistent and professional operation of Philadelphia Police Department," online at http://www.phillypolice.com/accountability.

18

61.    According to Philadelphia Defendants' Directive Index, also available at http://www.phillypolice.com/accountability, Philadelphia Defendants have and are currently enforcing a policy on "Firearms" as set forth in "Directive 5.27" (effective 10-31-01 and last updated 09-22-10) ("Directive 5.27").[14]

62.    Under Philadelphia Defendants' Directive 5.27, "It is the responsibility of all members of Philadelphia Police Department to ensure that all laws and regulations pertaining to the carrying of concealed firearms are properly enforced."

63.    Thus, under Philadelphia Defendants' Directive 5.27, "all members of the Philadelphia Police Department" must enforce "all laws and regulations pertaining to the carrying of" handguns against individuals, including individual Plaintiffs, Plaintiff FPC's similarly situated members and supporters, and similarly situated members of the public.

64.    On information and belief, such "laws and regulations" include the Commonwealth's and Philadelphia Defendants' criminal and procedural laws and policies, which include but are not limited to the Commonwealth's and Philadelphia Defendants' general ban on carrying firearms, as well as the requirements that a person acquire a LTCF in order to be exempt from

---

[14] Directive 5.27 is available online at https://www.phillypolice.com/assets/directives/D5.27-Firearms.pdf.

prosecution, fines, and other penalties for carrying a loaded, operable handgun on the person, in public places and motor vehicles.

65.   On information and belief, Defendants and their officers can and do enforce the Commonwealth's laws and regulations, and Philadelphia Defendants' ordinances and directives, including 18 Pa. C.S. §§ 6106–6109, Phila. Code §§ 10-818, 10-820, and 10-833 (with respect to carry within 100 feet of schools), and Philadelphia's Police Department Directive 5.27.

66.   Under Directive 5.27, "All processing of applications for License to Carry Firearms in Philadelphia County is the responsibility of the Gun Permits and Tracking Unit of the Philadelphia Police Department."

67.   Philadelphia Defendants' "Gun Permits and Tracking Unit of the Philadelphia Police Department" is also called the "Gun Permit Unit".[15]

68.   Philadelphia Defendants require individuals to spend hours or days trying to call the GPU on a generally unmanned telephone in order to try and get an appointment to access the GPU's LTCF services.

69.   Philadelphia Defendants do not provide individuals with an online or electronic means of scheduling an appointment.

---

[15] *See, e.g.,* https://www.phillypolice.com/forms/gun-permit-unit/index.html.

70.   Philadelphia Defendants require applicants to schedule an appointment with the GPU months or longer into the future to merely begin the process of applying for a LTCF.

71.   Philadelphia Defendants provide limited to no access to staff and services, impose severe delays, and force applicants to complete a long, burdensome process that may or may not result in the issuance of a carry license because Philadelphia Defendants' policies and practices "decide on a case-by-case basis" whether the applicants' right "*is really worth* insisting upon."

72.   Philadelphia Defendants' GPU last issued its "Instructions for Completion of an Application for a Pennsylvania License To Carry Firearm" on or about October 19, 2020.[16] A copy of this is attached hereto and incorporated herein as Exhibit A.

73.   Philadelphia Defendants' policy is that "Only applicants 21 years of age or older, residing in the county of Philadelphia, may apply for a Pennsylvania license to carry a firearm through Philadelphia Police Department."

74.   Philadelphia Defendants require all LTCF applicants to go, in person, to their only GPU office, only at the date and time of the applicant's appointment, and, because the "Gun Permit Unit will no longer accept walk-up service

---

[16] Online at https://www.phillypolice.com/assets/forms-reports/PALicenseToCarryForm.pdf.

when applying for a license to carry, applications will be done by **APPOINTMENT ONLY**." (Emphasis and capitalization original.)

75.   Philadelphia Defendants require all LTCF applicants to "have an **APPLICATION FILLED OUT COMPLETELY** and **APPLICABLE ITEMS LISTED BELOW** or they will not be accepted." (Emphasis and capitalization original.)

76.   Philadelphia Defendants require that, "[w]hen completed, the entire application must be returned **IN PERSON BY THE APPLICANT** to the above location, on your scheduled Appointment time." (Emphasis and capitalization original.)

77.   Philadelphia Defendants require that LTCF applicants provide their GPU with "A **VALID** Pennsylvania Drivers License or Non-Drivers ID, along with two (2) acceptable forms of proof of residence, all names and addresses must match." (Emphasis and capitalization original.)

78.   Though not required by State law or the PSP's E-PICS system, Philadelphia Defendants' policy is that "**ALL APPLICANTS WILL BE FINGERPRINTED**." (Emphasis and capitalization original.)

79.   Even though the PSP's E-PICS system would show a dishonorable discharge, and thus flag the person as prohibited, Philadelphia Defendants require that in

the case of an applicant who was "previously a member of the Armed Forces, a copy of your discharge papers (DD214) must accompany the application."

80. Philadelphia Defendants require that LTCF applicants who "have had a **NAME CHANGE**, must submit legal documents to show the name change. (i.e., Marriage License, Court Orders)". (Emphasis and capitalization original.)

81. Philadelphia Defendants require that LTCF applicants provide them with the names, addresses, and telephone numbers of two references.

82. Only if "all paperwork is in order" will the applicant then "be interviewed by Gun Permits Unit personnel."

83. And when that "interview is completed, an investigation will be conducted."

84. Philadelphia Defendants' policies and practices are designed to, and do, chill, severely burden, delay, and deny applications for LTCFs.

85. Philadelphia Defendants require all LTCF applicants to make payment with a "recently purchased $20.00 money order that is valid for at least 1 year or longer" ("the only form of payment that will be accepted").

86. Philadelphia Defendants require all LTCF applicants to be interviewed by staff and law enforcement officers so that they can "decide on a case-by-case basis" to grant or deny the application.

87.   Philadelphia Defendants require all LTCF applicants to provide more

information and materials than is required for them to determine if an

applicant is disqualified from exercising Second Amendment rights—since

this can be accomplished by simply inputting the applicant's  information into

the Pennsylvania State Police's Pennsylvania Instant Check System (PICS)

E-PICS system—and even more than required under 18 Pa.C.S. § 6109.

88.   Philadelphia Defendants' GPU "Directions for Completion of Application" [17]

states in pertinent part:

> FIREARMS ARE NOT PERMITTED ON THE
> PREMISES.
>
> INSTRUCTIONS FOR COMPLETION OF AN
> APPLICATION FOR A
>
> PENNSYLVANIA LICENSE TO CARRY FIREARM
>
> DIRECTIONS FOR COMPLETION OF
> APPLICATION
>
> All applications must be completed to their entirety. Do
> not write in the shaded area at the top of the application
> that says "For Use By Issuing Authority". Should a box
> not apply to you, enter "N/A" in that box. DO NOT sign
> and date the application until you are in the presence of a
> member of the Gun Permit Unit when you submit your
> application. The following is a list of common errors made
> by applicants when applying for a License to Carry
> Firearms:

---

[17] Online at https://www.ppd-ltc.com/application-information.

• Box 4 (Middle Name): Full middle name is required, no initials

• Box 16 (Street Address): Enter full street address; If you also have a post office box, enter your PO box as well; This address MUST be the same as what is on your photo identification

• Box 28 (Reason): Check one reason which you would like to have displayed on your License to Carry Firearms; The License covers you for all of the reasons regardless of which reason you choose

• Box 7b (Place of Birth): Enter the city and state in which you were born

• Box 29 (References): List two references who are 21 years of age or older and are of no relation to you; full names, mailing addresses and phone numbers are required

• Box 31 (question regarding citizenship): If you are a registered alien, check "NO" and enter your country of birth, country of citizenship, and alien registration or I-94 number; You must also submit documentation proving your registration

Only applicants 21 years of age or older, residing in the county of Philadelphia, may apply for a Pennsylvania license to carry a firearm through the Philadelphia Police Department. Out of county residents must apply in their county of residence.

If you live out of state and are applying for a Pennsylvania License to Carry Firearms, be sure to bring your driver's license from your state of residence, your license/permit to carry firearms issued by that state, and proof the residency from the state you reside. If you live out of state, are not 21 years of age or older, or do not possess an out-of-state license/permit to carry firearms from your resident

state, you do not qualify for a Pennsylvania License to Carry Firearms.

Applications may be picked up at the Gun Permit Unit, 660 East Erie Ave, Monday through Friday, 8:30 AM to 1:00 PM. This Unit is Closed on Saturdays, Sundays, and Holidays, and from December 20th to January 3rd. Only 1 application per person. This information can also be found at the following website: www.phillypolice.com/ forms (click on License to Carry). (If downloaded from the internet applicant must bring all paperwork, including this instruction sheet.)

