## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEITH FETSURKA;** | : | Civil Rights Complaint |
| **TIMOTHY SIECK;** | : | 42 U.S.C. § 1983 |
| **NICOLAS DEFINA;** | : | |
| **ANDREW SCOTT;** and, : | | |
| **FIREARMS POLICY** | : | |
| **COALITION, INC.,** | : | |
| Plaintiffs | : | |
| | : | |
| **v.** | : | Case No. – 2:20-cv-05857 |
| | : | |
| **DANIELLE OUTLAW,** | : | |
| Philadelphia Police Commissioner; | : | |
| **CITY OF PHILADELPHIA,** | : | |
| **PENNSYLVANIA;** and, | : | |
| **COL. ROBERT EVANCHICK,** : | | |
| Commissioner of Pennsylvania : | | |
| State Police, | : | |
| Defendants | : | |

## PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS

COME NOW Plaintiffs Keith Fetsurka, Timothy Sieck, Nicolas Defina, and Andrew Scott ("Individual Plaintiffs"), and Firearms Policy Coalition, Inc. ("FPC"), who hereby respectfully submit by and through counsel this response to the Motion to Dismiss ("MTD") the First Amended Complaint ("FAC") filed by Defendant Danielle Outlaw and Defendant City of Philadelphia, Pennsylvania ("City Defendants"):

## INTRODUCTION

City Defendants move to dismiss the FAC on the grounds that Plaintiffs lack constitutional standing to raise the Second Amendment challenge they have raised and that the FAC in any event fails to state a claim on which relief can be granted. But the FAC easily survives this challenge. The largely undisputed facts and allegations in the FAC

1

establish that the challenged conduct of City Defendants has clearly violated the Second Amendment, that a live case and controversy remains in which this Court retains the power to grant meaningful, effective, and necessary relief, and that all Plaintiffs have a strong personal stake in the outcome of this action seeking such relief. The MTD must be denied.

## UNDISPUTED FACTS AND ALLEGATIONS

In their MTD, City Defendants either expressly concede or do not dispute any of the following essential facts and allegations underlying the FAC they seek to dismiss:

No ordinary citizen, including Individual Plaintiffs and the members and supporters of FPC, may lawfully carry on his or her person or in a motor vehicle in the City of Philadelphia a concealed and loaded firearm without a license to carry a firearm ("LTCF"), as the laws of the Commonwealth and those of City itself expressly prohibit such activity on pain of criminal sanction. 18 Pa.C.S. §§ 6106(a), 6107, 6109; Phila. Code §§ 10-818, 10-833, Philadelphia Police Department ("PDD"), Directive 5.27. (FAC ¶¶ 2-7, 35-45, 57, 66, 238-240, 245.) Violation of these laws will also result in the lifetime forfeiture of the offender's Second Amendment rights. (*Id.* ¶¶ 46, 245.) Both the Commonwealth and City Defendants are and have been actively enforcing these laws and related regulations, customs, and policies. (*Id*. ¶¶ 27-28, 30, 56, 58-65, 237, 241, 259, 269-271.)

Individual Plaintiffs are ordinary, law-abiding citizens who are not disqualified from exercising their rights under the Second Amendment (FAC ¶¶ 132, 134, 153, 188, 254) and who meet all the eligibility requirements for a LTCF (FAC ¶¶ 133, 154-155, 188-190, 256). They and the similarly situated members and supporters of FPC, who desire to lawfully carry a loaded firearm for self-defense and other lawful purposes, reasonably fear that

2

Defendants will enforce against them their laws and related enforcement policies, practices, and customs should they attempt to carry a firearm in violation of any of the same. (FAC ¶¶ 135, 157-158, 163, 172-173, 176, 192-193, 198, 249, 255, 257, 267-268.)

Individual Plaintiffs and the similarly situated members and supporters of FPC represent all other similarly situated individuals in Philadelphia County. (FAC ¶ 247.)[1]

City Defendants' Gun Permit Unit ("GPU") is and has been the only means of access for obtaining a LTCF in the entire County of Philadelphia, including for the more than 1.5 million residents in the City of Philadelphia alone. (FAC ¶¶ 50, 54-55.)

Historically, and for many months if not years before the GPU instituted new LTCF application procedures on December 7, 2020—only *after* being sued in this case—City Defendants had purposely, and woefully, understaffed and underfunded the GPU's operations, leaving the public with little or no access to its essential services—not just in comparison to the general demand for these services but in stark contrast to other, less essential services that City Defendants readily provide the public. (FAC ¶¶ 11, 71, 93, 129.)

Case in point, while City Defendants are *now* using email to accept and process LTCF applications, historically, such electronic procedures have been widely and consistently made available in providing the public access to other City services, including email, text messaging, and Internet-based platforms. (FAC ¶¶ 10, 91, 111, 112, 113.)

---

[1]     *See e.g.,* FAC ¶ 247, undisputed by City Defendants, where Plaintiffs allege: "As to all claims made in a representative capacity, there are common questions of law and fact that substantially affect the rights, duties, and liabilities of many similarly situated Pennsylvania and Philadelphia residents and visitors who knowingly or unknowingly are subject to the Defendants' laws, regulations, policies, and enforcement practices at issue."

