**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————————————— :
KEITH FETSURKA, *et al.,*                        :
                                                 :
      Plaintiffs,                            :          CIVIL ACTION
                                                 :
      v.                                     :          No. 20-5857
                                                 :
DANIELLE OUTLAW, *et al.,*                       :
                                                 :
      Defendants.                            :
————————————————————————————

---

**MEMORANDUM OF LAW IN SUPPORT OF
COL. ROBERT EVANCHICK'S
MOTION TO DISMISS AMENDED COMPLAINT**

---

Dated: January 13, 2021          Respectfully submitted,

                                JOSH SHAPIRO
                                Attorney General

COMMONWEALTH OF PENNSYLVANIA      BY: /s/ Stephen R. Kovatis
OFFICE OF ATTORNEY GENERAL        STEPHEN R. KOVATIS (Pa. No. 209495)
The Phoenix Building                 Senior Deputy Attorney General
1600 Arch St., 3rd Floor            Attorney-in-Charge, Eastern Regional Office
Philadelphia, PA 19103
Telephone:  (215) 560-2940         KAREN M. ROMANO
Fax:  (717) 772-4526               Chief Deputy Attorney General
skovatis@attorneygeneral.gov       Civil Litigation Section

i

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................ 1

II.   FACTS ....................................................................................................... 3

    A.   **Pennsylvania Law Requires a License to Carry Firearms In Some Circumstances and Sets the Procedure for License Applications, Which Is Largely Carried Out By Local Law Enforcement Officials** ........................ 3

    B.   **The COVID-19 Pandemic Forced Temporary Closures of the GPU** .............. 5

    C.   **Plaintiffs Present Various Circumstances and Efforts to Obtain an LTC, But None Allege Any Interference by the State Police in These Efforts** ........................... 6

III.   STANDARD OF REVIEW ........................................................................ 7

IV.   ARGUMENT ............................................................................................. 8

    A.   **Plaintiffs Fail to State a Justiciable Claim Against the State Police** ................ 8

        1.   Plaintiffs Lack Standing Because Their Alleged Injury Is Not Traceable to the State Police and Will Not Be Redressed by a Favorable Decision .................. 8

        2.   Plaintiffs Fetsurka, Sieck, and Scott Do Not Have a Ripe Claim for Relief. 11

    B.   **The Court Should Abstain From Exercising Jurisdiction Because Plaintiffs Have Available and Adequate State Law Remedies** .................................................... 13

    C.   **Plaintiffs Fail to State a Second Amendment Violation Under Binding Third Circuit Law** ........................................................................................................ 15

        1.   The Amended Complaint Does Not Allege that State Police Enforcement of Sections 6106-6109 Violates the Second Amendment ......................................... 16

        2.   Under Binding Third Circuit Authority, Pennsylvania's Firearm Permit Requirements Do Not Violate Plaintiffs' Second Amendment Rights ................ 17

            a)   *Pennsylvania's Gun License Requirements Do Not Impose a Burden on Conduct Falling Within the Second Amendment* ..................................... 18

            b)   *As the Third Circuit Held in Drake, Intermediate Scrutiny Applies to Any Challenge to Pennsylvania's Gun Permit Requirements* ....................... 20

            c)   *Pennsylvania's Gun Licensing Requirements Satisfy Intermediate Scrutiny, Particularly as Adapted in Response to COVID-19* ..................... 20

    **D.**     **Plaintiffs' Proposed Remedy Is Overbroad**........................................................ **23**

**V.**   **CONCLUSION** ............................................................................................................ 24

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................... 7

*Baker v. McCollan*, 443 U.S. 137 (1979) ................................................................................. 15

*Belitskus v. Pizzingrilli*, 343 F.3d 632 (3d Cir. 2003) .................................................................. 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................................... 7

*Benner v. Wolf*, 20-cv-775, 2020 WL 2564920 (M.D. Pa. May 21, 2020) ................................... 5

*Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020) ........................................... 8

*Caba v. Weaknecht*, 64 A.3d 39 (Pa. Cmwlth. 2013) ........................................................... 17, 19

*Chez Sez III Corp. v. Township of Union*, 945 F.2d 628 (3d Cir. 1991) ...................................... 13

*Chiropractic Am. v. Lavecchia*, 180 F.3d 99 (3d Cir. 1999) .................................................. 12, 13

*Commonwealth v. McKown*, 79 A.3d 678 (Pa. Super. Ct. 2013) ................................................ 21

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ................................................................. 8

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............................................. 15, 17, 18, 19

*Duquesne Light Co. v. U.S. E.P.A.*, 166 F.3d 609 (3d Cir. 1999) ........................................... 9, 10

*Elmore v. Cleary*, 399 F.3d 279 (3d Cir. 2005) .................................................................... 15, 16

*Fender v. Washington County, Pa.*, No. 14-cv-142, 2014 WL 1491138 (W.D. Pa. April 15, 2014) ................................................................................................................................................. 14

*Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020) ...................................................... 5

*George v. Rehiel*, 738 F.3d 562 (3d Cir. 2013) ........................................................................... 7

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ....................................................................... 20

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235 (3d Cir. 2012) .............................................................................................................................................. 8

*Jones v. DeNotaris*, 80 F. Supp. 3d 588 (E.D. Pa. 2015) ........................................................... 8

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) .............................................. 20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................. 8

*National City Mortg. Co. v. Stephen*, 647 F.3d 78 (3d Cir. 2011) ................................. 13

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003) ................................. 11

*Pa. Dental Ass'n v. Commw. Ins. Dep't*, 512 Pa. 217, 228, 516 A.2d 647 (1986) ...................... 14

*Peruta v. Cty. of San Diego*, 824 F.3d 919 (9th Cir. 2016) ........................................ 18

*Presbytery of New Jersey of the Orthodox Presbyterian Church v. Whitman*, 99 F.3d 101 (3d Cir. 1996) ............................................................................................. 13

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) ........................................... 12

*Rogers v. Grewal*, No. 18-cv-1544, 2018 WL 2298359 (D.N.J. May 21, 2018) ......................... 17