Applicants must have an APPLICATION FILLED OUT COMPLETELY and APPLICABLE ITEMS LISTED BELOW or they will not be accepted. (Do not use pencil)

When completed, the entire application must be returned IN PERSON BY THE APPLICANT to the above location, Monday through Friday, 8:30 AM to 1:00 PM. (New applications and renewals will only be handled during this time

Also needed at this time of RENEWAL OR NEW APPLICATION:

One (1) 2" x 2" (inch) Passport Type color photo of the applicant's head and shoulders, (NO SUNGLASSES, HATS, BANDANNAS, ETC.).

A recently purchased $20.00 money order that is valid for at least 1 year or longer is the only form of payment that will be accepted. (Payable to "City of Philadelphia").

FYI – A Postal money order has no expiration date.

A VALID Pennsylvania Drivers License or Non-Drivers ID, along with two (2) acceptable forms of proof of residence, all names and addresses must match. NO PO

BOXES WILL BE ACCEPTED, (see below for examples).

ALL APPLICANTS WILL BE FINGERPRINTED.

Applicants, who have had a NAME CHANGE, must submit legal documents to show the name change. (i.e., Marriage License, Court Orders)

If you were previously a member of the Armed Forces, a copy of your discharge papers (DD-214) must accompany the application.

Foreign born applicants who are presently American citizens must bring either their naturalization papers or a passport

Registered aliens must have their current alien registration identification card, i.e., GREEN CARD.

Must show current or expired permits at time of application. Expired permits to carry will be retained by the Gun Permits Unit.

If all paperwork is in order, the applicant will then be interviewed by Gun Permits Unit personnel. When the interview is completed, an investigation will be conducted. All applicants will receive written notice by U.S. mail of either approval or disapproval of their application for a Pennsylvania license to carry a firearm. Upon approval, the applicant has thirty (30) days to pick-up their License to Carry.

ALL APPLICANTS SHOULD BE AWARE THAT FALSE STATEMENTS (WHETHER ORAL OR WRITTEN) WILL BE CAUSE FOR DENIAL AND MAY RESULT IN ARREST.

PLEASE NOTE THAT THE SAME PROCEDURES ARE APPLICABLE FOR RENEWALS.

Below are examples of, but not limited to, acceptable forms for proof of your residency:

• Current Utility Bills: (within the last three months / 90 DAYS)
• Phone Bill – Home/Cellular
• Electric Bill
• Gas Bill
• Water Bill
• Cable/Satellite Bill
• Current Credit Card Statements
• Current Bank/Student Loan Statements
• Valid Vehicle Registration
• Valid Vehicle Insurance Card
• Voters Registration Card

JUNK MAIL IS NOT ACCEPTABLE

89.   Philadelphia Defendants require LTCF applicants to provide documents and other materials that are not necessary for them to determine if an applicant is "disqualified from exercising Second Amendment rights."

90.   Philadelphia Defendants treat the right to keep and bear arms as a second-class right, singled out for special—and specially unfavorable—treatment.

91.   As just one stark example, the City of Philadelphia's Department of Licenses and Inspections allows all customers to access "an automated appointment system from their computers, their phone or contacting 311." https://www.phila.gov/media/20200724101316/PG_003_INF_LI-appointments-FAQ.pdf. And, it provides for appointments within as little as 24 hours and within no more than 14 days. *Id.* Thus, a person can apply for

and obtain a building or zone permit, or a trade license, within a day and no more than two weeks, while someone seeking to a license necessary to exercise a constitutional right without being prosecuted for a crime must submit to an entirely paper-based, in-person process through a unit that only schedules appointments over the phone, has limited hours, often does not answer calls when it is open, and delays appointments months into the future.

92.  Individual Plaintiffs, Plaintiff FPC's similarly situated members and supporters, and other similar members of the public—who are required to communicate with and use the GPU in order to access their fundamental, individual right to bear arms in public—are provided with limited or no access and inadequate services and resources, thus chilling, delaying, and/or denying access to, and further burdening, the exercising of their right to bear arms.

93.  Moreover, on information and belief, Philadelphia Defendants' policies and practices cause: 1) their GPU to have less staff, resources, and capabilities than necessary to timely provide constitutionally required services that are necessary to access and exercise the fundamental, individual right at stake; 2) their GPU to add and impose burdens far beyond what is required to determine if the applicant is "disqualified from exercising Second Amendment rights"; and 3) their GPU to treat the GPU's firearm-related services dis-favorably compared to Philadelphia Defendants' other services, thus "singl[ing] out for

special—and specially unfavorable—treatment" and making the right to keep and bear arms a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *See McDonald v. City of Chicago*, 561 U.S. 742, 779 (2010).

### *Philadelphia Defendants' GPU Closures*

94.  Philadelphia Defendants have at least once previously enacted and enforced a policy completely closing their GPU's operations with respect to timely accepting, processing, and issuing LTCFs for a period of months.

95.  On information and belief, Philadelphia Defendants previously closed their GPU between March 2020 and late July 2020.

96.  Even after Philadelphia Defendants' GPU was limitedly re-opened in late July 2020, phone calls to those numbers were "only [] accepted between the hours of 8:30 AM and 2:00 PM.," rather than during normal business hours.

In addition, Philadelphia Defendants' GPU is generally "Closed on Saturdays, Sundays and Holidays, and from December 20th to January 3rd."

97.  On or about November 18, 2020, Philadelphia Defendants enacted and continue to enforce a policy that once again completely closes their GPU's operations with respect to accepting, processing, and issuing LTCFs.

98.     A public notice posted on or about November 18, 2020, in a door window at

the official office of Philadelphia Defendants' GPU (photograph at Figure 1,

below) states:

> "<u>ATTENTION</u>!!! Keeping in accordance with the
> Mayor's announcement to halt all non-essential City
> government operations, in order to reduce the spread of the
> <u>COVID-19</u> coronavirus the <u>Gun Permit Unit will remain
> closed until further notice</u>. Anyone who received an
> approval notice to pick-up your permit during this closure,
> your notice will be honored when the unit begins operation
> again."

> (Underline emphasis in original.)

**Figure 1**



99.    Thus, Philadelphia Defendants have enacted and are currently enforcing a
       policy declaring, and treating, constitutionally necessary firearm-related
       services as "non-essential" and less important than other programs and
       services they offer the public.

100.   Philadelphia Defendants' website,[18] as of November 29, 2020, states in
       pertinent part that:

> ****IMPORTANT NOTICE****
> November 2020
> Due to several positive COVID-19 cases and the need to
> quarantine as advised by the Philadelphia Department of
> Public Health, the Gun Permits Unit will be closed to the
> public beginning on Wednesday, November 19, 2020, and
> will re-open on Monday, December 7, 2020.
>
> *This closure includes all walk-up service and previously
> scheduled appointments.

101.   Philadelphia Defendants' same website further declares and, according to the
       announcement, has declared since at least October 21, 2020:

> IMPORTANT NOTICE**
>                 * * *
>
> (Last Updated October 21st, 2020) For additional
> information, visit the Philadelphia Police Gun Unit
> website https://www.ppd-ltc.com/
>
> RE-OPENING INFORMATION
> July 8th, 2020

---

[18] Online at https://www.phillypolice.com/forms/gun-permit-unit/index.html.

In accordance with C.D.C. protocols the Gun Permit Unit will no longer provide walk up service at this time.

The Unit will be open Monday, Tuesday and Wednesday for applications by appointment only, pickups, Lost & Stolen Reports, Status Checks and Other inquires will be processed Thursday and Friday by appointment only.

These changes are to ensure the safety of the public and unit personnel.

The Unit has the following phone numbers designated for making appointments, (215) 685- 3661 and (215) 685-3662.

On July 8th, 2020 the Gun Permit Unit will begin to accept appointments for the Re-opening of the Unit.  Phone calls will only be accepted between the hours of 8:30 AM and 2:00 PM.

THE UNIT WILL BEGIN SERVICE ON THE FOLLOWING DATES:

JULY 16TH & 17TH - PICKUPS LOST & STOLEN REPORTS STATUS CHECKS OTHER INQUIRES

JULY 20TH, 21ST & 22ND - APPLICATIONS (ONLY)

JULY 23RD & 24TH - PICKUPS LOST & STOLEN REPORTS STATUS CHECKS OTHER INQUIRES

THIS WILL BE THE SCHEDULE GOING FURTHER.

THE UNIT WILL STILL BE CLOSED ON ALL FEDERAL, STATE AND LOCAL HOLIDAYS.