Additionally, until just recently, City Defendants unnecessarily limited the application process to paper-based applications and in-person submissions (FAC ¶¶ 11, 69, 93, 120-124), despite the availability of effective online application programs already being used throughout the Commonwealth to process LTCF applications, and in other states processing similar applications, such as Permitium (FAC ¶¶ 114-119), and despite the many other forms of widely available technologies they have long used for interfacing with the public in providing other City services (FAC ¶¶ 123-125). Indeed, they have even refused to use (and to this day still refuse to use) *regular* mail services. (FAC ¶ 122).

In violation of the preemption enacted by the General Assembly and provided for by 18 Pa.C.S. §§ 6109(c),[2, 3] 6124 and 37 Pa.Code 33.114, City Defendants have also

---

[2]     As specified in Section 6109, the General Assembly delineated between the process of applying, by using the term "application" and the document to be submitted to apply for a license to carry firearms, by using the term "form." For example, subsection (b) is titled "Place of application" and subsection (c) specifies that "[t]he *application* for a license to carry a firearm shall be uniform throughout this Commonwealth and shall be on a *form* prescribed by the Pennsylvania State Police." *Id*. (emphasis added). If the term "application" was intended to convey the form promulgated by the Pennsylvania State Police, subsection (b) would have been titled "Place to make application" instead of "Place of Application" and subsection (c) would have been written as "The application for a license to carry a firearm shall be uniform throughout this Commonwealth and prescribed by the Pennsylvania State Police" instead of "The application for a license to carry a firearm shall be uniform throughout this Commonwealth and shall be on a form prescribed by the Pennsylvania State Police."

[3]     While statutory law regarding the issuance of LTCFs has existed since 1972 (Dec. 6, 1972, Act 1972-334 (S.B. 455), P.L. 1482), the General Assembly was frustrated by the lack of uniformity throughout Pennsylvania relating to the form and process for issuance of LTCFs, especially in relation to Philadelphia, and in 1988 decided to make the process and form uniform (Dec. 19, 1988, Act 1988-158 (S.B. 245), P.L. 1275). The following colloquy occurred in relation to Senate Bill 245 (which would become Act 158 of 1988):

**Mr. GODSHALL**: …This amendment is reform legislation. It amends section 6109 of the Uniform Firearms Act to establish *uniform comprehensive criteria* for the issuance of a license to carry a firearm.

…

The form of the application. Presently in many counties all different kinds of forms are used. Probably there may be 15, 20 different forms used by various counties and maybe even more. This bill says that the form shall be one as prescribed by the Pennsylvania State Police.

…

**Mr. WASS**. Mr. Speaker, as we refer to criminal investigations, can you describe how a criminal investigation would happen?

**Mr. GODSHALL**. The sheriff would have to dial into or call the Pennsylvania State Police asking for a criminal background check on any individual, and it would be forthcoming in minutes, if not sooner.

…

**Mr. GODSHALL**. What we are trying to do with this bill is establish uniform standards around the State of Pennsylvania which do not exists today.

…

What we are doing here is actually by statute *we are uniforming all the issuing agents. We are taking all the issuing agents and putting them under one standard*, and it is the first time it has ever been done…It creates a uniform standard.

…

**Mr. PRESMANN**. … Originally, when opposition came to me on this bill both from sheriffs and chiefs of police in my area, one of the things it stemmed on was the idea of the sheriff or the chief of police making a judgment call on who should get a firearm, the permit to carry a concealed firearm. That was one of their biggest concerns, that the judgment call would be taken away from them. The example used to me by my sheriff is, *there is someone that <u>he knows</u> by reputation is a hothead*, someone who gets in fights but has never had a conviction because it is a bar fight where the two guys go outside and fight and that kind of thing. I do not have my attorney with me to read this thing for me, but under (1)(i), "An individual whose character and reputation is such that the individual would be likely to act in a manger dangerous to public safety," does that section cover my hypothetical where a sheriff can make a judgment call?

**Mr. GODSHALL**.   This is exactly why that was put in there…we wanted to have something in here with some discretion, because we knew that *<u>they knew people, they were familiar with people</u>*, and that is exactly the reason that was put in there, and it is exactly worded this way to cover that situation.

Commonwealth of Pennsylvania Legislative Journal, 172nd General Assembly Session of 1988 No. 64, Pg. 1817, 1819-1820 (emphasis added).

After Act 158 of 1988 was enacted, issues arose regarding Philadelphia's interpretation of then Section 6109(e)(2), which prompted the General Assembly to again take action, so the LTCF application process would be uniform across the entire Commonwealth. *See*, June 13, 1995, Act 1995 Special Session-17 (H.B. 110), P.L. 1024. The following colloquy occurred in relation to House Bill 110 (which became Act 17 of 1995).