*Roman Catholic Diocese of Brooklyn v. Cuomo*, __ U.S. __, 2020 WL 6948354 (Nov. 25, 2020) ............................................................................................. 22

*S. Bay United Pentecostal Church v Newsom*, __ U.S. __, 140 S.Ct. 1613 (2020) ..................... 21

*Scutella v. Pennsylvania Atty. Gen.*, CIV.A. 12-165, 2014 WL 4659647 (W.D. Pa. Sept. 17, 2014) ............................................................................................. 9

*Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131 (3d Cir. 2009) .............................. 9

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ........................... 15, 17, 18, 19

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) ........................... 8

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) .............................................. 20

*Wyatt, Virgin Islands, Inc.*, 385 F.3d 801 (3d Cir. 2004) .......................................... 11

**Statutes**

18 Pa. C.S. § 6106 .................................................................................. 3

18 Pa. C.S. § 6108 .................................................................................. 4

18 Pa. C.S. § 6109 ........................................................................... 4, 11, 14

42 U.S.C. § 1983 .................................................................................. 16

42 U.S.C. § 1983 .................................................................................. 15

**Rules**

Fed. R. Civ. P. 12 .................................................................................................................. 7

Fed. R. Civ. P. 65 ................................................................................................................. 22

Fed. R. Civ. P. 8 .................................................................................................................... 7

Defendant Col. Robert Evanchick ("Col. Evanchick"), by counsel, respectfully submits this memorandum of law in support of his Motion to Dismiss Amended Complaint.

## I.     INTRODUCTION

This case presents a fact-specific Second Amendment challenge in a unique situation created by a global pandemic. This year, the City of Philadelphia's ("City" or "Philadelphia") gun permit unit ("GPU"), which accepts and processes applications of City residents for a license to carry a firearm ("LTC"), has had its operations limited and twice been forced to temporarily close by the COVID-19 pandemic. Following the second temporary GPU closure, Plaintiffs—who are Philadelphia residents either desiring to apply, or who have actually applied, for an LTC and an organization representing gun owners—brought this lawsuit challenging GPU practices under the Second Amendment. In the Amended Complaint, Plaintiffs assert a litany of factual allegations about the operation of the GPU and (often erroneous) legal statements about the Second Amendment, broadly asserting Second Amendment violations. Plaintiffs ask for an order reopening the GPU and instituting a list of improvements to its LTC application processes.

However, the Amended Complaint says little about Col. Evanchick, who is sued in his official capacity as the Commissioner of the Pennsylvania State Police ("State Police"). The State Police, Plaintiffs admit, plays a limited role in the LTC application process, including drafting the standard application form and running the electronic background system used by the City and other municipalities in the Commonwealth. Plaintiffs allege nothing to the contrary and, oddly, do not even seem to be complaining about anything that the State Police has done. In all instances, the Amended Complaint simply notes the role of the State Police or, in at least one case, praises it. Instead, Plaintiffs' claim against the State Police appears to be more generalized: because the City is violating their Second Amendment rights, they say, the State Police should be enjoined from enforcing Pennsylvania's gun licensing statutes, 18 Pa. C.S. §§ 6106-6109

1

("Sections 6106-6109"), against them. Plaintiffs ask this Court, essentially, to grant them immunity from sanction for violating state law that prohibits, for example, carrying a concealed firearm without a license simply because they have not timely received LTCs.

Plaintiffs have filed an Amended Complaint, ECF No. 16, and moved for preliminary injunctive relief, ECF No. 8. As to Col. Evanchick, the Court should dismiss the Amended Complaint.

*First*, Plaintiffs have not stated any justiciable claim against the State Police. Plaintiffs lack standing because the Amended Complaint lacks any nexus between their alleged constitutional injury and the State Police, and because no injunction against the State Police could redress the particular harm they allege. Plaintiffs have not shown why the State Police are responsible for infringing on their alleged right to an LTC or how an injunction against the State Police would remedy their failure to receive an LTC. The remedy they seek—*de facto* immunity from otherwise constitutional state firearm licensing laws—bears no connection to their alleged harm resulting from the GPU's slowdown. Further, there appears to be no justiciable claim for at least 3 of the 4 individual Plaintiffs, who do not have a ripe claim because they have not actually been denied the opportunity to move forward with an LTC application.

*Second*, even if the Court finds that it has jurisdiction over a justiciable claim, it should abstain from exercising that jurisdiction and unnecessarily reaching a conclusion on a difficult and contentious constitutional matter when state law provides an adequate remedy. Although Plaintiffs contend that the failure to timely act on their LTC applications violates the Second Amendment, they ignore available procedures that would remedy their harm without intervention by the federal court or resolution of a constitutional question. This presents a classic circumstance where the Court can and should decline to reach the constitutional question.

*Third*, Plaintiffs fail to state a Second Amendment claim under established Third Circuit law. Plaintiffs ask this Court to hold (a) that a Second Amendment right exists *outside the home*; (b) that applying Sections 6106-6109 to them implicates a Second Amendment right; and (c) that Sections 6106-6109 fails to satisfy intermediate scrutiny. Each of these three holdings would be either a dramatic departure from or in direction tension with established law. The Third Circuit previously has (a) declined to find a Second Amendment right outside the home, because it is unnecessary in this context; (b) found that, even if the Second Amendment did extend beyond the home, gun licensing requirements do not implicate any constitutional right; and (c) held that New Jersey's gun licensing requirements, which closely resemble those of Sections 6106-6109, are constitutional. The Court should simply apply existing law in this circuit and find no Second Amendment violation here.

*Fourth*, even if Plaintiffs could state a Second Amendment claim, the remedy they propose that would require inclusion of the State Police is dramatically overbroad. Despite the law requiring injunctions to be limited in scope, Plaintiffs ask the Court to order that no gun licensing laws should apply to them simply because the City's procedures for gun licensing are allegedly deficient. While this Court has some discretion to fashion a proper remedy to a constitutional violation, Plaintiffs' desired remedy—and any remedy that would include enjoining the State Police—is vastly and unlawfully overbroad.