THE UNIT WILL BE CLOSED DECEMBER 20TH TO JANUARY 3RD EACH YEAR.

A FACE COVERING MUST BE WORN AT ALL
TIMES UNLESS DIRECTED TO REMOVE IT BY
UNIT PERSONNEL.

YOU MUST BE ON TIME FOR YOUR
APPOINTMENT.

IF YOU ARE LATE YOU WILL NOT BE SEEN AND
WILL HAVE TO OBTAIN ANOTHER
APPOINTMENT DATE.

IF YOU DO NOT HAVE ALL THE ITEMS REQUIRED
TO APPLY, YOU WILL NOT BE PERMITTED TO
LEAVE AND RE-ENTER, YOU WILL HAVE TO
OBTAIN ANOTHER APPOINTMENT DATE.

ONLY THE APPLICANT WILL BE PERMITTED TO
ENTER THE BUILDING (IF AN INTERPRETER IS
NEEDED THEY CAN ENTER WITH THE
APPLICANT).  NO ONE UNDER THE AGE OF 21
WILL BE ALLOWED TO ENTER THE BUILDING.

102.   Following Philadelphia Defendants' prior GPU closure, it was not until July

8, 2020 that the GPU began to accept calls to make appointments for LTCF

services, which, on information and belief, were restarted by Philadelphia

Defendants in a limited capacity on or about July 22, 2020.

103.   According to reports of members of the public, Philadelphia Defendants' GPU

was unable to schedule LTCF application appointments for any time sooner

than six or more months into the future.

104.   Journalist Stephen Gutowski, writing for The Washington Free Beacon,

published an article on September 22, 2020, that recounted one

Philadelphian's ordeal in attempting to contact Philadelphia Defendants' GPU for ten (10) straight days only to then be scheduled for an LTCF initial application appointment on January 19, 2021, four months later.[19]

105.   In that same article, Gutowski recounted the ordeal of another Philadelphian who told by Philadelphia Defendants' GPU that it would be a full calendar year before he would be able to schedule an LTCF initial application appointment.

106.   On information and belief, Philadelphia Defendants and their GPU cause such delays and burdens on a regular basis.

***Philadelphia Defendants Have Many Alternatives to their GPU Closures, LTCF Processes, Appointments, Burdens, and Delays***

107.   In addition to Philadelphia Defendants' prior and currently enforced GPU closure policies, they have and are enforcing policies that chill, deny, burden, and/or unduly delay the LTCF application and issuance process.

108.   Due to their policies and practices, as well as their GPU closures, Philadelphia Defendants' GPU has and continues to suffer from severe backlogs, delays, and service limitations.

109.   Throughout the COVID-19 pandemic, Philadelphia Defendants have refused to provide alternative means of accepting and processing LTCF applications.

---

[19] *See* https://freebeacon.com/coronavirus/philadelphia-residents-face-months-long-wait-to-apply-for-gun-carry-permits/.

110. Those seeking access to the Unit's constitutionally necessary services—including Plaintiffs and their members and supporters, and similarly situated members of the public—are treated as "second-class" citizens for purposes of the exercise of their Second Amendment right.

111. Philadelphia Defendants have and use various modern technologies to communicate with the public about official business, including telephones and phone calls, text messages, e-mail, and Internet-based Web forms. *See*, *e.g.*, https://www.phillypolice.com/forms/submit-a-tip, which states in pertinent part:

> Tips via Phone, Text Message, and Email
>
> In addition to this online form (which you may use to remain anonymous), you can also submit tips using any of the below methods.
>
> Via Telephone
> Dial 215.686.TIPS (8477).
>
> Photo/Video Tips via Email
> If you would like to submit a tip, including photo or video, via email, send to tips@phillypolice.com. Include as many details as you can, such as the physical address and names of any known persons. Include your contact information if you would like us to follow up with you directly.

112. Philadelphia Defendants use secure Web-based forms, e-mail, and text messages for official business and submissions. For example, a person can

"File an Official Complaint on Philadelphia Defendants' website, online at https://www.phillypolice.com/forms/official-complaint-form/index.html.

113.   Even though Philadelphia Defendants provide and allow the public to use Web-based forms, e-mail, and text messages for official business, submissions, and communicating with Philadelphia Defendants and their officers and staff, they do not provide or allow individuals needing and using the constitutionally necessary services of their GPU to do the same.

114.   The Schuylkill County, Pennsylvania Sheriff's Office has an online LTCF application system where applicants can complete all of the application requirements and pay the necessary fees online. *See* http://www.co.schuylkill.pa.us/offices/sheriff/index.asp. *See also* the online Web based LTCF form at https://schuylkillpaso.permitium.com/ccw/start?.

115.   And the Schuylkill County Sheriff's Department is not alone in utilizing an efficient, accessible, and easy to use online LTCF application form, email, or other alternative and efficient means of accepting applications rather than in-person visits by applicants.

116.   The county sheriffs for the counties of Berks, Blair, Bucks, Cambria, Monroe, Montgomery, Pike, and Wayne all also currently offer online applications.[20]

---

[20] *See*, https://www.co.berks.pa.us/Dept/Sheriff/Pages/FirearmsSection.aspx (declaring that "Firearm licensing through the Berks County Sheriff's Office can now be completed online by using the link below," online at

117. On, information and belief, Adams, Columbia, Fayette, Luzerne, McKean, Mercer, and York County sheriff departments are all in the process of implementing electronic submission options for LTCF applications.

118. Permitium PermitDirector is a Web-based system "for weapon permits [that] serves as an end-to-end online solution that includes the application,

---

https://berkspaso.permitium.com/ccw/start");
http://www.blairco.org/Dept/Sheriff/Pages/default.aspx (declaring that "YOU CAN NOW APPLY FOR YOUR CONCEALED CARRY LICENSE ONLINE! (CLICK HERE TO APPLY FOR YOUR LICENSE ONLINE!)");
http://www.buckscounty.org/government/RowOfficers/Sheriff/CarryLicense (declaring "Effective October 14, 2020 we will be starting a new on-line procedure to provide the most efficient way of processing gun permit applications. To apply for a License to Carry Firearms in Bucks County, Pa., please visit: https://buckspa.permitium.com/ccw/start");
https://www.cambriacountypa.gov/sheriff-office.aspx (declaring "*LICENSE TO CARRY PERMIT INFO* You can now apply for your License to Carry Permit Online! Click HERE to Apply Online Today!!");
http://www.monroecountypa.gov/Dept/Sheriff/Pages/ConWeapons.aspx (declaring "Due to the COVID-19 pandemic we will be accepting applications for concealed carry permits via email or regular mail until further notice.");
https://www.montcopa.org/401/Gun-Permits (declaring "Effective September 9, 2020 we have started a new on-line procedure to provide the most efficient way of processing gun permit applications. Emailed applications are no longer accepted. To apply for a License to Carry Firearms in Montgomery County, Pa., please visit: https://montgomerypa.permitium.com/ccw/start");
http://www.pikepa.org/Sheriffs/LTCApp.pdf (declaring that the Pike County Sheriff's Office accepts LTCF applications via email); and,
https://www.waynecountypa.gov/509/License-to-Carry-Information-Application (declaring that Wayne County Sheriff Mark Steelman "has moved part of the License to Carry a Firearm application process online. New applicants and renewing permit holders may now start the application process online.").

background check tracking, processing, payment and issuance of gun and concealed carry permits." *See* https://permitium.com/products.html.

119. The Permitium PermitDirector product has "913,070 CCW permits issued" and serves 200 counties in 13 states, including but not limited to Schuylkill County, Pennsylvania. *See* https://permitium.com/stats.html.

120. Philadelphia Defendants could, but do not, accept and process LTCF applications without any in-person appointment.

121. Philadelphia Defendants could, but do not, use online systems so that the public could schedule or reschedule GPU appointments, eliminating the current challenges that the public faces in attempting to reach a live person during the limited hours of the GPU's routinely understaffed operations.

122. Philadelphia Defendants could, but do not, use U.S. Mail or couriers like FedEx, UPS, and intra-city local couriers or runners to accept LTCF applications or issue LTCF licenses to qualified applicants, also eliminating the challenges the public faces in attempting to reach a live person during the limited hours of the GPU's routinely understaffed operations.

123. Similarly, Philadelphia Defendants could, but do not, use email to accept LTCF applications or issue LTCF licenses to qualified applicants.

124. Philadelphia Defendants could also, but do not, use text messaging to accept LTCF applications or issue LTCF licenses to qualified applicants.

125.   Philadelphia Defendants could, but do not, use common electronically fill-
       able and sign-able PDF files, or systems like DocuSign, HelloSign, Adobe
       Acrobat with E-Sign, to accept and process LTCF applications, which would
       be far more efficient and thus effective at processing applications than the
       entirely paper-based system they use.