> **Senator ROBBINS**. … A provision to delete the Philadelphia exemption to uniform statewide criteria for the issuance of a license to carry a firearm is also included in my amendment. *Philadelphia gun owners should not be treated as second class citizens*. They should have the same right to self-defense as other citizens of the Commonwealth. *They are entitled to equal protection under our Constitution*. Currently, the rate of license issuance in the 66 counties outside of Philadelphia is nearly 13 times as great as the rate of issuance in Philadelphia. It has been so difficult to obtain a license in Philadelphia that most folks do not even bother applying. This is a section of current law that is crying out for reform. There was a consensus among the select committee that if we wish to provide better protection for the law-abiding citizens in Philadelphia, he or she should have the same opportunity to obtain a license to carry as all other Pennsylvania citizens. To reduce crime, we have to increase the opportunity citizens have to protect themselves against it. The record in the other 66 counties in the year since enactment of *Act 158 of 1988, the reform legislation that established uniform statewide criteria for the issuance of a license to carry a firearm*, shows that issuing licenses to all law-abiding citizens who apply does not result in increased incidents of firearm misuse among that class of persons.

Commonwealth of Pennsylvania Legislative Journal, 1st Special Session of 1995, No. 32, pgs. 171-72 (emphasis added).

With the enactment of Act 17 of 1995, it is explicitly clear that the General Assembly sought to enact a uniform process and form – preempting issuing authorities from regulating the process and form and ensuring equal application of the law – that would apply to all applicants across the Commonwealth, regardless of their county of residence, whereby the applicant is only required to complete and submit the form promulgated by the Pennsylvania State Police and the investigation was to solely entail the issuing authority obtaining approval from the Pennsylvania State Police that the applicant was not prohibited from an LTCF. The only discretion provided to an issuing authority was that which was already *known* to the issuing authority about the applicant.

imposed several additional conditions above and beyond the requirements of the Commonwealth's statutory scheme (which City Defendants continue to claim they can and will enforce in the future in their discretion, *see* MTD 18-19): personal interviews of the applicant, two forms of proof of residence, fingerprinting, discharge papers (DD-214 forms) for all former members of the armed forces, proof of legal name change for all applicants whose names have been changed based on a marriage, the name and address of two "references," and payment of the necessary fees by money order. (FAC ¶¶ 77, 78, 79, 80, 81, 85, 86, 87, 93, 109.) In fact, as made explicitly clear in Section 6109(c), the *only* requirement of an applicant is to complete and submit the form – promulgated by the Pennsylvania State Police – to the proper issuing authority, pursuant to 6109(b).

None of these additional conditions are necessary to determine whether the applicant is disqualified from exercising his or her Second Amendment rights, as the Pennsylvania Instant Check System (PICS) system is alone sufficient to make this determination. (FAC ¶ 87, 89, 126.) Nor is it necessary to limit the forms of payment to money orders only, as City Defendants have (and still do), given the longstanding ubiquity and reliability of debit and credit card transactions. (FAC ¶ 127.)

Worse, while the GPU is *now* open, City Defendants completely shut down operations of the GPU for *more than four solid months* between March and July 2020, leaving residents, including Individual Plaintiffs, the members and supporters of FPC, and all similarly situated individuals, with no means to even *apply for* a LTFC. (FAC ¶¶ 95.)

When they finally reopened the GPU on July 8, 2020, City Defendants further curtailed the already limited services by canceling the walk-up services they did provide,

relegating everything to an in-person application process *by appointment only*. (FAC ¶¶ 74, 100-101; *see also* https://www.phillypolice.com/forms/gun-permit-unit/index.html.) And these appointments had to be scheduled during the limited hours of 8:30 a.m. to 2:00 p.m., Monday through Friday, through the phone line that often went unanswered due to the persistent understaffing and underfunding. (*Id.* ¶¶ 96, 101.) On information and belief, the first in-person appointments did not resume until at least July 22, 2020. (*Id.* ¶ 102.)

And then, City Defendants completely shut down the GPU a second time, between November 19, 2020, and December 7, 2020 (FAC ¶¶ 98, 100; *see also* https://www.phillypolice.com/forms/gun-permit-unit/index.html.)

Consequently, for the months and weeks leading up to December 7, 2020, applicants experienced lengthy delays and backlogs in the submission, processing, and determination of applications (FAC ¶¶ 11, 108, 130), such that members of the public seeking to apply for a LTCF in the exercise of their fundamental Second Amendment rights were met with a telephone line often unanswered or entirely unmanned (FAC ¶¶ 11), and often relegated to appointments scheduled many months into the future (FAC ¶¶ 68, 70, 103-107).

The systemic failures and limitations prevailing within the GPU throughout this period, i.e., until the reopening and institution of new procedures on December 7, 2020, were widely known and substantiated with documented accounts of members of the public, who reported having made numerous attempts to reach the GPU only for the phone line to go unanswered and for any appointments offered to be scheduled six months or more, even as long as an entire year, into the future. (FAC ¶¶ 103-107.)