For these reasons, any claim against Col. Evanchick should be dismissed.

## II.     FACTS

### A.     Pennsylvania Law Requires a License to Carry Firearms In Some Circumstances and Sets the Procedure for License Applications, Which Is Largely Carried Out By Local Law Enforcement Officials

Under state law, subject to certain exceptions, it is unlawful to carry a firearm in a vehicle or concealed on the body without a license-to-carry permit ("LTC"). 18 Pa. C.S. § 6106; Am.

Compl., ECF No. 16, ¶ 3. Additionally, in the City and unlike the rest of the Commonwealth, it is unlawful to open carry any firearm without a LTC. 18 Pa. C.S. § 6108.

The permitting process for an LTC is governed by 18 Pa. C.S. § 6109. To obtain an LTC, a resident of Philadelphia is directed to submit an application to the chief of police. 18 Pa. C.S. § 6109(b). The State Police prescribe the form to be used in the permitting process, which must require the applicant to state the purpose of the application and to sign a statement dictated by the statute. 18 Pa. C.S. § 6109(c); *see also* ECF No. 16-1 at 4-5 (attaching the form). Following the application, for a Philadelphia resident, the police must conduct an investigation of the applicant's background. 18 Pa. C.S. § 6109(d). As part of that application, the local law enforcement official runs a search of the individual through the Pennsylvania Instant Check System ("E-PICS"), which is an online system operated by the State Police. Am. Compl. ¶ 87. Following the background check, which is required to take no more than 45 days, an applicant who meets the statutory criteria receives an LTC. 18 Pa. C.S. § 6109(e).

The State Police do not manage or control the local law enforcement offices that issue LTCs. According to the Amended Complaint, the Philadelphia Police Department operates the City's GPU, which "provide[s] limited to no access to staff and services, impose[s] severe delays, and force[s] applicants to complete a long, burdensome process that may or may not result in the issuance of a carry license." Am. Compl. ¶ 71. Specifically, the GPU requires applicants to set an appointment to submit an LTC application, and that appointment can be "months or longer into the future." Am. Compl. ¶¶ 70, 74. At the appointment, an applicant must submit a variety of personal information, sit for an interview, and pay a fee—all of which, Plaintiffs contend, "are designed to, and do, chill, severely burden, delay, and deny applications" for LTCs. Am. Compl. ¶¶ 75-87.

**B.    The COVID-19 Pandemic Forced Temporary Closures of the GPU**

In early 2020, COVID-19 swept the globe.[1] To protect the lives and health of millions of Pennsylvanians, Governor Wolf, on March 6, 2020, issued an executive order proclaiming the existence of a disaster emergency throughout the Commonwealth.[2] Subsequent orders made necessary by COVID-19—including an order temporarily shuttering much in-person business operation in the Commonwealth—were upheld by the courts. *See Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 888-91 (Pa. 2020) (closing business was a proper exercise of the Governor's powers in response to the "natural disaster" of COVID-19); *Benner v. Wolf*, 20-cv-775, 2020 WL 2564920 (M.D. Pa. May 21, 2020) ("It is not the place of this Court to question the reasonable motives of elected officials," and thus it "will not micromanage public policy in the midst of a pandemic.").

According to Plaintiffs, the City's GPU was closed from March to July of 2020, during the height of the first wave of COVID-19 in the United States and during the time of the Governor's order closing businesses. Am. Compl. ¶ 95. It reopened in late July, accepting phone calls on regular business days between 8:30 a.m. and 2:00 p.m. Am. Compl. ¶ 96. On or about November 18, 2020, as COVID-19 surged, the GPU was again closed. Am. Compl. ¶¶ 97-98. The City has announced that this closure was due to a specific outbreak among employees in the GPU and that, after a quarantine period required by public health, it reopened on Monday, December 7, 2020. Am. Compl. ¶ 100.

---

[1]    Derrick Bryson Taylor, "A Timeline of the Coronavirus," *The New York Times*, https://www.nytimes.com/article/coronavirus-timeline.html (last visited 3/20/2020).

[2]    .   Website of the Governor of Pennsylvania, https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf

**C.      Plaintiffs Present Various Circumstances and Efforts to Obtain an LTC, But None Allege Any Interference by the State Police in These Efforts**

Plaintiff Fetsurka moved to Philadelphia in December 2019. Am. Compl. ¶ 141. Because of his "work schedule," he was "unable to get to" the Philadelphia GPU prior to March 2020, when it was closed due to the COVID-19 pandemic. Am. Compl. ¶ 143. Fetsurka contacted the GPU in August 2020 and, after initially being given an appointment in September 2021, he was rescheduled for November 19, 2020. Am. Compl. ¶¶ 147-49. That appointment was cancelled, but Fetsurka was scheduled with the GPU on December 14, 2020. Am. Compl. ¶ 150.

Plaintiff Sieck wished to apply for an LTC in May 2020. Am. Compl. ¶ 164. However, the Amended Complaint does not aver what steps (if any) Sieck took to obtain an LTC. Instead, it alleges "[o]n information and belief" that he "could not have obtained an appointment to even submit an application to obtain a [LTC] and begin Philadelphia Defendants' application process until at least some time in 2021, and perhaps into 2022, even if he had been able to schedule an appointment with their GPU prior to Philadelphia Defendants' most recent closure of the GPU." Am. Compl. ¶ 165. It appears this belief is based on two hearsay accounts that were relayed in a news article published by the Washington Free Beacon. Am. Compl. ¶¶ 104-05.

Plaintiff Defina applied for an LTC at the GPU in April 2019. Am. Compl. ¶ 177. Defina did not receive any further communication from the City regarding his application through at least November 2020. Am. Compl. ¶ 180. He could not check on the status of his application in person because of his personal circumstances, and he was unable to connect with the GPU via telephone. Am. Compl. ¶¶ 181-83.