126.   Philadelphia Defendants could use the PSP's E-PICS system to quickly verify
       that individual Plaintiffs, FPC's similarly situated members and supporters,
       and other applicants are not disqualified from exercising Second Amendment
       rights and issue a LTCF to them immediately thereafter.

127.   On information and belief, Philadelphia Defendants could also accept
       common credit and debit cards for payments for other services, instead of
       limiting the "acceptable forms of payment cash, money order, business or
       bank check payable to the City of Philadelphia."[21]

128.   Philadelphia Defendants could, but do not, waive or defer the payment of the
       $20 LTCF application fee during COVID.

129.   Philadelphia Defendants could, but do not, provide their GPU with additional
       funding, personnel, and resources on a temporary or permanent basis in order
       to meet the demand for its constitutionally necessary services.

---

[21] *See* https://www.phila.gov/records/PoliceFire/Traffic_Accident_Reports.html.

130.   On information and belief, on account of the aforementioned deficiencies, inadequacies, understaffing, underfunding, and unnecessary complications causing undue delays in the acceptance and processing of LTCF applications, Philadelphia Defendants' GPU currently has and has had for many months a substantial backlog of unprocessed LTCF applications.

### *Facts Specific to Plaintiff Fetsurka*

131.   The foregoing paragraphs are incorporated herein as if set forth in full.

132.   Plaintiff Fetsurka is not disqualified from exercising Second Amendment Rights.

133.   Plaintiff Fetsurka:

a.     Is a United States citizen;

b.     Is over the age of 21;

c.     Is not under indictment;

d.     Has never been convicted of a felony or misdemeanor crime of domestic violence;

e.     Has never been convicted of a crime punishable by more than one (1) year;

f.     Is not a fugitive from justice;

g.     Is not an unlawful user of, or addicted to, any controlled substance;

h.     Has not been adjudicated a mental defective or been committed to a mental institution;

i.     Has not been discharged from the Armed Forces under dishonorable conditions;

j.     Has never renounced his citizenship; and,

k.     Is not the subject of a restraining order relating to an intimate partner.

134.  Plaintiff Fetsurka has never been charged with nor convicted of any misdemeanor or felony offense and is not prohibited from possessing firearms and ammunition, nor prohibited from receiving a LTCF under 18 Pa.C.S. § 6109(e).

135.  Plaintiff Fetsurka intends and desires to lawfully carry a loaded, operable handgun on his person, in public, including for purposes of self-defense and in case of confrontation.

136.  As a result of Defendants' enforcement of the Commonwealth's and the City's criminal laws, Plaintiff Fetsurka cannot lawfully carry a firearm in public.

137.  As a result of Philadelphia Defendants' policies and enforcement practices, including the closures of their GPU, Plaintiff Fetsurka is precluded from applying for and obtaining a LTCF and therefore is subject to the carry restrictions specified in 18 Pa.C.S. §§ 6106, 6107, and 6108, which Defendants are actively enforcing and thereby, *inter alia*, preventing him from

carrying a loaded, operable handgun in public, on his person and in motor vehicles, for all lawful purposes including self-defense.

138. Plaintiff Fetsurka is currently employed as a range safety officer, where he is responsible for ensuring the safety of individuals using the firearms range at his place of employment.

139. Prior to being employed as a range safety officer, Plaintiff Fetsurka was a member of the United States Army, where he honorably served for twelve years as a combat medic.

140. Throughout his time in the Army, Plaintiff Fetsurka held licenses to carry handguns in Georgia, Colorado, North Carolina, and Texas. These licenses have since lapsed as he is no longer a resident of those states.

141. Plaintiff Fetsurka moved to Defendant Philadelphia in or about in December 2019.

142. Since about May 2020, and with the violent mobs and riots which consumed many cities across the United States, including Defendant Philadelphia, Plaintiff Fetsurka has become particularly concerned about his safety, especially when he is outside of his home in public.

143. Due to a strict time off policy and work schedule than ran Monday through Fridays, Plaintiff Fetsurka was unable to get to Philadelphia Defendants' GPU

prior to its closure in March 2020, which lasted for a period of approximately four months and five days.

144. Plaintiff Fetsurka learned in or about August 2020 that Defendants' GPU was operational and attempted to schedule an appointment by phone.

145. In or about August 2020, Plaintiff Fetsurka was able to establish contact with an individual at Defendants' GPU only to be informed that there was no availability for an appointment to apply for a LTCF until "next year."

146. Plaintiff Fetsurka accepted the next available appointment date of September 15, 2021, over a year from the date of his phone call.

147. In or about October 2020, Plaintiff Fetsurka received a phone call from an unknown individual at Defendants' GPU stating that they had an opening on November 19, 2020 at 10:30 AM.

148. Plaintiff Fetsurka accepted that appointment slot.

149. On or about November 18, 2020, the day before the appointment, Plaintiff Fetsurka received another phone call from an unknown individual at Defendants' GPU during which he was told his November 19, 2020 appointment had been canceled and must be rescheduled.

150. Plaintiff Fetsurka now has a tentative appointment date of December 14, 2020.

151. To date, Plaintiff Fetsurka has been unable to attend an appointment at Defendants' GPU to submit a LTCF application.

### *Facts Specific to Plaintiff Sieck*

152. The foregoing paragraphs are incorporated herein as if set forth in full.

153. Plaintiff Sieck is not disqualified from exercising Second Amendment rights.

154. Plaintiff Sieck:

    a. Is a United States citizen;

    b. Is over the age of 21;

    c. Is not under indictment;

    d. Has never been convicted of a felony or misdemeanor crime of domestic violence;

    e. Has never been convicted of a crime punishable by more than one (1) year;

    f. Is not a fugitive from justice;

    g. Is not an unlawful user of, or addicted to, any controlled substance;

    h. Has not been adjudicated a mental defective or been committed to a mental institution;

    i. Has not been discharged from the Armed Forces under dishonorable conditions;

    j. Has never renounced his citizenship; and,

    k. Is not the subject of a restraining order relating to an intimate partner.

155. Plaintiff Sieck has never been charged with nor convicted of any misdemeanor or felony offense and is not prohibited from possessing firearms and ammunition, nor prohibited from receiving a LTCF under 18 Pa.C.S. § 6109(e).

156. As a result of Defendants' enforcement of the Commonwealth's and the City's criminal laws, Plaintiff Sieck cannot lawfully carry a firearm in public.

157. Plaintiff Sieck intends and desires to acquire a LTCF from Philadelphia Defendants.

158. Plaintiff Sieck intends and desires to lawfully carry a loaded, operable handgun on his person, in public, including for purposes of self-defense and in case of confrontation.

159. As a result of Philadelphia Defendants' policies and enforcement practices, including their closure of their GPU, Plaintiff Sieck is precluded from applying for and obtaining a LTCF and therefore is subject to the carry restrictions specified in 18 Pa.C.S. §§ 6106, 6107, and 6108, which Defendants are actively enforcing and thereby, *inter alia*, preventing him from carrying a loaded, operable handgun on his person, in public, and in case of confrontation, for all lawful purposes including self-defense.

160.  Plaintiff Sieck is employed by a brewery in Philadelphia and considered to be an "essential employee." Because of his work, he must leave his home and travel from his residence to his employer's place of work.

161.  Since about May 2020, and with the violent mobs and riots which consumed many cities across the United States, including Defendant Philadelphia, Plaintiff Sieck has become particularly concerned about his safety, especially when he is outside of his home in public.

162.  During these recent acts of public violence and domestic terrorism, Plaintiff Sieck has become aware that the Target located immediately adjacent to his place of employment that been looted and destroyed not once, but twice, by violent rioters.

163.  Consequently, Plaintiff Sieck is and has been concerned about the social unrest that plagues Defendant Philadelphia, fears for his safety, and desires and intends to carry a loaded, operable handgun on his person, in public, for all lawful purposes including self-defense.

164.  Because a LTCF is necessary to lawfully exercise his carry rights for these purposes, Plaintiff Sieck wished to apply to Philadelphia Defendants for a LTCF beginning in or about May 2020, but he has been unable to do so because of Philadelphia Defendants' policies and enforcement practices, including but not limited to the closure of their GPU, extreme backlog of

appointments to just submit an application, GPU's lack of adequate staff and processing timeliness, and other such burdens and delays.