City Defendants' persistent understaffing and underfunding of the GPU, imposition of unnecessarily onerous conditions, and shutdowns leading to the backlogs, major delays, and interruptions in service over this period directly impacted Individual Plaintiffs, FPC's similarly situated members and supporters, and all similarly situated individuals, as they and all such individuals were entirely precluded or severely constrained in their ability to apply for and obtain within any reasonable period of time the LTCF necessary to lawfully exercise their Second Amendment rights. (FAC ¶¶ 261-267, 274-275.)

Plaintiff Fetsurka has desired to obtain a LTCF since before the GPU's first closure in 2020, but was unable to make the required in-person appearance during the GPU's hours of operation before it shut down in March 2020. (FAC ¶ 141-143.) He and all similarly situated individuals were completely precluded from even applying during the closure. (FAC ¶¶ 98, 100.) When he contacted the GPU in August 2020 after learning it had reopened, he took the next earliest appointment which was September of 2021. (*Id.* ¶ 144-147.) Two months later, the GPU called and offered an earlier appointment on November 19, 2020, which he accepted. (*Id.* ¶¶ 147-148.) Plaintiff Fetsurka waited yet another month for that appointment only to receive another call from the GPU on November 18, cancelling it. (*Id.* ¶ 149.) He was later scheduled for December 14, 2020, though that was scrapped as well because of the general change in procedures on December 7th. (*Id.* ¶¶ 150-151.)

Plaintiff Sieck has desired to obtain a LTCF since as early as May of 2020, but was unable to do so throughout the periods of the GPU's closures between March 2020 and July 2020 and November 19, 2020 and December 6, 2020, and he had no realistic expectation of being able to obtain one given the widely known staffing shortages, delays,

and backlogs at the GPU throughout this time period, which necessarily precluded any ordinary law-abiding citizen like him from actually being able to obtain a LTCF for many months if not more than a year beyond the point of any application. (*Id.* ¶¶ 164-166.)

Plaintiff DeFina has been seeking an LTCF since at least April 10, 2019, when he applied for one, in-person at the GPU, at which time he was told there "should be no problem" with issuing one to him. (FAC ¶¶ 177-179.) However, in the intervening months between then and December 7, 2020, he received no further communication from the GPU about the application and his work schedule over this period prevented him from making yet another in-person appearance in an effort to determine the status of the application. (*Id.* ¶¶ 180-183.) Further, like Plaintiff Sieck and everyone else, Plaintiff DeFina was absolutely precluded from pursuing the previous application or initiating a new one during the periods that the GPU was shut down, and he had no realistic expectation of being able to obtain one any time in the near future given the widely known staffing shortages, delays, and backlogs prevailing at the GPU throughout this period—particularly when the lack of any response to his prior application indicated he had been *denied*. (*Id.* ¶¶ 184-185.)

Plaintiff Scott has desired to obtain a LTCF since as early as November 2020, but he was absolutely precluded from even applying for much less obtaining one during the period of the GPU's closure between November 19, 2020 and December 6, 2020, and he had no realistic expectation of being able to obtain one during any other part of November 2020 given the widely known staffing shortages, delays, and backlogs, which necessarily precluded any ordinary law-abiding citizen like him from actually being able to obtain a

LTCF for many months if not more than a year beyond the point of any application, until the GPU reopened and instituted new procedures on December 7, 2020. (*Id.* ¶¶ 199-200.)

Based on the same widely known systemic issues persisting at the GPU through December 6, 2020, similarly situated members and supporters of FPC, as well as all other similarly situated individuals represented herein, have been adversely and directly harmed in the same essential manner, and FPC itself has suffered and continues to suffer losses through the diversion of resources necessary to defending and asserting its associational interests in protecting the rights of all these affected individuals. (FAC ¶¶ 26, 272-273.)

## GENERAL LEGAL STANDARDS

City Defendants move to dismiss the FAC for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") and lack of standing under Rule 12(b)(1) of the FRCP, though based on the same essential contention—that Individual Plaintiffs cannot show a legally cognizable injury in fact under the Second Amendment. The legal standards for surviving a motion to dismiss under Rule 12(b)(6) are lenient, favoring adjudication on the merits, and thus require the court "to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Hartig Drug Company Inc. v. Senju Pharmaceutical Co. Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016). The legal standards are the same under Rule 12(b)(1) whenever the challenge attacks the complaint on its face. *Petruska v. Gannon University*, 462 F.3d 294, 299, n. 1 (3d Cir. 2006). When the challenge "attacks allegations underlying the assertion of jurisdiction in the complaint,"

the court need not accept the allegations as true and may "weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Hartig Drug Company*, at 268.

Generally, "[c]onstitutional standing requires that a plaintiff adequately establish:

(1) an injury in fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Medtronic Sofamor Danek USA, Inc. v. Globus Medical, Inc.*, 637 F.Supp.2d 290, 297-98 (E.D. Pa. 2009.) Standing must be determined "as of the commencement of the suit," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570, n. 2 (1992), i.e., based on "the facts of the case as they existed at the time the lawsuit was filed," *Geneva College v. Sebelius*, 929 F.Supp.2d 402, 422 (W.D. Pa. 2013). The standing doctrine must be distinguished from the mootness doctrine, which is like "the doctrine of standing set in a time frame," *Freedom from Religion Foundation, Inc. v. Connellsville Area School Dist.*, 127 F.Supp.3d 283, 298 (W.D. Pa. 2015), and ensures that a live case and controversy remains "extant at all stages of review," *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71-72 (2013).