Plaintiff Scott "sought to apply to Philadelphia Defendants for a [LTC] beginning in or about November 2020." Am. Compl. ¶ 199. However, like Sieck, the Amended Complaint does not aver what steps (if any) Scott took to attempt to obtain an LTC. Instead, it alleges "[o]n

information and belief" that he "could not have obtained an appointment to even submit an application to obtain a [LTC] and begin Philadelphia Defendants' application process until at least some time in 2021, and perhaps into 2022, even if he had been able to schedule an appointment with their GPU prior to Philadelphia Defendants' most recent closure of the GPU." Am. Compl. ¶ 200. As with Sieck, it appears this belief is based on hearsay accounts published in the news media. Am. Compl. ¶¶ 104-05.

The Plaintiffs who have actually applied for an LTC—Fetsurka and Defina—do not allege any issue or problem with the State Police during the processing of their applications. The remaining Plaintiffs aver no interaction whatsoever with the State Police or one of its policies or practices.[3]

## III.  STANDARD OF REVIEW

A defendant may move to dismiss a complaint under Rule 12(b)(1) where the district court lacks subject-matter jurisdiction over a claim. Fed. R. Civ. P. 12(b)(1). Standing is addressed under Rule 12(b)(1) because it is a jurisdictional matter. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). In a facial challenge to subject-matter jurisdiction, in which the defendant attacks the sufficiency of a complaint, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Electronics Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

A defendant may move to dismiss a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). While a complaint need only contain a "short and plain statement" of the facts, *see* Fed. R. Civ. P. 8(a), it must contain "more than labels and

---

[3]     The City's Motion to Dismiss, ECF No. 29, contains updated information about the status of each Plaintiff's application. *Id.* at 12-13. The State Police have no first-hand information, but incorporate any undisputed facts considered by the Court in resolving the motions to dismiss.

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* Although courts "must take all of the factual allegations in the complaint as true," they "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*; *see also George v. Rehiel*, 738 F.3d 562, 583-84 (3d Cir. 2013). The "mere possibility of misconduct" is not enough; the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Assessing a complaint's sufficiency is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010). While a court must accept well-pled facts as true, "that admonition does not demand that the Court ignore or discount reality." *Jones v. DeNotaris*, 80 F. Supp. 3d 588, 593 (E.D. Pa. 2015).

## IV.    ARGUMENT

### A.    Plaintiffs Fail to State a Justiciable Claim Against the State Police

#### 1.    Plaintiffs Lack Standing Because Their Alleged Injury Is Not Traceable to the State Police and Will Not Be Redressed by a Favorable Decision

Under Article III of the Constitution, federal courts' "authority to exercise judicial review and interpret the Constitution" exists only where there is "a proper case or controversy" between the parties. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340-41 (2006) (citing *Marbury v. Madison*, 1 Cranch 137 (1803)). "[T]he irreducible constitutional minimum" of standing requires a party to set forth specific facts indicating the existence of an actual or imminent injury that is causally connected to the defendant's challenged action and is "'likely'" to be "'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting

*Simon v. En. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)). "The familiar elements of Article III standing require a plaintiff to have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 348 (3d Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, __ U.S. __, 136 S.Ct. 1540, 1547 (2016)). "The plaintiff bears the burden of meeting the 'irreducible constitutional minimum' of Article III standing." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 244 (3d Cir. 2012) (quoting *Lujan*, 504 U.S. at 560).

In a lawsuit involving multiple claims and/or multiple defendants, "plaintiffs must demonstrate that they have standing to bring each and every claim against each and every defendant." *Scutella v. Pennsylvania Atty. Gen.*, CIV.A. 12-165, 2014 WL 4659647 (W.D. Pa. Sept. 17, 2014) (citing *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 138 n.5 (3d Cir. 2009)). Put differently, standing "is not dispensed in gross." *Toll Bros.*, 555 F.3d at 138 n.5 (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). Under these standards, a plaintiff fails to establish causation as to a particular defendant when an injury "is manifestly the product of the independent action of a third party." *Duquesne Light Co. v. U.S. E.P.A.*, 166 F.3d 609, 613 (3d Cir. 1999).

Even assuming that they have stated an injury to a constitutional right—which, for reasons stated below, they have not—Plaintiffs lack standing to bring a claim against the State Police because Plaintiffs' alleged injury (a) is not traceable to the conduct of the State Police, and (b) is not likely to be redressed by any injunction directed to the State Police.

First, as to causation, nothing in the Amended Complaint alleges that any Commonwealth law or State Police policy or practice has delayed or denied their permit applications. Plaintiffs

allege that they suffer constitutional injury because Col. Evanchick "has and continues to enforce the Commonwealth's laws pertaining to the keeping and bearing of firearms." *See* Am. Compl. ¶ 237. If it were not for these laws requiring an LTC, Plaintiffs aver, they "would carry a loaded firearm on their person and in their motor vehicles, in public, for lawful purposes including self-defense." *See id.* ¶ 240. And, Plaintiffs claim, they are unable to obtain an LTC because of the "GPU policies and practices" and the "GPU closures and undue delays and burdens." *See id.* ¶¶ 242-43; *see also id.* ¶¶ 10-11, 67-106 (describing the City's GPU procedure and closures). The Amended Complaint limits its claims to a change in practice of the City, and it does not allege that the State Police caused or control that practice. *See Duquesne Light Co.*, 166 F.3d at 613 (finding that a defendant's action was not "fairly traceable" to the complained injury when the defendant had "no power to require" a third party to cease an offending practice). Nothing alleges that the State Police are responsible for, or in any way connected to, the decision of the City to close the GPU due to the pandemic.

In other words, Plaintiffs contend that Pennsylvania's laws present an unconstitutional restriction on their Second Amendment rights because they are unable to obtain an LTC, and they are unable to obtain an LTC because of the procedures and practices used by the City's GPU. This presents the classic example of an injury that is "manifestly the product of the independent action of a third party." *See Duquesne Light Co.*, 166 F.3d at 613. But for the City's alleged mismanagement of the GPU,[4] there would be no constitutional injury. Because any injury flows from the alleged conduct of a third party, Plaintiffs fail to establish causation and thus lack standing to state a justiciable claim against Col. Evanchick.