165. On information and belief, Plaintiff Sieck could not have obtained an appointment to even submit an application to obtain a LTCF and begin Philadelphia Defendants' application process until at least some time in 2021, and perhaps into 2022, even if he had been able to schedule an appointment with their GPU prior to Philadelphia Defendants' most recent closure of the GPU. He and all other similarly situated Philadelphians like him have effectively been unconstitutionally chilled in the exercise of their fundamental carry rights through the widely known reality that the policies and practices of Philadelphia Defendants are and have been for many months severely delaying the acceptance and processing of LTCF applications, to the point that one could not reasonably expect to actually obtain a license for many months into the future—and likely long after the abatement of the very risks and dangers of the current social unrest that the carry rights are designed to meet.

166. To date, Plaintiff Sieck has been unable to attend an appointment at Defendants' GPU to submit a LTCF application.

### Facts Specific to Plaintiff Defina

167. The foregoing paragraphs are incorporated herein as if set forth in full.

168. Plaintiff Defina is not disqualified from exercising Second Amendment rights.

49

169. Plaintiff Defina:

    a. Is a United States citizen;

    b. Is over the age of 21;

    c. Is not under indictment;

    d. Has never been convicted of a felony or misdemeanor crime of domestic violence;

    e. Has never been convicted of a crime punishable by more than one (1) year;

    f. Is not a fugitive from justice;

    g. Is not an unlawful user of, or addicted to, any controlled substance;

    h. Has not been adjudicated a mental defective or been committed to a mental institution;

    i. Has not been discharged from the Armed Forces under dishonorable conditions;

    j. Has never renounced his citizenship; and,

    k. Is not the subject of a restraining order relating to an intimate partner.

170. Plaintiff Defina has never been charged with nor convicted of any misdemeanor or felony offense and is not prohibited from possessing firearms and ammunition, nor prohibited from receiving a LTCF under 18 Pa.C.S. § 6109(e).

171.  As a result of Defendants' enforcement of the Commonwealth's and the City's criminal laws, Plaintiff Defina cannot lawfully carry a firearm in public.

172.  Plaintiff Defina intends and desires to acquire a LTCF from Philadelphia Defendants.

173.  Plaintiff Defina intends and desires to lawfully carry a loaded, operable handgun on his person, in public, including for purposes of self-defense and in case of confrontation.

174.  As a result of Philadelphia Defendants' policies and enforcement practices, including their closure of their GPU, Plaintiff Defina is precluded from applying for and obtaining a LTCF and therefore is subject to the carry restrictions specified in 18 Pa.C.S. §§ 6106, 6107, and 6108, which Defendants are actively enforcing and thereby, *inter alia*, preventing him from carrying a loaded, operable handgun on his person, in public, and in case of confirmation, for all lawful purposes including self-defense.

175.  Plaintiff Defina is employed as a legal recruiter for a staffing agency.

176.  Plaintiff Defina is and has been concerned about the social unrest that plagues Defendant Philadelphia, fears for his safety, and desires and intends to carry a loaded, operable handgun on his person, in public, for all lawful purposes including self-defense.

177. On or about April 10, 2019, Plaintiff Defina applied for a LTCF at Philadelphia Defendants' GPU. A copy of his receipt from the Gun Permit Unit is attached hereto and incorporated herein as Exhibit B.

178. On this date, Plaintiff Defina arrived at the GPU, signed in, and waited approximately two hours before he was able to speak with a member of Defendants' GPU and submit his completed LTCF application.

179. The member of Defendants' GPU whom Plaintiff Defina spoke with during the process told Plaintiff Defina that there "should be no problem" with the issuance of his permit.

180. However, to date, and now some *20 months* later, Plaintiff Defina has yet to receive any further communication from Philadelphia Defendants' GPU as to the approval or denial of his LTCF application.

181. Plaintiff Defina has attempted to contact Philadelphia Defendants' GPU to inquire as to the status of his application but was unable to speak with anyone on the phone.

182. Furthermore, Philadelphia Defendants' GPU's receipt states in relation to status checks that:

> 40 DAYS AFTER YOU APPLY YOU CAN CHECK THE STATUS OF YOUR APPLICATION. YOU MUST BRING YOUR FILE NUMBER ALONG WITH YOUR DRIVER'S LICENSE OR STATE ID. SIGN IN ON PINK SHEET FOR STATUS CHECK.

(Exhibit B, emphasis original.)

183.  Due to his prior employment, Plaintiff Defina was unable to devote the time
      to take another trip to Philadelphia Defendants' GPU to sign in, wait, and
      hopefully be able to see someone to check the status of his application.

184.  Plaintiff Defina still wishes to obtain a LTCF but has been unable to because
      of Philadelphia Defendants' policies and enforcement practices, including but
      not limited to the closure of their GPU, extreme backlog of appointments to
      just submit an application, GPU's lack of adequate staff and processing
      timeliness, other such burdens and delays, and in particular the GPU's obvious
      failure to further process, complete, or make any determination on the
      application he submitted early *last* year.

185.  On information and belief, Plaintiff Defina could not have obtained an
      appointment to even submit an application to obtain a LTCF and begin
      Philadelphia Defendants' application process until at least some time in 2021,
      and perhaps into 2022, even if he had attempted to schedule *another*
      appointment to submit another *application* with their GPU prior to
      Philadelphia Defendants' most recent closure of the GPU. Indeed, given
      Defendants' handling of his prior application, Plaintiff Defina could
      reasonably conclude he has been constructively denied—*despite* the
      assurance of the GPU personnel that there "should be no problem" with the

issuance of a permit—such that any further attempt to apply for a LTCF would be a futile effort unless and unless this Court grants the relief Plaintiffs seek. Otherwise, like with Plaintiffs Sieck and Scott and all others being warded off from attempting to obtain a LTCF through the GPU's current operations, Plaintiff Defina is being and will continue to be unconstitutionally chilled in the exercise of his fundamental right to bear arms in his city of residence.

186.   To date, Plaintiff Defina has not been issued a LTCF and provided with a valid LTCF.

### *Facts Specific to Plaintiff Scott*

187.   The foregoing paragraphs are incorporated herein as if set forth in full.

188.   Plaintiff Scott is not disqualified from exercising Second Amendment rights.

189.   Plaintiff Scott:

   a.  Is a United States citizen;

   b.  Is over the age of 21;

   c.  Is not under indictment;

   d.  Has never been convicted of a felony or misdemeanor crime of domestic violence;

   e.  Has never been convicted of a crime punishable by more than one (1) year;

   f.  Is not a fugitive from justice;

g.  Is not an unlawful user of, or addicted to, any controlled substance;

h.  Has not been adjudicated a mental defective or been committed to a mental institution;

i.  Has not been discharged from the Armed Forces under dishonorable conditions;

j.  Has never renounced his citizenship; and,

k.  Is not the subject of a restraining order relating to an intimate partner.

190.  Plaintiff Scott has never been charged with nor convicted of any misdemeanor or felony offense and is not prohibited from possessing firearms and ammunition, nor prohibited from receiving a LTCF under 18 Pa.C.S. § 6109(e).

191.  As a result of Defendants' enforcement of the Commonwealth's and the City's criminal laws, Plaintiff Scott cannot lawfully carry a firearm in public.

192.  Plaintiff Scott intends and desires to acquire a LTCF from Philadelphia Defendants.

193.  Plaintiff Scott intends and desires to lawfully carry a loaded, operable handgun on his person, in public, including for purposes of self-defense and in case of confrontation.

194.  As a result of Philadelphia Defendants' policies and enforcement practices, including their closure of their GPU, Plaintiff Scott is precluded from

applying for and obtaining a LTCF and therefore is subject to the carry restrictions specified in 18 Pa.C.S. §§ 6106, 6107, and 6108, which Defendants are actively enforcing and thereby, *inter alia*, preventing him from carrying a loaded, operable handgun on his person, in public, and in case of confirmation, for all lawful purposes including self-defense.

195.  Plaintiff Scott is employed as a software developer.

196.  Since about May 2020, and with the violent mobs and riots which have consumed many cities across the United States, including Defendant Philadelphia, Plaintiff Scott has become particularly concerned about his safety, especially when he is outside of his home in public.

197.  During these recent acts of public violence and domestic terrorism, Plaintiff Scott has become aware that an individual was mugged near his residence.

198.  Consequently, Plaintiff Scott is and has been concerned about the social unrest that plagues Defendant Philadelphia, fears for his safety, and desires and intends to carry a loaded, operable handgun on his person, in public, for all lawful purposes including self-defense.

199.  Because a LTCF is necessary to lawfully exercise his carry rights for these purposes, Plaintiff Scott sought to apply to Philadelphia Defendants for a LTCF beginning in or about November 2020, but he has been unable to because of Philadelphia Defendants' policies and enforcement practices,

including but not limited to the closure of their GPU, extreme backlog of appointments to just submit an application, GPU's lack of adequate staff and processing timeliness, and other such burdens and delays.