"Like ripeness and unlike standing, mootness is determined at the time of the court's decision (rather than at the time the complaint is filed)." *Donald J. Trump for President, Inc. v. Boockvar*, __F.Supp.3d__ (W.D. Pa. 2020), 2020 WL 5997680, *30. And, while the plaintiff bears the burden of demonstrating the existence of standing at the commencement of the action, the burden shifts to the party claiming mootness. *Hartnett v. Pennsylvania State Education Association*, 963 F.3d 301, 305 (3d Cir. 2020). "If the defendant (or any party) claims that some development has mooted the case, it bears '[t]he ''heavy burden of

persua[ding]'' the court' that there is no longer a live controversy." *Id.* at 305-06 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

## ARGUMENT

### I.  All Plaintiffs Have Standing to Raise the Second Amendment Challenge

At the outset, City Defendants fail to draw the important legal distinction between the standing and mootness doctrines, framing the bulk of their motion around facts and circumstances that occurred *after* the commencement of the action—i.e., after the filing of the initial complaint on November 20, 2020, and the FAC on November 30, 2020. They repeatedly emphasize the intervening events of the reopening of the GPU and its new process of accepting and processing applications by email as of *December 7*, 2020, which have enabled Individual Plaintiffs to obtain a LTCF *only after* months of needless delay. They argue that *Plaintiffs* "have failed to demonstrate an injury-in-fact" and *Plaintiffs* "cannot show redressability or causation either" based on these later events, MTD at 10-13, 21, improperly attempting to shift to Plaintiffs *their* burden of demonstrating that the changed circumstances negate the case and controversy on which the complaint is based.

In fact, while characterizing their jurisdictional challenge as an attack on *standing*, City Defendants entirely avoid the actual issue to be decided for *standing* purposes: whether the FAC pleads facts sufficient to demonstrate the requisite injury in fact, causation, and redressability based on the facts in existence *when the suit was commenced*. As discussed below, the intervening events on which City Defendants rely to attack Plaintiffs' *standing* have not negated the original case and controversy so as to render the

action *moot*, but Plaintiffs will first address the question of *standing* as of the time the suit was commenced because that is the threshold question that the MTD actually presents.

### A.    The Palpable "Injury in Fact"

In the context of standing, a "concrete and particularized" injury is one that actually or imminently affects the plaintiff "in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. at 560. Because City Defendants do not wrestle with the actual question of *standing*, they have not addressed—much less refuted—the essential allegations in the FAC concerning the constitutional injury that had *already been inflicted* by the time the suit was commenced on November 20, 2020, and *which continued to persist* until City Defendants reopened the GPU under new procedures on December 7, 2020.

Rather, in keeping with their general strategy of tailoring the MTD to focus on these later events, City Defendants leave wholly undisputed the core factual allegations that: historically, they purposely understaffed and underfunded the GPU generally and in contrast to other City services which they favored by offering greater resources and accessibility to the public; historically, they purposely limited the LTCF application process to paper-based application and in-person submissions, unnecessarily, as evidenced by the new email process; historically, they purposely imposed several conditions not required or contemplated under the statutory scheme in violation of the preemption – 18 Pa.C.S. §§ 6109(c), 6124 – enacted by the General Assembly, and not necessary as evidenced by the new process; they have completely shut down the GPU for extended periods of time, including for more than four months between March and July of 2020, and most recently between November 19 and December 7, 2020.

City Defendants also do not dispute that the historical operations of the GPU led to significant delay and backlogs in the submission, processing, and determination of applications, forcing all new applicants to make numerous and repeated efforts to contact someone at the GPU just to even set an appointment and then only to be scheduled for an appointment several months if not a year or more into the future. Nor do they contest the essential allegations in the FAC regarding the impact to Plaintiffs—that all Individual Plaintiffs and those similarly situated who wished to obtain a LTCF during this time were absolutely precluded from even applying for much less obtaining one throughout the periods that City Defendants had shut down the GPU, which collectively amounted to more than five months—*almost half of the year 2020*—and, even when the GPU was open, these individuals had absolutely no realistic expectation much less any assurance of being able to obtain a LTCF anytime within the reasonably near future, given the widely known problems at the GPU that effectively sidelined all new applicants for months on end. As City Defendants also do not attempt to dispute, Plaintiff Fetsurka himself was booked for an appointment *more than a year* into the future when he called the GPU in August 2020, and then, only due to this litigation, were the Plaintiffs' applications processed *post-haste* in an evident attempt to undermine Plaintiffs' standing and dissuade this Court from reviewing the unlawfulness of City Defendants' past and ongoing conduct.