---

[4]     Of course, this is not to say that the City **has** mismanaged its GPU. Rather, this statement simply reflects the operable deferential standard of review. In fact, the City appears to be properly balancing its constitutional obligations with its public health obligations.

Second, as to redressability, Plaintiffs' argument presents the Court with a bait-and-switch. Plaintiffs will likely argue that their constitutional injury would be redressed by an injunction against the State Police because, if the City and State Police are enjoined from enforcing Sections 6106-6109, Plaintiffs will be free to carry concealed firearms in Philadelphia without a license. However, the statutory requirement to obtain an LTC and the criminal sanction for failure to comply *is not the constitutional injury asserted in this case*. Plaintiffs do not contend that all citizens have a right under the Second Amendment to carry concealed weapons in Philadelphia without a license, and they cite no authority for such a radical proposition. Rather, they assert that the Second Amendment rights of a class of individuals—first-time LTC applicants—are being infringed by the manner in which LTC applications are being processed. But since the only role played by the State Police in this process is drafting the standard application form, *see* 18 Pa. C.S. § 6109(c) and ECF No. 16-1 at 4-5, and running the applicant's background check, *see* Am. Compl. ¶ 87 (describing the E-PICS system), an injunction directed to the State Police would not remedy the alleged infringement. In fact, the Amended Complaint *praises* the State Police's current background check system and *encourages* the City to utilize something like it. *See* Am. Compl. ¶ 126. No relief directed to the State Police would redress the specific injury claimed by Plaintiffs here.

For these distinct reasons, each of which would be sufficient to dismiss this claim, Plaintiffs lack standing to pursue a claim against Col. Evanchick.

   2. <u>Plaintiffs Fetsurka, Sieck, and Scott Do Not Have a Ripe Claim for Relief</u>

"Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (cleaned up). "Claims based merely upon assumed potential invasions of rights are not enough to warrant judicial intervention." *Wyatt, Virgin Islands, Inc.*, 385 F.3d 801, 806 (3d Cir. 2004).

Although Plaintiffs challenge the current administration of the City's LTC application process, three of the four individuals do not present a ripe claim because their claims rely on speculation about what ***might*** happen rather than what ***has*** happened. Specifically, neither Plaintiff Sieck nor Plaintiff Scott aver that they have even attempted to apply for an LTC with the City. Both plead a belief that they would not be able to get an appointment to submit an application until "at least some time in 2021, and perhaps into 2022," *see* Am. Compl. ¶¶ 165, 200, but neither states that he actually received an appointment that far into the future. Notably, the claims of Plaintiff Fetsurka belie the subjective belief of Sieck and Scott—Fetsurka initially received an appointment in September 2021, but that appointment was rescheduled to November, and then December, 2020. *See* Am. Compl. ¶¶ 147-50. Neither Sieck nor Scott have been denied an LTC because, according to the Amended Complaint at least, neither has applied for one. As to Fetsurka himself, the Amended Complaint provides that he had an appointment scheduled after its filing, that should have now occurred. *See* Am. Compl. ¶ 150.

Thus, the claims of Fetsurka, Sieck, and Scott should be dismissed unless and until they can state a ripe claim that their Second Amendment rights are being infringed.[5]

---

[5]     Plaintiff Defina presents a different situation. Unlike the other Plaintiffs, he claims that he actually applied for an LTC but the City has taken no action on the application for at least 19 months. *See* Am. Compl. ¶¶ 180-83. However, as described below, *see infra* Section IV.B, state law provides an adequate remedy if these allegations are true, and, regardless, a delay in receiving an LTC does not infringe a Second Amendment right.

**B.      The Court Should Abstain From Exercising Jurisdiction Because Plaintiffs Have Available and Adequate State Law Remedies**

While federal courts generally have a duty to exercise the jurisdiction given to them by Congress, that duty is not absolute; courts possess the discretion to decline to hear a case under certain circumstances, even where it has subject matter jurisdiction. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). This doctrine of abstention, while it should be the exception rather than the rule, is "firmly rooted" in American jurisprudence. *Chiropractic Am. v. Lavecchia*, 180 F.3d 99, 103 (3d Cir. 1999).

Under one version of the doctrine, known as *Pullman* abstention, a federal court may decline to hear a case "when a state court determination of a question of state law might moot or change a federal constitutional issue presented in a federal court case." *National City Mortg. Co. v. Stephen*, 647 F.3d 78, 83 (3d Cir. 2011) (quoting *Trent v. Dial Medical of Florida, Inc.*, 33 F.3d 217, 223 n.5 (3d Cir. 1994)). *Pullman* abstention is appropriate where resolution of an unsettled issue "might narrow or eliminate the federal constitutional question . . . in order to avoid 'needless friction with state policies.'" *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 631 (3d Cir. 1991) (quoting *Railroad Comm'n v. Pullman*, 312 U.S. 496, 500 (1941)). *Pullman* abstention is appropriate where (1) uncertain issues of state law underlie the federal constitutional claim; (2) state law issues subject to state court interpretation could obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claim; and (3) an erroneous construction of state law by the federal court would disrupt important state policies. *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Whitman*, 99 F.3d 101, 106 (3d Cir. 1996).

Under an alternative version of the doctrine, *Burford* abstention, a court may decline to hear a case "when questions of state law in which the state has expressed a desire to establish a

coherent policy with respect to a matter of substantial public concern are presented." *National City Mortg. Co.*, 647 F.3d at 83 (quoting *Trent*, 33 F.3d at 223 n.5). *Burford* abstention is appropriate when "timely and adequate state-court review is available" and "(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Chiropractic Am.*, 180 F.3d at 104 (quoting *New Orleans Public Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361 (1989)) (additional citations and internal quotation marks omitted).