200. On information and belief, Plaintiff Scott could not have obtained an appointment to even submit an application to obtain a LTCF and begin Philadelphia Defendants' application process until at least some time in 2021, and perhaps into 2022, even if he had attempted to schedule an appointment with their GPU prior to Philadelphia Defendants' most recent closure of the GPU. Like Plaintiff Sieck, and all other similarly situated Philadelphians, Plaintiff Scott has effectively been unconstitutionally chilled in the exercise of his fundamental carry rights through the widely known reality that the policies and practices of Philadelphia Defendants are and have been for many months severely delaying the acceptance and processing of LTCF applications, to the point that one could not reasonably expect to actually obtain a license for many months into the future—and likely long after the abatement of the very risks and dangers of the current social unrest that the carry rights are designed to meet.

201. To date, Plaintiff Scott has been unable to attend an appointment at Defendants' GPU to submit a LTCF application.

### The Controlling Constitutional Text, and the History and Tradition that Informs It

202.  The United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II.

203.  The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

204.  The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald*, 561 U.S. at 750; *id.* at 805 (Thomas, J., concurring).

205.  "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-35.

206.  In *Heller*, the Supreme Court also held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of

confrontation." *Heller*, 554 U.S. at 592.

207. This is " 'a natural right which the people have reserved to themselves, confirmed by the Bill of Rights,' " *Heller*, 554 U.S. at 594 (quoting A Journal of the Times: Mar. 17, NEW YORK JOURNAL, Supp. 1, Apr. 13, 1769).

208. And the meaning of the right during the founding-era—which the high court has commanded must still control today—"unambiguously" "refer[red] to the carrying of weapons outside of an organized militia." *Id.* at 584. It is clear that, "[a]t the time of the founding, as now, to 'bear' meant to "carry." *Id.*

209. *Heller* commands that the fundamental right to *bear* arms for self-defense and in case of confrontation—as part and parcel of "the natural right of resistance and self-preservation," *Heller*, 554 U.S. at 594—is of particular importance when it comes to ensuring citizens' ability to carry *handguns* for such purposes, because the court explicitly recognized the handgun as "the quintessential self-defense weapon" in this country and that any complete prohibition against their carry and use is necessarily invalid. *Id.* at 629.

210. *Heller* mandates that the constitutionality of restrictions on the rights enshrined in the Second Amendment must be scrutinized under the text of the Constitution itself, looking to the history and tradition to inform its original public meaning. The high court has directed the analysis be "guided by the principle that '[t]he Constitution was written to be understood by the

voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731). We look to "the historical background of the Second Amendment" because "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *Id.* at 592.

211. The *Heller* court held that to "bear arms" means to "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584(quoting *Muscarello v. United States*, 524 U.S. 125 at 143) (internal quotations omitted).

212. Throughout American history, arms carrying was a right as to all peaceable citizens. Sometimes, it was even a duty. *See e.g.*, David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 573–577, 587 (2019) (listing statutes requiring arms carrying by members of the general public to travel, work in the fields, work on roads and bridges, attend church, and attend court).

213. Historically, under the Constitution's relevant history and tradition, only dangerous persons have historically been acceptably deprived of the right to bear arms. Peaceable persons have always been free to carry arms for self-

defense and other lawful purposes. *See generally* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020).

214.  The tradition of disarming violent and dangerous persons was practiced from medieval England through mid-20th century America, but there is no tradition of disarming nonviolent people like Plaintiffs Fetsurka, Sieck, Defina, and Scott and those similarly situated. *Id.*

215.  No laws requiring government permission for American citizens to carry a firearm existed before the twentieth century—including at the time of the ratification of the Second Amendment in 1791. What laws did exist were indisputably unconstitutional, as they were the product of racist views long since abandoned as antithetical to the core purposes of the rights guaranteed all citizens under the Constitution. As the high court declared in *Brown v. Board of Ed.,* 347 U.S. 483, n. 5 (1954), quoting *In re Slaughter-House Cases*, 1873, 16 Wall. 36, 67-72:

> [The Fourteenth Amendment] 'ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because

of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race.'.

216.   When the Supreme Court of North Carolina upheld the "Act to prevent Free Persons of Colour from carrying Fire-arms" in 1844, its opinion was based on the now clearly untenable rationale that "Free people of color in this State are not to be considered as citizens, in the largest sense of the term, or, if they are, they occupy such a position in society, as justifies the legislature in adopting a course of policy in its acts peculiar to them—so that they do not violate those great principles of justice, which lie at the foundation of all laws." *State v. Newsom*, 27 N.C. 250, 250 (1844).

217.   Defendants' laws, policies, and practices are, in pedigree, substance, and effect, the same kind of racist regulations that prevented African-American freedmen from exercising their right to keep and bear arms under the "Jim Crow" and similarly suspect-class-based restrictions.

**COUNT ONE**
**DEPRIVATION OF CIVIL RIGHTS**
**RIGHT TO KEEP AND BEAR ARMS**
**U.S. CONST., AMENDS. II AND XIV, 42 U.S.C. § 1983**
*(Plaintiffs v. Defendants)*

218.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

219.   There is an actual and present controversy between the parties.

220.   42 U.S.C. § 1983 prohibits state actors from depriving a person of federal constitutional rights under color of state law.

221.   The Second Amendment states that "the right of the people to keep and bear arms shall not be infringed."

222.   The Supreme Court has held that the right to keep and bear arms is a fundamental right, the core of which is for self-defense.  *Heller*, 554 U.S. at 581.

223.   In *Heller*, the U.S. Supreme Court defined "bear arms" as to "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584.

224.   In *McDonald*, the Supreme Court held that the Second Amendment is incorporated as applicable to the states through the Fourteenth Amendment. 561 U.S. at 791; *Id*. at 806 (Thomas, J., concurring).

225. The Supreme Court has made clear the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms as among those fundamental rights *necessary* (i.e., essential) to our system of ordered liberty, *McDonald*, 561 U.S. at 778, 791, and as a privilege and immunity of citizenship, *id*. at 805 (Thomas, J., concurring).

226. "The very enumeration of the [Second Amendment] right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 635 (emphasis in original).

227. The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S., at 780, and it cannot "be singled out for special—and specially unfavorable—treatment." *Id.* at 778–79.

228. The Constitution elevates Plaintiffs' rights above Defendants' convenience or administrative concerns. "[T]he prospect of additional administrative inconvenience has not been thought to justify invasion of fundamental constitutional rights." *Carey v. Population Servs. Int'l*, 431 U.S. 678, 691 (1977).

229. And "it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963).

230. The Defendants' laws, policies, enforcement practices, and customs challenged herein that individually and collectively violate the constitutional right to bear arms are not longstanding, have no historical pedigree, and are not rooted in our Nation's traditions.

231. Defendants' laws, policies, and enforcement practices prevent law-abiding individuals not prohibited from possessing or acquiring firearms from carrying loaded, operable firearms on their person in public for all lawful purposes including self-defense and in case of confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles.

232. Defendants' laws, policies, and enforcement practices are more extensive than necessary and are not the least restrictive means of addressing the carriage of firearms by persons who are disqualified from exercising Second Amendment rights under state and/or federal laws.

233. In *Heller*, the Supreme Court declared unconstitutional the District of Columbia's laws that, *inter alia*, prevented Mr. Heller from having a handgun on his person that was "operable for the purpose of immediate self-defense." 554 U.S. at 635.

234.    By preventing legally eligible adults, like and including Plaintiffs, Plaintiffs'
members and supporters, and others similarly situated to them, from bearing
arms as they are constitutionally entitled, Defendants have violated the
Plaintiffs' rights protected under the Second and Fourteenth Amendments and
denied them those arms for the purpose of immediate self-defense and all
lawful purposes.

235.    Plaintiffs, and other adults like them, have been and will continue to be subject
to the Defendants' laws, policies, and enforcement practices which deny
access to, exercise of, and violates their right to bear arms, including but not
limited to the right to immediate self-defense in case of confrontation.

236.    As detailed above, nothing in the text itself nor the applicable history or
tradition of the Second or Fourteenth Amendments supports the infringement
and burdens that the enforcement of Defendants' laws and policies impose on
the ability of law-abiding citizens, like Plaintiffs and those similarly situated,
to otherwise lawfully and peaceably carry loaded handguns for all lawful
purposes, including self-defense in case of confrontation, in the exercise of
their fundamental right to bear arms.

237.    Defendant Evanchick has and continues to enforce the Commonwealth's laws
pertaining to the keeping and bearing of firearms, including 18 Pa.C.S. §§
6106–6109.