These circumstances directly affected each Individual Plaintiff, each similarly situated member and supporter of FPC, and each other similarly situated individual represented herein "in a personal and individual way" by completely cutting off the ability to obtain a LTCF in the lawful exercise of their carry rights under the Second Amendment,

or severely limiting it to the point of being essentially non-existent, throughout the period they sought to obtain a LTCF and continuing to December 7, 2020. Under these circumstances, such individuals need not even have attempted to apply for a LTCF during this period to have suffered the requisite degree of harm, as City Defendants suggest. MTD 10, 14. Notably, in emphasizing the efficacies of their new process, City Defendants boast they have "made a process accessible to [Plaintiffs] to accept applications online and have them processed in a timely manner," MTD 13, implicitly conceding the preexisting process was *not* accessible or timely in handling LTCF applications. Indeed, the restraints imposed by that process effectively amounted to a complete ban, and a severe curtailment at best, on the right to keep and bear arms throughout this period, and such restraints are unquestionably unconstitutional. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). City Defendants do not claim otherwise in ignoring the operative window of time.

### B.      Causation and Redressability Are Equally Plain

City Defendants' argument that "Plaintiffs have failed to establish the requisite causation or redressability prongs of the standing analysis" is similarly a non-starter because it is based solely on the changed circumstances on which they generally rely—i.e., that *now*, as of December 7, 2020, "Defendants have made a process accessible to [Plaintiffs] to accept applications online and have them processed in a timely manner" and thus "the relief that Plaintiffs are seeking is *currently* available to them." MTD 13 (italics added). City Defendants say nothing of causation and redressability as they relate to the time period *before* any such new process had been made available, which is the focus of the standing inquiry. For standing purposes, a "causal connection between the injury and

the conduct complained of" is one that is "fairly … trac[able] to the challenged action of the defendant," and an injury is redressable when it is "likely" that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. at 560-61.

The allegations that City Defendants enforced the law, and related regulations, practices, and customs resulting in the injury complained of, throughout the operative period for standing purposes—i.e., up through the date suit was commenced on November 20, 2020, and continuing through December 6, 2020—likewise remain undisputed. And these allegations are surely sufficient to establish the requisite causal connection, with City Defendants having consistently maintained control over the GPU. The allegations in the FAC are also unquestionably sufficient to establish redressability for standing purposes, for the full brunt of the injury complained of had not only already been inflicted by the time the suit was commenced but remained continuing through at least December 6, 2020.

Thus, Individual Plaintiffs have demonstrated constitutional standing. FPC also has standing to sue on behalf of itself and its members, who include Individual Plaintiffs, standing which City Defendants have not specifically challenged. *See Common Cause of Pennsylvania v. Pennsylvania*, 558 F.3d 249, 261 (3d Cir. 2009) ("an organization may be granted standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the organization or association itself may enjoy," and "an association may assert claims on behalf of its members, … where the record shows that the organization's individual members themselves have standing to bring those claims").

**II.      A Live Case and Controversy Remains, Compelling the Relief Plaintiff Seek**

*Mootness* is what City Defendants are really getting at in arguing "there is no present case or controversy" on the basis that the GPU is now "open and timely accepting applications via electronic submission" as of December 7, 2020. MTD 11-12. But they fail to recognize why this change in circumstances simply does not put an end to things.

First, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Laidlaw Envtl. Servs.*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). "[I]f it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Laidlaw*, at 189 (quoting *City of Mesquite*, at 289, n. 10). Consequently, the standard for determining whether a case has been mooted by the defendant's conduct is stringent," *id.*, as "it 'will moot a case only if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,'" *Hartnett v. Pennsylvania State Education Association*, 963 F.3d 301, 306 (3d Cir. 2020). And again, the defendant's burden here is a "heavy" one. *Hartnett*, at 307. Indeed, courts are generally "skeptical" of mootness arguments based on voluntary cessation of the conduct at issue, and particularly when the defendant claims "the injury will not recur, yet maintains that its conduct was lawful all along." *Id.* at 306-07.

Here, it is not at all clear that the undisputed conduct of City Defendants giving rise to Plaintiff's complaint—the historical, purposeful failure or refusal to properly fund and staff the GPU so as to manage and process the actual volume of LTCF applications; the total shutdowns of the GPU in response to concerns over the current COVID-19 pandemic;

the imposition of unnecessarily onerous and complex conditions and requirements for applicants; and, the resulting major delays and roadblocks for ordinary citizens seeking to obtain a LTCF in the lawful exercise of their carry rights under the Second Amendment— "could not reasonably be expected to recur." Quite the opposite, City Defendants devote a substantial portion of their MTD to defending their practices as having been "lawful all along"—arguing that "the closures and delays" have been necessary to protect the public welfare, and that the additional conditions imposed in violation of the preemption enacted by the General Assembly—including the in-person interviews, fingerprinting, and layers of extra paperwork that necessarily drag out, complicate, and ultimately delay access to a LTCF—are "reasonably related" to their interest in complying with those requirements. MTD at 15-16, 18-19. Since when is the violation of law "reasonably related" to putative compliance with the law? Any assurance that their challenged conduct will not recur must be met with acute skepticism, especially given their unclean hands.