In *Fender v. Washington County, Pa.*, No. 14-cv-142, 2014 WL 1491138 (W.D. Pa. April 15, 2014), the district court applied *Pullman* abstention to a civil rights claim challenging the decision of the local sheriff to revoke a firearm license under Section 6109. The court specifically noted that Section 6109 "sets forth specific procedures to be followed by both the Sheriff, and the [applicant]," including appeal through the state court system. *Id.* at *4. Where the parties had not utilized that procedure and instead run to federal court, abstention was appropriate. As the *Fender* court noted, "[a]lthough there may be federal constitutional implications at play . . . the matter of denials of applications to carry firearms is traditionally a state law matter, in which important state law interests are implicated," and "[t]hese issues have been resolved routinely by the trial and appellate courts of Pennsylvania. *Id.*

Abstention, whether under a *Pullman* theory or a *Burford* theory, is appropriate here for the same reasons that it was in *Fender*. Section 6109 sets forth a clear procedure for resolving disputes related to firearm licensing, and no Plaintiff has attempted to avail himself of these procedures. Further, to the extent that Plaintiff Defina contends that the Section 6109 procedures

14

are unavailable to him because the City has not acted on his application, he still has a state law procedural remedy. *See Pa. Dental Ass'n v. Commw. Ins. Dep't*, 512 Pa. 217, 228, 516 A.2d 647, 652 (1986) ("Mandamus is a device that is available in our system to compel a tribunal or administrative agency to act when that tribunal or agency has been 'sitting on its hands.'"); *see also* 18 Pa. C.S. § 6109(e) (requiring that any investigation take no more than 45 days). Any of these options would afford Plaintiffs the opportunity to resolve their individual disputes without this Court needing to weigh in on constitutional questions in an area replete with "important state law interests." *See Fender*, at *4. In short, state law provides Plaintiffs with the remedy they seek: prompt review and decision of their LTC applications. This Court should abstain from exercising jurisdiction unless and until Plaintiffs avail themselves of this remedy.

### C. Plaintiffs Fail to State a Second Amendment Violation Under Binding Third Circuit Law

Section 1983 provides a cause of action against any "person" who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The statute "is not itself a source of substantive rights, but [rather] a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). To state a Section 1983 claim, a plaintiff must show that a person acted under color of state law and that this person violated the plaintiff's federal constitutional or statutory rights. *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005).

After the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Third Circuit established a two-step approach to Second Amendment claims. First, a court must determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Marzzarella*, 614 F.3d 85, 89

(3d Cir. 2010). "If it does not, [the] inquiry is complete" and relief is denied. *Id.* "If it does, [the court should] evaluate the law under some form of means-end scrutiny," and the law is upheld only if it satisfies the appropriate level of scrutiny. *Id.*

Plaintiffs' claim against Col. Evanchick fails to satisfy either prong of *Marzzarella*. Enforcement of Sections 6106-6109 against Plaintiffs does not impose a burden that falls within the Second Amendment, which alone requires dismissal of their claim. Moreover, the Third Circuit has made clear that intermediate scrutiny applies in this situation, and under that standard enforcement of state law against Plaintiffs satisfies an important interest and does not burden more conduct than is reasonably necessary.

1.    The Amended Complaint Does Not Allege that State Police Enforcement of Sections 6106-6109 Violates the Second Amendment

Before even reaching the merits of any Second Amendment challenge, Plaintiffs' claim fails a threshold issue under Section 1983—it does not aver that Col. Evanchick, in his official capacity with the State Police, is currently depriving them of any rights, privileges, or immunities of federal law. *See* 42 U.S.C. § 1983. Although the Amended Complaint avers that Col. Evanchick and the State Police are responsible for enforcing Sections 6106-6109, *see* Am. Compl. ¶¶ 237-40, it does not aver that those statutes are unconstitutional, or even unconstitutional as applied to individuals who have not yet received an LTC. Instead, Plaintiffs' claim against Col. Evanchick appears to be that, if they cannot promptly obtain an LTC from the City, they should be immune from the "restrictions, criminal sanctions, and penalties" of these otherwise constitutional statutes. *See* Am. Compl. ¶ 255. Simply, that is not how Section 1983 works. At its most basic level, Section 1983 makes injunctive relief available against an official who is violating Plaintiff's civil rights. *See Elmore*, 399 F.3d at 281. Plaintiff does not make that showing here as to Col. Evanchick. Because enforcement of Sections 6106-6109 does not

16

deprive Plaintiffs of any rights, privileges, or immunities, the Amended Complaint fails to satisfy the basic elements of a Section 1983 claim, and Col. Evanchick should be dismissed as a defendant.

          2.     Under Binding Third Circuit Authority, Pennsylvania's Firearm Permit Requirements Do Not Violate Plaintiffs' Second Amendment Rights

While the Amended Complaint does not make it clear, assuming that Plaintiffs intend to bring an as-applied challenge to Sections 6106-6109 under the Second Amendment, they have failed to state a claim.

For a claim related to firearm licensing, the Third Circuit's thorough and binding decision in *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) controls this case. There, the Court applied *Heller* and *Marzzarella* to a Second Amendment challenge to New Jersey's gun permit law. Specifically, the plaintiffs in that case challenged the requirement that applicants must demonstrate a "justifiable need" for a firearm as determined by a police official or superior court judge. *Id.* at 429. Despite dealing with possibly the most discretionary part of the application process, the Third Circuit held that the plaintiffs failed to satisfy **both** prongs of the *Marzzarella* test. It found that the gun license requirements at issue did not impose a burden on conduct falling within the Second Amendment's protection and, even if they did, they would survive applicable scrutiny. *Id.* at 440; *see also Caba v. Weaknecht*, 64 A.3d 39, 51-52 (Pa. Cmwlth. 2013) (following *Heller*, holding that Section 6109 is constitutional). *Drake* remains good law and is binding on this Court. *Rogers v. Grewal*, No. 18-cv-1544, 2018 WL 2298359, at *3 (D.N.J. May 21, 2018), *aff'd sub nom. Rogers v. Attorney Gen. New Jersey*, 18-2366, 2018 WL 10808705 (3d Cir. Sept. 21, 2018), *cert. denied sub nom. Rogers v. Grewal*, 140 S.Ct. 1865 (2020).