238. Because of the Commonwealth's statutes and Defendant Evanchick's enforcement of them, individual Plaintiffs, Plaintiff FPC's similarly situated members and supporters, and other law-abiding, typical adults who reside in Philadelphia and do not already have a LTCF cannot lawfully carry a loaded firearm on their person and in their motor vehicles, in public, for lawful purposes including self-defense.

239. But for the Commonwealth's statutes and Defendant Evanchick's enforcement of them, individual Plaintiffs, Plaintiff FPC's similarly situated members and supporters, and other law-abiding, typical adults who reside in Philadelphia and do not already have a LTCF could apply for a LTCF in another county.

240. But for the Commonwealth's statutes and Defendant Evanchick's enforcement of them, individual Plaintiffs, Plaintiff FPC's similarly situated members and supporters, and other law-abiding, typical adults who reside in Philadelphia and do not already have a LTCF would carry a loaded firearm on their person and in their motor vehicles, in public, for lawful purposes including self-defense.

241. Philadelphia Defendants have and continue to enforce the Commonwealth's and Philadelphia Defendants' laws pertaining to the bearing of firearms, including 18 Pa.C.S. §§ 6106–6109, Phila. Code §§ 10-818 and 10-833 (with

respect to carry of firearms within 100 feet of schools), Philadelphia Police Department Directive 5.27, their GPU policies and practices, and their various GPU closures and undue delays and burdens, upon individual Plaintiffs, Plaintiff FPC's similarly situated members and supporters, and other law-abiding, typical adults who reside in Philadelphia.

242.   Because of the Commonwealth's statutes and Philadelphia Defendants' laws pertaining to the bearing of firearms, including 18 Pa.C.S. §§ 6106–6109, Phila. Code §§ 10-818 and 10-833 (with respect to carry of firearms within 100 feet of schools), Philadelphia Police Department Directive 5.27, their GPU policies and practices, and their GPU closures and undue delays and burdens, and Philadelphia Defendants' enforcement of same, individual Plaintiffs, Plaintiff FPC's similarly situated members and supporters, and other law-abiding, typical adults who reside in Philadelphia and do not already have a LTCF cannot lawfully carry a loaded firearm on their person and in their motor vehicles, in public, for lawful purposes including self-defense.

243.   But for the Commonwealth's statutes and Philadelphia Defendants' laws pertaining to the bearing of firearms, including 18 Pa.C.S. §§ 6106–6109, Phila. Code §§ 10-818 and 10-833 (with respect to carry of firearms within 100 feet of schools), Philadelphia Police Department Directive 5.27, their GPU policies and practices, and their GPU closures and undue delays and

burdens, and Philadelphia Defendants' enforcement of same, individual Plaintiffs, Plaintiff FPC's similarly situated members and supporters, and other law-abiding, typical adults who reside in Philadelphia and do not already have a LTCF would carry a loaded firearm on their person and in their motor vehicles, in public, for lawful purposes including self-defense.

244. Defendants' individual and collective enforcement of their laws, regulations, policies, and enforcement practices amount to a total ban on the right of Plaintiffs, Plaintiffs' members and supporters, and those who are similarly situated to bear loaded, operable handguns on their person in public for all lawful purposes including self-defense and in case of confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles.

245. Plaintiffs, Plaintiffs' members and supporters, and those similarly situated are forced into the untenable position of choosing between compliance with the law in order to avoid prosecution which, if convicted, would result in a lifetime prohibition on the exercise of their Second Amendment right and "unlawfully" carrying a firearm for self-defense as guaranteed by the Second Amendment of the United States Constitution.

246. Defendants' laws and enforcement policies, practices, and customs preventing legally and constitutionally eligible individuals from bearing loaded, operable handguns on their person in public for all lawful purposes including self-

defense and in case of confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles violates the enumerated, fundamental, individual right to bear arms.

247. As to all claims made in a representative capacity herein, there are common questions of law and fact that substantially affect the rights, duties, and liabilities of many similarly-situated Pennsylvania and Philadelphia residents and visitors who knowingly or unknowingly are subject to the Defendants' laws, regulations, policies, and enforcement practices at issue.

248. Defendants have and will continue to enforce their laws, policies, practices, and customs against Plaintiffs, Plaintiffs' members and supporters and similarly situated persons.

249. Plaintiffs reasonably fear that Defendants will enforce against them their laws and Defendants' related enforcement policies, practices, and customs.

250. Plaintiffs thus seek declaratory, preliminary, and permanent injunctive relief, as this action involves matters of substantial public interest.

251. The Second and Fourteenth Amendments to the United States Constitution guarantee adult citizens of States their fundamental right to keep and bear arms, both in the home and in public places, including but not limited to while on public streets, sidewalks, and spaces or in a motor vehicle.

252. The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty, and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

253. The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire, keep, and carry loaded, operable handguns on their person in public for all lawful purposes including self-defense and in case of confrontation, in public places, on public streets, sidewalks, and spaces, and in their motor vehicles.

254. Plaintiffs Fetsurka, Sieck, Defina, and Scott are law-abiding citizens who are not disqualified from exercising their rights under the Second Amendment.

255. Plaintiffs Fetsurka, Sieck, Defina, and Scott desire to obtain a LTCF so that they would be exempt from the restrictions, criminal sanctions, and penalties imposed by Pa.C.S. §§ 6106, 6107, and 6108, and thus lawfully carry a loaded, operable handgun on their person, in public and in motor vehicles, for self-defense and all lawful purposes.

256. Plaintiffs Fetsurka, Sieck, Defina, and Scott meet all the eligibility requirements for the issuance of a LTCF as provided for by 18 Pa.C.S. § 6109(e).

257. Plaintiffs Fetsurka, Sieck, Defina, and Scott, Plaintiff FPC's members and supporters, and those similarly situated to them, wish to exercise their

71

fundamental, individual right to bear arms and would, but for Defendants'
laws, policies, and enforcement practices and reasonable fear of enforcement,
including but not limited to arrest, prosecution, loss of liberty, and lifetime
loss of their enumerated right to keep and bear arms should they be convicted
of an offense under 18 Pa.C.S. §§ 6106, 6107, and 6108.

258. Philadelphia Defendants, and their PPD, are, by and through their policies and
enforcement practices of closing the GPU, and/or limiting or inadequately
providing GPU staff and other resources, and/or limiting the public's access
to their rights through the GPU, and/or dis-favorably treating the GPU and its
services relative to other units and services, singling out the fundamental,
individual right to keep and bear arms for "special—and specially
unfavorable—treatment." *McDonald*, 561 U.S. at 779.

259. Philadelphia Defendants, and their PPD, have and are currently enforcing
laws and policies chilling, delaying, and denying law-abiding adult citizens in
Philadelphia their fundamental, individual right to bear arms, including but
not limited to by their closure and restrictions placed upon the GPU, severe
and undue delays in the acceptance and processing of LTCF applications,
severe and undue burdens in the acceptance and processing of LTCF
applications, and the enforcement of 18 Pa.C.S. §§ 6106, 6107, and 6108,
which prevents those individuals from carrying a loaded, operable handgun

on their person, in public on public streets, sidewalks, and spaces and in motor vehicles, in case of confrontation, and for the purpose of immediate self-defense.

260.   As a result of Philadelphia Defendants' GPU closure policy, and active and continuing enforcement of that policy, Plaintiffs Fetsurka, Sieck, Defina, and Scott cannot apply for and be issued a LTCF.

261.   By operation of 18 Pa.C.S. § 6109(b), an otherwise qualified, law-abiding individual, including Plaintiffs Fetsurka, Sieck, Defina, and Scott may not make an application for a LTCF with a sheriff of another county that has not ceased to process LTCF applications.

262.   As a result of Philadelphia Defendants' enforcement of their laws and policies, Plaintiffs Fetsurka, Sieck, Defina, and Scott cannot apply for and timely be issued a LTCF under 18 Pa.C.S. § 6109, therefore subjecting Plaintiffs and others like them to the restrictions specified in 18 Pa.C.S. §§ 6106, 6107, 6108, Phila. Code §§ 10-818 and 10-833 (with respect to carry within 100 feet of a school), and Directive 5.27, which Defendants have at all relevant times enforced, and are actively enforcing today.

263.   Plaintiffs Fetsurka, Sieck, Defina, and Scott would acquire a LTCF for lawful purposes, including self-defense, in order to be exempt from the Defendants' criminal laws and associated penalties, but cannot due to Philadelphia

Defendants' active enforcement of their laws and policies, including but not limited to the GPU closure, treating the GPU and the services it provides as "non-essential," limited and/or inadequate public access to the GPU, limited and/or inadequate resources provided to the GPU, and their refusal to institute an online LTCF permitting system, like Permitium's PermitDirector, such that it cannot timely accept and process applications for and issue LTCFs under 18 Pa.C.S. § 6109.