In reality, with the COVID-19 pandemic still a prevailing health crisis, continuing to worsen every day, it seems virtually inevitable that City Defendants will once again reinstitute the same, if not more restrictive, actions resulting in "the closures and delays" that they insist "served" their interest in protecting the public welfare from the disease. At the very least, it cannot be said that City Defendants have carried their *heavy* burden of demonstrating it is *absolutely clear* that the challenged conduct will not recur. Rather, the requested declaratory and injunctive relief remain effective and necessary remedies against the constitutional violations at issue, and Plaintiffs retain a "personal stake in the outcome" in this action seeking such relief. *Symczyk*, 569 U.S. at 71-72.

Second, in addition to the declaratory and injunctive relief Plaintiffs seek, they have also specifically sought nominal damages against Defendant Outlaw. FAC ¶ 277, Prayer, p. 80, subsection (f). "Claims for damages are retrospective in nature—they compensate for past harm. By definition, then, such claims cannot be moot[.]" *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 622 (3d Cir. 2013) (internal quotations omitted); *accord Freedom from Religion Foundation*, 127 F.Supp.3d at 298 ("the availability of damages or other monetary relief almost always avoids mootness"). This equally applies to claims for nominal damages: "[t]he clear consensus outside the Third Circuit is that a valid claim for nominal damages is sufficient to avoid mootness," and the Third Circuit "has suggested that it agrees with it." *Freedom from Religion Foundation*, at 300 (internal quotations omitted). Thus, a Plaintiff's "claim for nominal damages 'continue[s] to present a live controversy" and the court "must address the merits of their challenge." *Id.* Based on this well-settled law, City Defendants cannot avoid this action on mootness grounds for the independent reason that Plaintiffs have sought nominal damages for the constitutional injuries already inflicted long before the GPU procedures changed on December 7, 2020.

## III. The FAC States a Strong Second Amendment Claim for Relief

In their attack on the merits of the Second Amendment claim, City Defendants claim the FAC fails to state a claim for relief because restrictions on carrying a firearm in public are "longstanding and presumptively constitutional regulations" and therefore impose no legally cognizable burden on the protected rights, and any burdens they have imposed or will continue to impose are justifiable anyway as "reasonable" means of protecting the public welfare and complying with the Commonwealth's statutory scheme. MTD 15-19.

City Defendants completely ignore—and thus make no attempt to dispute—the historical analysis in the FAC demonstrating that licensing schemes like the one at issue here clearly are not longstanding and are in fact creatures of modernity. FAC ¶¶ 213-216. City Defendants cite no evidence or support for their contrary claim, save for their citation to the opinion in *Drake v. Filko*, 724 F.3d 426, 429, where they seek cover under the Third Circuit's holding that the *justifiable need* standard under *New Jersey's* carry licensing scheme "qualifies as a 'presumptively lawful,' 'longstanding' regulation." MTD 17. This holding is not in accord with the documented history or tradition underlying the Second Amendment, but it has no preclusive impact here in any event because it is distinguishable.

Plaintiffs certainly do contend that the *Drake* analysis is wrong and the Second Amendment right does indeed extend outside the home, such that the ability of law-abiding citizens like them cannot be subject to government regulated licensing schemes. But, unlike in *Drake*, the injury Plaintiffs have suffered and for which they seek redress goes far beyond a single condition imposed against them under the scheme. Rather, in addition to challenging the general constitutionality of the scheme and all its conditions to licensure for ordinary citizens (save only for the requirement that a person is "not disqualified from exercising Second Amendment rights," as construed in *Heller*, 554 U.S. at 635), Plaintiffs have challenged the undisputed shutdowns, delays, backlogs, understaffing, underfunding, and other unnecessarily onerous and complex application procedures that have resulted in major delays and, for months at a time, have completely cut off the ability of ordinary people to obtain a LTCF in the exercise of their carry rights under the Second Amendment.

These are real and redressable injuries, and ones likely to recur, not just in light of City Defendants' historical practices of operating the GPU in this manner until just recently but also particularly in light of the prevailing COVID-19 pandemic which they use as justification for "the closures and delays" they readily admit have occurred. MTD 15, 18. Indeed, as the high court recently admonished, "even in a pandemic, the Constitution cannot be put away and forgotten," *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U. S. ____ (2020), 2020 WL 6948354, *3, and even though the "judicial impulse to stay out of the way in times of crisis … may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack," because "[t]hings never go well when we do," *id.* at 6 (Gorsuch, J., concurring). Thus, "our usual constitutional standards should apply during the current pandemic." *Id.*

*Heller* establishes the "usual standards" in this context, and it is clear that the historical procedures of the GPU resulting in the "closure and delays" that City Defendants seek to justify as "reasonable" do not pass constitutional muster under *Heller*. The severe constraints and indeed total roadblocks City Defendants have erected against ordinary citizens seeking to obtain a LTCF in order to lawfully exercise of their Second Amendment carry rights are categorically unconstitutional. *Heller*, 554 U.S. at 584 (the right to "bear arms" includes the "carry [of a firearm] ... in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person").