17

Applying the Third Circuit's holdings to this case, as this Court must, Plaintiffs' claim fails on multiple levels.

> a)      *Pennsylvania's Gun License Requirements Do Not Impose a Burden on Conduct Falling Within the Second Amendment*

In *Heller*, the Supreme Court held "that the Second Amendment confers *upon individuals* a right to keep and bear arms for self-defense by holding that a District of Columbia law forbidding the individual possession of usable handguns *in the home* violated the Second Amendment." *Drake*, 724 F.3d at 430 (emphasis in original). Although the Third Circuit has declined to "definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home," it has acknowledged that the Second Amendment "may have some application beyond the home." *Id.* at 431.[6] But even if a Second Amendment right outside the home exists, the Court held in *Drake*, licensing requirements for publicly carrying firearms do not implicate that right. As the Court observed, after *Heller* the Third Circuit has repeatedly found that "certain longstanding regulations are 'exceptions' to the right to keep and bear arms, such that the conduct they regulate is not within the scope of the Second Amendment." *Drake*, 724 F.3d at 431 (citing *United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011); *United States v. Huet*, 665 F.3d 588, 600 (3d Cir. 2012)).[7] The Court upheld the discretionary decision of a

---

[6]      After *Drake*, an *en banc* Ninth Circuit held that there is no Second Amendment right to carry concealed weapons outside the home. *See Peruta v. Cty. of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc) ("We therefore conclude that the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public."). However, following the clear holding and reasoning of *Drake*, this Court need not reach the question of whether there is ***any*** Second Amendment right outside the home to find that enforcement of Sections 6106-6109 would not violate any such right even if it did exist.

[7]      While two other circuits have reached a different conclusion, they do not change the applicable law here. The Third Circuit expressly rejected the reasoning of *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). *See Drake*, 724 F.3d at 431 (noting that "the Seventh Circuit in *Moore* may have read *Heller* too broadly"). And *Wrenn v. District of Columbia*, 864 F.3d 650

state as to whether an individual has shown a "justifiable need" to publicly carry a firearm as part of a "presumptively lawful, longstanding licensing provision under the teachings of *Heller* and *Marzzarella*." *Id.* at 432. Thus, here, to the extent that Plaintiffs challenge any other "presumptively lawful, longstanding licensing provision," under *Drake* such a provision would not implicate a Second Amendment right, fail the first prong of *Marzzarella*, and require dismissal.

Plaintiffs point to nothing in Sections 6106-6109 that deviate from presumptively lawful, longstanding licensing practices. Indeed, Pennsylvania courts have held that Section 6109 is one of the "presumptively lawful regulatory measures" noted in *Heller*. *Caba*, 64 A.3d at 51 (quoting *Heller*, 554 U.S. at 627 n.26). *Caba* is correct. Pennsylvania has required a license to publicly carry a firearm since at least 1939. *See* Uniform Firearms Act, Act of June 24, 1939, P.L. 872, § 628(e), 18 P.S. § 4628(e) (attached as Exhibit A). And, since at least that time, applicants were required to show "good reason" to carry a firearm in public and that they were a "suitable person to be so licensed." *Id.* § 628(f). Applicants were not suitable if, for example, there was "reasonable cause" to believe they committed a crime of violence or if they were of "unsound mind." *Id.* § 628(g). Sections 6106-6109 fall well within this type of "longstanding licensing provision" that, just like the New Jersey statute at issue in *Drake*, are outside the scope of the Second Amendment. *See Drake*, 724 F.3d at 432.

Because Pennsylvania's requirements to obtain an LTC are longstanding and presumptively lawful, *see Drake*, 724 F.3d at 432, they do not implicate a Second Amendment right. Consequently, under the first prong of the *Marzzarella* test, "the inquiry is complete" and

---

(D.C. Cir. 2017), adopted the same reasoning of *Moore* that the Third Circuit had rejected. *Id.* at 663-64. It is the Third Circuit, not the Seventh or D.C. Circuits, that controls here.

Plaintiff's claim should be denied. *See* 614 F.3d at 89. This Court should dismiss their claim with prejudice.

        b)       *As the Third Circuit Held in* Drake*, Intermediate Scrutiny Applies to Any Challenge to Pennsylvania's Gun Permit Requirements*

If this Court reaches the second prong of *Marzzarella*, it must initially determine what level of scrutiny to apply. And under *Drake*, a Second Amendment challenge to firearm licensing requirements is subject to intermediate scrutiny. 724 F.3d at 436. In reaching this conclusion, the Third Circuit reasoned that strict scrutiny would apply when a law burdens the "core" of a constitutional right, and that "the core of the right conferred upon individuals by the Second Amendment is the right to possess usable handguns *in the home* for self-defense." *Id.* Strict scrutiny does not apply to limitations on the ability to carry a firearm in public "because if the Second Amendment protects the right to carry a handgun outside the home for self-defense at all, that right is not part of the core of the Amendment." *Id.* (cleaned up); *accord Gould v. Morgan*, 907 F.3d 659, 671 (1st Cir. 2018), *cert. denied sub nom. Gould v. Lipson*, 207 L.Ed.2d 1050 (June 15, 2020) ("[T]he core Second Amendment right is limited to self-defense in the home."); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) (finding that intermediate scrutiny applies to gun license laws); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) (same). Thus, intermediate scrutiny would apply to any challenge to Sections 6106-6109.

        c)       *Pennsylvania's Gun Licensing Requirements Satisfy Intermediate Scrutiny, Particularly as Adapted in Response to COVID-19*

To satisfy intermediate scrutiny, "the government must assert a significant, substantial, or important interest; there must also be a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary." *Drake*, 724 F.3d at 436. "When reviewing the constitutionality of statutes, courts 'accord substantial deference to the [legislature's] predictive judgments.'" *Id.* at 436-37 (quoting *Turner*

*Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)). In the context of firearm licensing, Pennsylvania "has, undoubtedly, a significant, substantial and important interest in protecting its citizens' safety." *See Drake*, 724 F.3d at 437. The only question is whether there is a reasonable fit between this interest and the enforcement procedures used by the State Police.