264. As a result of Philadelphia Defendants' enforcement of § 10-833(2) with respect to carry within 100 feet of schools, Plaintiffs Fetsurka, Sieck, Defina, and Scott cannot carry firearms on their person or in motor vehicles, in public, for lawful purposes including self-defense.

265. Plaintiffs Fetsurka, Sieck, Defina, and Scott, Plaintiff FPC's members and supporters, and similarly situated members of the public who do not currently possess a valid LTCF cannot lawfully carry handguns, in any manner (i.e., openly or concealed), in Defendant City of Philadelphia because of Defendants' laws, policies, and active enforcement of them.

266. Plaintiffs Fetsurka, Sieck, Defina, and Scott, Plaintiff FPC's members and supporters, and similarly situated members of the public cannot lawfully carry handguns, in any manner, outside of Defendant City of Philadelphia because of Defendant Evanchicks' active enforcement of the laws, policies, and

practices  criminalizing the carrying of loaded, operable firearms in public without a LTCF.

267.  Plaintiffs Fetsurka, Sieck, Defina, and Scott wish to, but have been forced to abstain from, carrying a loaded, operable handgun on their person, in public and in motor vehicles, in case of confrontation, and for the purpose of immediate self-defense, for fear of arrest, prosecution, incarceration, and/or fine under Defendants' laws and their enforcement of them.

268.  Plaintiffs Fetsurka, Sieck, Defina, and Scott reasonably fear arrest and prosecution for exercising their rights by carrying a loaded, operable handgun on their person outside the home, in public, because of the Defendants' laws, policies, and active enforcement of them.

269.  Defendant Evanchick is responsible for the formulation, issuance, and/or implementation of the Commonwealth's laws, policies, practices, and customs at issue in this case.

270.  Defendant Evanchick has enforced and continues to enforce the Commonwealth's laws, policies, customs, and practices against Plaintiffs and is in fact presently enforcing and threatening to enforce the challenged laws, policies, customs, and practices against Plaintiffs and others like them.

271.  Philadelphia Defendants, and their PPD, have enforced and continue to enforce the challenged laws, policies, customs, and practices against Plaintiffs

and are in fact presently enforcing and threatening to enforce the challenged laws, policies, customs, and practices against Plaintiffs and others like them.

272. Plaintiff FPC has an associational interest in defending and asserting the rights of their members and similarly situated members of the public against Defendants' laws, policies, and enforcement practices.

273. Because of Defendant's enforcement of the laws, regulations, policies, practices, and customs challenged herein, FPC has suffered and continues to suffer a diversion of resources to identify and/or counteract the unlawful actions, as well as a frustration of the organization's mission.

274. Defendants' laws, policies, and enforcement practices target and impact normal, legally eligible adults who are constitutionally entitled to bear, carry, and lawfully use arms for all lawful purposes, including self-defense, in public.

275. Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the Commonwealth of Pennsylvania, including Plaintiffs Fetsurka, Sieck, Defina, and Scott, all similarly situated members and supporters of Plaintiff FPC, and all other similarly situated individuals, through their enforcement and implementation of the Commonwealth's laws and regulations.

276. Philadelphia Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the Commonwealth of Pennsylvania, including Plaintiffs Fetsurka, Sieck, Defina, and Scott, all similarly situated members and supporters of Plaintiff FPC, and all other similarly situated individuals, through their enactment and enforcement of the City's laws, policies, practices, and customs, including but not limited to the criminal laws banning carry of firearms, the closure of the GPU, the GPU's appointment scheduling and other delaying policies, the lack of resources dedicated to the GPU sufficient to perform its duties and provide constitutionally necessary services, their policy treating the GPU as "non-essential" and "second class" to other City services, their refusal to provide alternative means of accepting and processing LTCF applications and issuing LTCF licenses, their unnecessary and severe burdens on applicants, delays, and other such policies and practices, which have denied, and will continue to deny, prevent, and chill by criminal sanction, the exercise of the fundamental right to bear arms in public for self-defense and in case of confrontation unless and until redressed through the relief Plaintiffs seek herein.

277. Plaintiffs have incurred nominal damages, attorney fees, and costs as a direct result of Defendants' laws and policies, and their enforcement of them, as well as filing and prosecuting the present action.

278. 42 U.S.C. § 1983 creates a cause of action against state and local government actors who deprive individuals of federal constitutional rights under color of state law.

279. Defendants' laws, policies, practices, customs, and ongoing enforcement of them violate the rights of Plaintiffs Fetsurka, Sieck, Defina, and Scott, Plaintiff FPC's members and supporters, and similarly situated members of the public, are thus causing injury and damage actionable under 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant, as follows:

a)    A declaratory judgment that Defendants' laws, regulations, policies, enforcement practices, and actions individually and/or collectively prevent Plaintiffs, Plaintiff FPC's members and supporters, and similarly situated individuals who are not disqualified from exercising Second Amendment rights, from carrying loaded, operable firearms in public on their person and in their motor vehicles, for all lawful purposes including self-defense, and thus

violate the right to keep and bear arms protected under Second and Fourteenth Amendments to the United States Constitution;

b)      An order temporarily, preliminary, and permanently restraining and enjoining Defendants and their officers, agents, servants, employees, all persons in concert or participation with them, and all who have notice of the injunction, from enforcing Defendants' laws, regulations, policies, enforcement practices, and actions that individually and/or collectively prevent Plaintiffs, Plaintiff FPC's members and supporters, and similarly situated individuals who are not disqualified from exercising Second Amendment rights, from carrying loaded, operable firearms in public on their person and in their motor vehicles, for all lawful purposes including self-defense;

c)      A declaratory judgment that Philadelphia Defendants' policies and practices of treating constitutionally necessary firearm-related services as "non-essential" or "second class" to other City of Philadelphia services are unconstitutional under the Second and Fourteenth Amendments to the United States Constitution;

d)      An order temporarily, preliminary, and permanently restraining and enjoining Philadelphia Defendants' policies and practices of treating constitutionally necessary firearm-related services as "non-essential" or "second class" to other City of Philadelphia services;

e)   An order requiring Philadelphia Defendants and their respective units, employees, officers, and agents, and all those with such powers delegated to them, to: 1) provide one mail or courier-based LTCF application submission and license issuance alternative; 2) provide one or more electronic alternative means for the submission and processing of LTCF applications; 3) provide a waiver or one or more alternative means for payments of LTCF application fees; 4) cease requiring paper, in-person only LTCF applications, interviews, and materials and information not required to determine if an applicant is "disqualified from exercising Second Amendment rights," as the Supreme Court defined in *Heller*; 5) accept and timely process applications for a LTCF in a manner commensurate with the fundamental right at stake; 6) provide their GPU with the funding, personnel, and/or resources necessary to support the demand for their constitutionally required services; and, 7) immediately issue a LTCF to Plaintiffs Fetsurka, Sieck, Defina, and Scott, and to similarly situated members of Plaintiff FPC and the public, upon their submission of an application as soon as they are confirmed by Defendant Evanchick's E-PICS online system as not "disqualified from exercising Second Amendment rights," as the Supreme Court has defined in *Heller*;

f)   Nominal damages against Defendant Outlaw;

g)   All other and further legal and equitable relief, including injunctive relief, against Defendants as necessary to effectuate the Court's judgment, and/or as the Court otherwise deems just and equitable; and,

h)   Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

Respectfully Submitted,

/s/ Adam Kraut

| | |
|---|---|
| William Sack | Adam Kraut |
| Attorney Id. No. 325863 | Attorney Id. No. 318482 |
| FIREARMS POLICY COALITION | FIREARMS POLICY COALITION |
| 1215 K Street, 17th Floor | 1215 K Street, 17th Floor |
| Sacramento, CA 95814 | Sacramento, CA 95814 |
| (916) 596-3492 | (916) 476-2342 |
| wsack@fpclaw.org | akraut@fpclaw.org |
| | |
| Joshua Prince, Esq. | Raymond M. DiGuiseppe |
| Attorney ID: 306521 | THE DIGUISEPPE LAW FIRM, P.C. |
| CIVIL RIGHTS DEFENSE FIRM, P.C. | 4320 Southport-Supply Road |
| 646 Lenape Rd | Suite 300 |
| Bechtelsville, PA 19505 | Southport, NC 28461 |
| 888-202-9297 ext. 81114 | P: 910-713-8804 |
| 610-400-8439 | E: law.rmd@gmail.com |
| Joshua@Civilrightsdefensefirm.com | *Appearing Pro Hac Vice* |