Even if these actions are subject a tiers-of-scrutiny analysis, that analysis certainly demands more than the "intermediate" scrutiny test that City Defendants apply. At a minimum, strict scrutiny is necessary, requiring that City Defendants demonstrate "they

are pursuing a compelling interest and using the least restrictive means available." *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 2020 WL 6948354 at *4. But even if one applies intermediate scrutiny, under the true test, the government "must, in some meaningful way, demonstrate that alternative measures that burden substantially less [protected conduct] would fail to achieve the government's interests."' *Bruni v. City of Pittsburgh*, 824 F.3d 353, 369 (3d Cir. 2016) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) & *McCullen v. Coakley*, 573 U.S. 464, 495 (2014), respectively).[4]

City Defendants have not done so. In fact, how can an outbreak of COVID-19 among employees at the GPU justify completely shutting down operations for *more than four months* when it is widely known that a mere *14-day period* of quarantining is sufficient to eliminate the risks that such individuals will further spread the virus? City Defendants do not even claim to have considered the efficacy of any less restrictive alternatives than those they have imposed. In fact, that City Defendants have been able to fairly quickly institute email-based application procedures and dispense with any in-person interviews or fingerprinting, except in what they call "certain exceptional circumstances," illustrates the availability of less restrictive alternatives to solely in-person, paper-based procedures at the GPU and total shutdowns of GPU operations in the event of COVID-19 outbreaks.

As for the additional conditions that City Defendants continue to impose, and claim to "retain discretion" to impose as they see fit moving forward, including interviews and

---

[4]     While these cases concern free speech restrictions, "we look to other constitutional areas for guidance in evaluating Second Amendment challenges," "the First Amendment is the natural choice," and "the structure of First Amendment doctrine should inform our analysis of the Second Amendment." *U.S. v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

fingerprinting, MTD 19, it is not so simple for them to just declare the conditions "reasonably related" to the discharge of their statutory duties, especially when they are in violation of the preemption enacted by the General Assembly. Assuming, *arguendo*, that City Defendants could even claim that these requirements, in direct violation of preemption, are "reasonably related," it is their burden to demonstrate dispensing with these conditions would result in a process that "would *fail to achieve*" its claimed interests in "fulfilling its statutory duties," MTD 19, something difficult to conceive when the investigatory duties spelled out in the statutory scheme itself contain no such requirements as conditions to ensuring proper processing of applications. And, the GPU's history of extraordinarily long delays underscores how its imposition of such unnecessary conditions could only be exacerbating the systemic problems and thus exacerbating the deprivation of the Second Amendment rights left hanging in the balance.

City Defendants seek to escape responsibility for their enforcement of the statute, pointing the finger at Defendant Evanchick as solely responsible for the injuries arising from the constitutional infirmities of the statutory scheme. MTD 4-5, 10, 20-21. But City Defendants themselves acknowledge their undoubtedly crucial role in the enforcement of the scheme through their arguments emphasizing their "significant interest in complying with the duties *delegated to [them]* under Section 6109 of the UFA," and that their "role under Section 6109 goes far beyond rubber stamping LTCF applications." MTD 15, 18 (italics added). And the allegations in the FAC specifically describing the nature and extent of their significant role in this process are among the many City Defendants do not dispute.

Lastly, City Defendants can find no refuge in the state intermediate appellate court opinion in *Caba v. Weaknecht*, 64 A.3d 39 (Pa. Commw. Ct. 2013) upholding the carry licensing scheme against a Second Amendment challenge. MTD 21. Simply put, "a federal court is not bound by a state court's interpretation of federal laws." *U.S. v. Bedford*, 519 F.2d 650, 654, n. 3 (3d 1975). It is the law of the United States Supreme Court that controls. *James v. City of Boise, Idaho*, 136 S.Ct. 685, 688-689 (2016), *per curiam* (all state and federal courts are "bound by this Court's interpretation of federal law"). Under that law, Plaintiffs are entitled to the relief they seek. At the least, it must be said that the FAC survives the lenient standards for "stat[ing] a claim to relief that is plausible on its face," requiring the denial of City Defendants' MTD. *Ashcroft v. Iqbal*, 556 U.S. at 678.

## CONCLUSION

**WHEREFORE**, Plaintiffs respectfully request that this Court deny City Defendants' motion to dismiss the First Amended Complaint.

Respectfully Submitted,

/s/ Adam Kraut
Adam Kraut
Attorney Id. No. 318482
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 476-2342
akraut@fpclaw.org

Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461

P: 910-713-8804
E: law.rmd@gmail.com
*Appearing Pro Hac Vice*

Joshua Prince, Esq.
Attorney ID: 306521
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
888-202-9297 ext. 81114
610-400-8439
Joshua@Civilrightsdefensefirm.com

*Attorneys for Plaintiffs*