As a threshold matter, Plaintiffs point to nothing specific in Sections 6106-6109 that would not fit with the government's interest in safety. Instead, Plaintiffs list the license application requirements and declare, *ipse dixit*, that these requirements are unduly burdensome. *See* Am. Compl. ¶¶ 72-90. That conclusion is contrary to law. New Jersey, New York, and Maryland all have similar gun licensing requirements, all of which, the Third Circuit says, satisfy intermediate scrutiny. *See Drake*, 724 F.3d at 438-39. Like these states, Pennsylvania uses a "measured approach [that] neither bans public handgun carrying nor allows public carrying by all firearm owners," and intermediate scrutiny does not require the Court "to intrude upon the sound judgment and discretion" of the Commonwealth. *See Drake*, 724 F.3d at 440; *see also Commonwealth v. McKown*, 79 A.3d 678, 690 (Pa. Super. Ct. 2013) (holding that Section 6106 survives intermediate scrutiny).

Plaintiffs aver that, during 2020, they have suffered particular encumbrances on their ability to get LTCs caused by COVID-19. First, there is no allegation that COVID-19 has slowed or affected limited the role that the State Police play in licensing. So if the State Police's standard practices are constitutional and if COVID-19 did not change these standard practices, there is no colorable claim that it is currently violating Plaintiff's constitutional rights. That, alone, would defeat Plaintiff's Second Amendment claim against Col. Evanchick.

Second, even assuming that the State Police could be responsible for general slowdowns created by COVID-19, the outcome remains the same. As state and local officials adjust to the

continuing uncertainties created by the current global pandemic, they "act in areas fraught with medical and scientific uncertainties" and thus "their latitude must be especially broad." *S. Bay United Pentecostal Church v Newsom*, __ U.S. __, 140 S.Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring in the denial of the application for injunctive relief) (internal citations, quotation marks, and alterations omitted). Under these circumstances, these officials "should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* Even if the pandemic does not lower the applicable standard of scrutiny in a particular circumstance, the Supreme Court has acknowledged that "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, __ U.S. __, 2020 WL 6948354, at *2 (Nov. 25, 2020). Thus, any change to the normal gun licensing process as a result of COVID-19 should pass constitutional scrutiny as long it does not do "more . . . than is reasonably necessary" to adjust to the realities of the virus. *See Drake*, 724 F.3d at 436.

Here, Plaintiffs point to nothing at all—and certainly nothing specific to the State Police—that would constitute more than is reasonably necessary to deal with the effects of COVID-19. The GPU was closed, but the closure was temporary and in response to a specific breakout of the virus in the unit. *See* Am. Compl. ¶¶ 98-100. The unit is currently back open and operating, according to the City. Far from constituting a "total ban" on carrying firearms, *see* Am. Compl. ¶ 244, issues related to the global pandemic amount to nothing more than temporary delays that continue to satisfy intermediate scrutiny.

Further, other than issues related to COVID-19, Plaintiffs point to nothing in Sections 6106-6109 or any State Police policy related to LTCs that cannot survive intermediate scrutiny. Plaintiffs appear to acknowledge that issuing LTCs may hinge on whether individuals are "law-

abiding citizens," *see, e.g.*, Am. Compl. ¶¶ 236-43, but they provide no explanation as to how the procedures used by the State Police and mandated in Sections 6106-6109 are not at least a reasonable fit with the goal of maintaining public safety. Thus, any such law or policy at issue would survive Second Amendment scrutiny.

### D.        Plaintiffs' Proposed Remedy Is Overbroad

Any injunction granted by the Court must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). "[I]njunctive relief should be 'no more burdensome to the defendant than necessary to provide complete relief to plaintiffs.'" *Novartis*, 290 F.3d at 598 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979)). Although courts generally have discretion to fashion an appropriate injunctive remedy, an injunction ordering the Commonwealth to "to obey the law" is overly broad and in error. *Belitskus v. Pizzingrilli*, 343 F.3d 632, 650 (3d Cir. 2003).

Here, even assuming Plaintiffs make out any kind of Second Amendment claim, the Court could award Plaintiffs complete relief without enjoining Col. Evanchick and without creating an unnecessary danger to the public. If the Court ordered the City to reopen the GPU and process applications exactly according to Plaintiffs' demands—again, assuming those demands are required by the Constitution—the Plaintiffs would have complete relief, and they would have it without any injunction involving the State Police. The only ostensible reason to include the State Police within the scope of injunctive relief is because it is a law enforcement entity that might enforce Sections 6106-6109 against Plaintiffs. Of course, assuming Plaintiffs intend to leave Philadelphia while carrying a concealed firearm without a license, *every* municipal police department in the Commonwealth might be a potential defendant under that theory. Assuming that Plaintiffs' only purpose in including Col. Evanchick as a defendant is to

23

include the State Police within the scope of a possible injunction directed to the City, it amounts

to nothing more than an improper directive to the State Police that they must "obey the law." *See*

*Belitskus*, 343 F.3d at 650. And the result of any such injunction would create an entire class of

individuals immune from Pennsylvania law, creating an unnecessary risk to the public. The

Court should decline Plaintiffs' invitation and decline to grant the requested relief.

## V.      CONCLUSION

Wherefore, this Court should dismiss all claims against Defendant Col. Robert

Evanchick.

Dated: January 13, 2021                    Respectfully submitted,

                                           JOSH SHAPIRO
                                           Attorney General

COMMONWEALTH OF PENNSYLVANIA               BY: /s/ Stephen R. Kovatis
OFFICE OF ATTORNEY GENERAL                 STEPHEN R. KOVATIS (Pa. No. 209495)
The Phoenix Building                       Senior Deputy Attorney General
1600 Arch St., 3rd Floor                   Attorney-in-Charge, Eastern Regional Office
Philadelphia, PA 19103
Telephone:  (215) 560-2940                 KAREN M. ROMANO
Fax:  (717) 772-4526                       Chief Deputy Attorney General
skovatis@attorneygeneral.gov               Civil Litigation Section