**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEITH FETSURKA;** | : | Civil Rights Complaint |
| **TIMOTHY SIECK;** | : | 42 U.S.C. § 1983 |
| **NICOLAS DEFINA;** | : | |
| **ANDREW SCOTT;** and, | : | |
| **FIREARMS POLICY** | : | |
| **COALITION, INC.,** | : | |
| Plaintiffs | : | |
| | : | |
| **v.** | : | Case No. – 2:20-cv-05857 |
| | : | |
| **DANIELLE OUTLAW,** | : | |
| Philadelphia Police Commissioner; | : | |
| **CITY OF PHILADELPHIA,** | : | |
| **PENNSYLVANIA;** and, | : | |
| **COL. ROBERT EVANCHICK,** | : | |
| Commissioner of Pennsylvania | : | |
| State Police, | : | |
| Defendants | : | |

## PLAINTIFFS' RESPONSE TO DEFENDANT ROBERT EVANCHICK'S MOTION TO DISMISS

COME NOW Plaintiffs Keith Fetsurka, Timothy Sieck, Nicolas Defina, and Andrew Scott ("Individual Plaintiffs"), and Firearms Policy Coalition, Inc. ("FPC"), who hereby respectfully submit by and through counsel this response to the Motion to Dismiss ("MTD") the First Amended Complaint ("FAC") filed by Defendant Robert Evanchick.

## INTRODUCTION

Defendant Robert Evanchick, who is sued in his official capacity as Commissioner of the Pennsylvania State Police (hereinafter "Commissioner"), moves to dismiss the FAC on the grounds that: Plaintiffs have failed to plead a justiciable claim; even if the claim is justiciable, this Court should abstain from deciding the merits because Plaintiffs have

viable state law remedies; Plaintiffs fail to state a claim for relief under the Second Amendment based on Third Circuit precedent; and their requested remedy is overbroad.

The undisputed facts and allegations in the FAC establish that the challenged conduct of Defendant Commissioner has violated and presents a credible threat of continuing to violate the Second Amendment, that a live case and controversy exists over which this Court and this Court alone holds the power to grant meaningful, effective, and necessary relief, and that all Plaintiffs have a strong personal stake in the outcome of this action seeking such relief. The MTD must be denied.

## UNDISPUTED FACTS AND ALLEGATIONS

In his MTD, Defendant Commissioner, like City Defendants, either expressly concedes or does not dispute any of the following essential facts and allegations:

Throughout American history, arms carrying was a right as to all peaceable citizens. Sometimes, it was even a duty. *See e.g.*, David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 573–577, 587 (2019) (listing statutes requiring arms carrying by members of the general public to travel, work in the fields, work on roads and bridges, attend church, and attend court). Historically, under the Constitution's relevant history and tradition, only dangerous persons have historically been acceptably deprived of the right to bear arms. Peaceable, law-abiding persons have always been free to carry arms for self-defense and lawful purposes. *See generally*, Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020). (FAC ¶¶ 212-213.)

The tradition of disarming violent and dangerous persons was practiced from medieval England through mid-20th century America, but there is no tradition of disarming nonviolent people like Plaintiffs Fetsurka, Sieck, Defina, and Scott and those similarly situated. No laws requiring government permission for American citizens to carry a firearm existed before the twentieth century—including at the time of the ratification of the Second Amendment in 1791. What laws did exist were indisputably unconstitutional, as they were the product of racist views long since abandoned as antithetical to the core purposes of the rights guaranteed all citizens under the Constitution. (FAC ¶¶ 214-215.)

Nevertheless, no ordinary citizen, including Individual Plaintiffs and the members and supporters of FPC, may lawfully carry on his or her person or in a motor vehicle in the City of Philadelphia a loaded firearm without a license to carry a firearm (LTCF), as the laws of the Commonwealth and those of City expressly prohibit such activity on pain of criminal sanction, whether the firearm is concealed or unconcealed. 18 Pa.C.S. §§ 6106(a), 6108, 6109; Phila. Code §§ 10-818, 10-833, Philadelphia Police Department ("PDD"), Directive 5.27. (FAC ¶¶ 2-7, 35-45, 57, 66, 238-240, 245.) Violation of these laws will also result in the lifetime forfeiture of the offender's Second Amendment rights. (*Id.* ¶¶ 46, 245.) Both Defendant Commissioner and City Defendants are and have been actively enforcing these laws and related regulations, customs, and policies at all operative times relevant to the FAC. (*Id.* ¶¶ 27-28, 30, 56, 58-65, 237, 241, 259, 269-271.) And Defendant Commissioner specifically has enforced and continues to actively enforce the prohibitions on unlicensed carry of firearms within the City of Philadelphia pursuant to 18 Pa.C.S. §§ 6106(a), 6108, and 6109. (FAC ¶¶ 3-6, 30, 44-45, 237-240, 269-270.)

Individual Plaintiffs are ordinary, law-abiding citizens who are not disqualified from exercising their rights under the Second Amendment (FAC ¶¶ 132, 134, 153, 188, 254) and who meet all the eligibility requirements for a LTCF (*id.* ¶¶ 133, 154-155, 188-190, 256). They and the similarly situated members and supporters of FPC who desire to lawfully carry a firearm for self-defense and other lawful purposes reasonably fear that Defendants will enforce against all such individuals their laws and related enforcement policies, practices, and customs should they attempt to carry a firearm in violation of any of the same. (*Id.* ¶¶ 135, 157-158, 163, 172-173, 176, 192-193, 198, 249, 255, 257, 267-268.) Individual Plaintiffs and the similarly situated members and supporters of FPC represent all other similarly situated individuals in Philadelphia County. (*Id.* ¶ 247.)[1]

The Gun Permit Unit ("GPU") run by Defendants Outlaw and City of Philadelphia (collectively "City Defendants") functions to ensure compliance with the mandates of the Commonwealth's statutory scheme that Defendant Commissioner enforces, as well as local laws, policies, and practices of City Defendants designed to implement and enforce the Commonwealth's statutory scheme in Philadelphia. (FAC ¶¶ 27, 62-65, 241, 259.)

Consequently, the GPU is and has been the only means of access for obtaining a LTCF in the entire County of Philadelphia, including for the more than 1.5 million residents in the City of Philadelphia, and thus the only means of complying with the

---

[1]     *See e.g.,* FAC 247, where Plaintiffs allege (without contest from Defendants): "As to all claims made in a representative capacity, there are common questions of law and fact that substantially affect the rights, duties, and liabilities of many similarly situated Pennsylvania and Philadelphia residents and visitors who knowingly or unknowingly are subject to the Defendants' laws, regulations, policies, and enforcement practices at issue."

Commonwealth's statutory scheme. (FAC ¶¶ 50, 54-55.) Historically, and for many months if not years before City Defendants instituted new LTCF application procedures at the GPU on December 7, 2020—only *after* being sued in this case—City Defendants had woefully understaffed and underfunded the GPU's operations, regularly imposed needlessly complicated and burdensome requirements on applicants, and even completely shut down all operations at the GPU for extensive periods of time, leaving the public with little or no access to its essential services—not just in comparison to the general demand for these services but in stark contrast to other, less essential services that City Defendants readily provide the public. (FAC ¶¶ 10-11, 68-70, 74, 77-80, 85-87, 91, 93, 95, 98, 100-109, 111-127, 129-130.)

The systemic failures and limitations prevailing within the GPU throughout this period—until the reopening and institution of new procedures on December 7, 2020 *after* this action was filed—were widely known and substantiated with documented accounts of members of the public, who reported having made numerous attempts to reach the GPU only for the phone line to go unanswered and for any appointments offered to be scheduled six months or more, even as long as an entire year, into the future. (FAC ¶¶ 103-107.)

City Defendants' persistent understaffing and underfunding of the GPU, imposition of unnecessarily onerous conditions, and shutdowns leading to the backlogs, major delays, and interruptions in service over this period directly impacted Individual Plaintiffs, FPC's similarly situated members and supporters, and all similarly situated individuals, as they and all such individuals were entirely precluded or severely constrained in their ability to

apply for and obtain within any reasonable period of time the LTCF necessary to lawfully exercise their Second Amendment rights in Philadelphia. (FAC ¶¶ 261-267, 274-275.)

But for the Commonwealth's statutory scheme that Defendant Commissioner enforces and the local laws, policies, and practices of City Defendants designed to implement and enforce the same throughout the County of Philadelphia, Individual Plaintiffs and the similarly situated individuals they represent would have carried a loaded firearm on their person and/or in their motor vehicles, in public, for lawful purposes including self-defense, as they are entitled to do under the proper construction of the Second Amendment. (*Id.* ¶ 243.) These individuals were constrained from doing so because, throughout the period that they were precluded from obtaining a LTCF, they remained subject to a credible threat of arrest, prosecution, and/or conviction for violating the Commonwealth's statutory scheme for any form unlicensed carry. (*Id.* ¶¶ 242-244.)

Plaintiff Fetsurka has desired to obtain a LTCF since before the GPU's first closure in 2020, but was unable to make the required in-person appearance during the GPU's hours of operation before it shut down in March 2020. (FAC ¶ 141-143.) He and all similarly situated individuals were completely precluded from even applying during the extensive closure which persisted for more than four consecutive months. (FAC ¶¶ 98, 100.) When he contacted the GPU in August 2020 after learning it had finally reopened, he took the next earliest appointment which was September of 2021. (*Id.* ¶ 144-147.) Two months later, the GPU called and offered an earlier appointment on November 19, 2020, which he accepted. (*Id.* ¶¶ 147-148.) Plaintiff Fetsurka waited yet another month for that appointment only to receive another call from the GPU on November 18, cancelling it. (*Id.*

¶ 149.) He was later scheduled for December 14, 2020, though that was scrapped as well because of the general change in procedures on December 7th. (*Id.* ¶¶ 150-151.)

Plaintiff Sieck has desired to obtain a LTCF since as early as May of 2020, but was unable to do so throughout the periods of the GPU's closures between March 2020 and July 2020 and November 19, 2020 and December 6, 2020, and he had no realistic expectation of being able to obtain one given the widely known staffing shortages, delays, and backlogs at the GPU throughout this time period, which necessarily precluded any ordinary law-abiding citizen like him from actually being able to obtain a LTCF for many months, if not more than a year, beyond the point of any application. (*Id.* ¶¶ 164-166.)

Plaintiff Defina has been seeking an LTCF since at least April 10, 2019, when he applied for one, in-person at the GPU, at which time he was told there "should be no problem" with issuing one to him. (FAC ¶¶ 177-179.) However, in the intervening months between then and December 7, 2020, he received no further communication from the GPU about the application, and his work schedule over this period prevented him from making yet another in-person appearance in an effort to determine the status of the application. (*Id.* ¶¶ 180-183.) Further, like Plaintiff Sieck and everyone else, Plaintiff Defina was absolutely precluded from pursuing the previous application or initiating a new one during the periods that the GPU was shut down, and he had no realistic expectation of being able to obtain one any time in the near future given the widely known staffing shortages, delays, and backlogs prevailing at the GPU throughout this period—particularly when the lack of any response to his prior application indicated he had been *denied*. (*Id.* ¶¶ 184-185.)

Plaintiff Scott has desired to obtain a LTCF since as early as November 2020, but he was absolutely precluded from even applying for much less obtaining one during the period of the GPU's closure between November 19, 2020 and December 6, 2020, and he had no realistic expectation of being able to obtain one during any other part of November 2020 given the widely known staffing shortages, delays, and backlogs, which necessarily precluded any ordinary law-abiding citizen like him from actually being able to obtain a LTCF for many months, if not more than a year, beyond the point of any application, until the GPU reopened and instituted new procedures on December 7, 2020. (*Id.* ¶¶ 199-200.)

Based on the same widely known systemic issues persisting at the GPU through December 6, 2020, similarly situated members and supporters of FPC, as well as all other similarly situated individuals represented herein, have been adversely and directly harmed in the same essential manner, and FPC itself has suffered and continues to suffer losses through the diversion of resources necessary to defending and asserting its associational interests in protecting the rights of all these affected individuals. (FAC ¶¶ 26, 272-273.)

The collective enforcement of Commonwealth's law by Defendant Commissioner and the laws, policies, and practices of City Defendants designed to implement and enforce the same have caused Plaintiffs and those similarly situated to be categorically prohibited from carrying a handgun in public for self-defense. While the closures and onerous delays surrounding the acceptance and processing of LTCF applications created by the GPU's policies and practices were the precipitating events to this action, it is Defendant Commissioner's enforcement of the Commonwealth's statutory scheme that creates the legal backdrop forcing the interaction with and reliance upon the GPU in the first place.

And while it is City Defendants' conduct that has foreclosed the realistic possibility of obtaining the license necessary to carry within the City limits, it is Defendant Commissioner's active enforcement of the Commonwealth's statutory scheme that has erected the ultimate constitutional roadblock by generally prohibiting any *unlicensed* carry outside the home. The combined effect of these actions is what has resulted in a complete ban against the carrying of a firearm outside the home by ordinary, law-abiding citizens, including Individual Plaintiffs, anywhere in Philadelphia, for self-defense and the other lawful purposes for which they are entitled to do so under the Second Amendment.

## GENERAL LEGAL STANDARDS

Defendant Commissioner moves to dismiss the FAC for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") and lack of standing under Rule 12(b)(1) of the FRCP, claiming that the FAC fails to sufficiently plead  a causal nexus between Plaintiffs' injury and Defendant Commissioner's law enforcement actions or a legally cognizable injury in fact under the Second Amendment, and that Plaintiffs' requested relief is overbroad because their injury can be redressed without the requested relief against Defendant Commissioner.

The legal standards for surviving a motion to dismiss under Rule 12(b)(6) are lenient, favoring adjudication on the merits, and thus require the court "to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Hartig Drug Company Inc. v. Senju Pharmaceutical Co. Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016). The legal standards are the same under Rule 12(b)(1) whenever the challenge attacks the complaint

on its face. *Petruska v. Gannon University*, 462 F.3d 294, 299, n. 1 (3d Cir. 2006). When the challenge "attacks allegations underlying the assertion of jurisdiction in the complaint," the court need not accept the allegations as true and may "weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Hartig Drug Company*, at 268.

Generally, "[c]onstitutional standing requires that a plaintiff adequately establish:

(1) an injury in fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Medtronic Sofamor Danek USA, Inc. v. Globus Medical, Inc.*, 637 F.Supp.2d 290, 297-98 (E.D. Pa. 2009.)

## ARGUMENT

## I. Plaintiffs' Constitutional Injury is Directly Traceable to Defendant Commissioner, and Can Be Directly Redressed by the Requested Relief

The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST., AMEND II. When the People, by enacting that amendment, enshrined in their Nation's fundamental charter the right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense," *District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008), they did not mean to leave the freedom to exercise that right at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.*

The FAC alleges a constitutional injury of this right which is equally and jointly attributable to the actions of Defendant Commissioner and City Defendants. The understaffing and underfunding, major delays, complete shutdowns, and overly burdensome conditions imposed on applicants at the GPU represent only half the story. But for the Commonwealth's statutory scheme, and Defendant Commissioner's active enforcement thereof, Plaintiffs would not be required to seek permits from the GPU in the first place. The Commonwealth's statutory scheme expressly prohibits unlicensed carry of firearms within Philadelphia by all ordinary, law-abiding citizens, including Plaintiffs Fetsurka, Sieck, Defina, and Scott, and all those similarly situated, and the essential function of the GPU is to enforce this scheme along with its own laws, policies, and practices designed to implement the same. In the absence of any other lawful avenues to carry a firearm in public for self-defense besides the LTCF that all such individuals must obtain from the GPU, Defendant Commissioner's enforcement of the Commonwealth's statutory scheme is a direct and proximate cause of the resulting ban on carry—the very sort of categorical ban proscribed under the Constitution. Individual Plaintiffs and all similarly situated individuals have already been subjected to the unconstitutional effects of this categorical ban and they remain exposed to the same injury for so long as the statutory scheme continues to be enforced, particularly by and through the policies and practices of the GPU that have completely prohibited or severely limited any access to LTCFs.

Defendant Commissioner's active enforcement of the Commonwealth's statutory scheme during all operative times relevant to the FAC—Defendant Commissioner in no

way disputes his active and continuing enforcement throughout—is within his direct control, and thus satisfies the necessary causation prong of constitutional standing.

Regarding redressability, Plaintiffs have appropriately and necessarily sought relief against both Defendant Commissioner and City Defendants in light of the clear causal connection between the injury and Defendant Commissioner's enforcement of the Commonwealth's statutory scheme. The Constitution and the *Heller* opinion make clear that the right to bear arms outside the home falls within the ambit of Second Amendment protection. *See Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L.Rev. 1443, 1516 (2009) ("*Heller* expressly concluded that 'the right to . . . bear arms' referred to carrying arms."). In the absence of a means for lawful licensed carry, lawful unlicensed carry is the only alternative, and that alterative is non-existent under the Commonwealth's statutory scheme that Defendant Commissioner has enforced throughout all relevant times.

Thus, Defendant Commissioner continues to miss the point in arguing that the requested relief against him cannot redress the injury because Plaintiffs' claim turns solely on "the manner in which LTC applications are being processed" over which Defendant Commissioner exercises no direct control. (Comm. MTD 11.) In fact, Defendant Commissioner claims that Plaintiffs have not even alleged a constitutional injury arising from his undisputed enforcement of the Commonwealth's statutory scheme. (Comm. MTD 11, 16.) Yet, as the FAC makes abundantly clear (FAC ¶¶ 3, 5-6, 30, 44-45, 237-240, 269-270), the injury at issue ultimately stems from the inability of ordinary, law-abiding people to lawfully carry a firearm in public without a license under the Commonwealth's statutory

scheme. This general prohibition against unlicensed carry is what creates the need for all such individuals to seek and obtain an LTCF from the GPU in the first instance.

Defendant Commissioner's enforcement of the Commonwealth's statutory scheme is therefore inexorably tied to the injury and, given its fundamental connection to the deprivation of constitutional rights at issue, this enforcement action is essentially a catalyst that set into motion the events giving rise to Plaintiffs' claim of injury. It follows that the requested injunctive relief against Defendant Commissioner is part and parcel of any relief that would effectively remedy the injury and that would effectively protect against similar constitutional deprivations in the future. *See Commonwealth v. Montgomery*, 234 A.3d 523, 536 (2020) (illustrating the strict interpretation and enforcement of the crime established under section 6106(a) by holding that even "revealing a small portion of the gun that would go unnoticed by ordinary observation" brings a person within the purview of the general prohibition against carrying a firearm "concealed" without a license).

## II. The Undisputed Facts of the FAC Demonstrate that Plaintiffs' Claims Are All Ripe for Adjudication

"The ripeness doctrine determines whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Access Ins. Co. v. Carpio*, 861 F. Supp. 2d 539, 542 (E.D. Pa. 2012).

Plaintiffs have each alleged a ripe claim against all Defendants. At the core of Plaintiffs' allegations are the undisputed understaffing and underfunding, major delays, complete shutdowns, and overly burdensome conditions imposed on applicants at the GPU.

For months on end, it was literally impossible for Plaintiffs to *even apply* for a LTCF, much less obtain one. To conclude that Plaintiffs' claims lack ripeness because they did not avail themselves of the very application process to which they were denied any access, through no fault of their own and due *solely* to the actions of the Defendants, is to turn the very intent of the ripeness doctrine, and the case and controversy requirement itself, on its head.

Yet, the Defendant Commissioner makes precisely this argument. (Comm MTD. 12) ("Specifically, neither Plaintiff Sieck nor Plaintiff Scott aver that they have even attempted to apply for an LTC with the City.") By this logic, Plaintiff Sieck and Scott have failed to allege a ripe claim *because* they failed to successfully surmount the insurmountable barriers to applying for and obtaining an LTCF. But again, and crucially, Defendant Commissioner does not dispute that the GPU was completely closed *for over four consecutive months* in 2020, even before the subsequent *19-day* shutdown in November that precipitated this action. Defendant Commissioner's position boils down to the extraordinary argument that a government actor can avoid liability for failing to provide adequate access to governmental services necessary for the lawful exercise of a constitutional right by denying *any access at all* to those essential services.

Plaintiffs Sieck and Scott were indeed entirely precluded from applying for a LTCF during the complete closures of the GPU, as were all other similarly situated individuals who desired to obtain and otherwise would have sought to obtain a LTCF during the several weeks of the GPU's complete closure. That preclusion coupled with Defendant Commissioner's ongoing active enforcement of the Commonwealth's statutory scheme means that Plaintiff Sieck and Scott and all similarly situated individuals were subject to a

categorical prohibition on their ability to carry a handgun for self-defense. The fact is, *no matter what they did*, no matter how hard or how often they may have attempted to apply for and obtain a LTCF from the GPU during this time, they were *absolutely* precluded from obtaining one *and* they had no other option for lawful carry outside the home. Their constitutional injury is concrete, complete, and demonstrated by the undisputed facts.

Plaintiff Fetsurka *did* make an appointment to submit an application during the interim time period between the GPU's closures. His appointment—originally scheduled all the way out into September 2021—was rescheduled, cancelled, and rescheduled again. Only after the initiation of this lawsuit was Plaintiff Fetsurka able to successfully submit his application. And even though he was able to previously apply, like Plaintiffs Sieck and Scott, Plaintiff Fetsurka's constitutional injury was solidified at the moment the GPU shut its doors, and persisted until its doors reopened, because he too desired to obtain and would have otherwise sought to obtain a LTCF during the period of the first shutdown in 2020. (FAC ¶¶ 142-143.) His subsequent perseverance through the GPU's extraordinarily burdensome application process once the GPU finally reopened—a process that he was unable to complete *until after he sued* the GPU—cannot somehow retroactively evaporate his injury or render his claim of injury unripe, as Defendant Commissioner would have it under the untenable argument the Commissioner presents in an effort to dismiss the case.

Notably too, Defendant Commissioner concedes that Plaintiff Defina's claim *is* ripe, *and* he does not otherwise individually challenge Plaintiff Defina's standing beyond the general arguments about causation and redressability, which lack merit. (Comm. MTD 12, n. 5.) It is well established that "'the presence of one party with standing is sufficient to

satisfy Article III's case-or-controversy requirement.'" *Neale v. Volvo Cars of North America, LLC*, 794 F.3d 353, 364 (3d Cir. 2015) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52, n. 2) (2006)); *accord Lewis v. Alexander*, 685 F.3d 325, 338-39 (3d Cir. 2012) ("Where coplaintiffs have a shared stake in the litigation—close identity of interests and a joint objective—the finding that one has standing to sue renders it superfluous to adjudicate the other plaintiffs' standing."). Thus, even assuming—without at all conceding—that any doubt may exist about the ripeness or general justiciability of the other Plaintiffs' claims, the undisputed ripeness of Plaintiff Defina's claim is alone sufficient to establish the necessary ripeness under any Article III analysis.

## III.    Plaintiffs' Claims Squarely Raise Federal Constitutional Issues That Cannot be in Any Way be Effectively Addressed Through Any State Law Process

Abstention is a judicially created doctrine under which a federal court may decline to exercise its jurisdiction so that a state court or agency has the opportunity to first decide the matters at issue. *Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission,* 791 F.2d 1111, 1114 (3d Cir.1986). The abstention doctrine "represents an extraordinary and narrow exception to the virtually unflagging obligations of the federal courts to exercise the jurisdiction given to them." *Id.* Consequently, abstention is justified "only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *Id.*.

Beyond its abstract discussion of the *Pullman* and *Burford* forms of abstention, Defendant Commissioner fails to identify a single state law remedy that even *addresses* the current claim, let alone resolves it. In support of his assertion that this Court should

defer its jurisdiction, Defendant Commissioner relies on *Fender v. Washington County, Pa.*, No. 140cv-142, 2014 WL 1491138 (E.D.Pa. April 15, 2014). But the *Fender* Court abstained from reaching a Second Amendment claim in a matter challenging the *affirmative action* of a local sheriff to revoke a firearms license under Section 6109.

State law procedural remedies naturally do exist for affirmative actions revoking, granting, or denying LTCF applications. But nowhere in the Commonwealth's statutory scheme does it contemplate, much less specifically provide, any mechanism for relief from a complete and categorical preclusion of access to the process for obtaining an LTCF in the first instance. The statutory scheme necessarily *assumes* that access to the governmental services established under the scheme is being readily and adequately made available to those seeking an LTCF. The scheme certainly neither contemplates nor provides any mechanism to bring a claim seeking redress for a violation of *federal constitutional rights* exacted by a complete denial of access to those services; nor do any of City Defendants' complimentary laws, policies, or procedures contemplate or create any such mechanism for seek relief. In no way could this situation ever fit within the "extraordinary and narrow exception to the virtually unflagging obligations of the federal courts to exercise the jurisdiction given to them." Indeed, no other effective mechanism of relief even exists for these Plaintiffs. Their *sole* avenue for relief is through this case, in this Court.

## IV.    The FAC States a Strong Second Amendment Claim for Relief

Defendant Commissioner's case for dismissal of the FAC for failure to sufficiently state a claim begins with two fundamental inaccuracies—first, that the FAC fails to even allege that Defendant Commissioner's enforcement of Sections 6106-6109 violates the

Second Amendment, and second, that binding Third Circuit caselaw compels the Court to find there could be no violation in any event.

The FAC repeatedly and thoroughly alleges that Defendant Commissioner's enforcement of the Commonwealth's statutory scheme has violated and presents a credible threat of continuing to violate the Second Amendment. *See e.g.,* FAC ¶ 230 ("The Defendants' laws, policies, enforcement practices and customs challenged herein that individually and collectively violate the constitutional right to bear arms are not longstanding, have no historical pedigree and are not rooted in our Nation's traditions."); FAC ¶ 234 ("By preventing legally eligible adults, like and including Plaintiffs, Plaintiffs' member and supporters, and other similarly situated to them, from bearing arms as they are constitutionally entitled, Defendants have violated the Plaintiffs' rights protected under the Second and Fourteenth Amendments and denied them those arms for the purposes of immediate self-defense and all lawful purposes."); FAC ¶ 275 ("Defendants individually and collectively, under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges and immunities of citizenship of adult persons in the Commonwealth of Pennsylvania, including Plaintiffs Fetsurka, Sieck, Defina, and Scott, and all similarly situated members and supporters of Plaintiff FPC, and all other similarly situated individuals, through their enforcement and implementation of the Commonwealth's laws and regulations.")

Like City Defendants, Defendant Commissioner completely ignores—and thus makes no attempt to dispute—the historical analysis in the FAC demonstrating that licensing schemes like the one at issue here clearly are not longstanding and are in fact

creatures of modernity in no way endorsed by the *Heller* court's analysis as permissible firearms restrictions. FAC ¶¶ 213-216. Also, like City Defendants, Defendant Commissioner cites no evidence or support for his contrary claim, save for his citation to the opinion in *Drake v. Filko*, 724 F.3d 426, 429, where he seeks cover under the Third Circuit's holding that the *justifiable need* standard under *New Jersey's* carry licensing scheme "qualifies as a 'presumptively lawful,' 'longstanding' regulation." (MTD 17.) This holding is not in accord with the documented history or tradition underlying the Second Amendment, but it has no preclusive impact here in any event because it is distinguishable.

Further, the *Drake* opinion does not preclude the relief Plaintiffs seek, and require, to redress the injury at issue. Plaintiffs certainly do contend that the *Drake* analysis is wrong and the Second Amendment right does indeed extend outside the home, such that the ability of law-abiding citizens like them cannot be subject to government-regulated licensing schemes. But even so, unlike in *Drake*, the injury Plaintiffs have suffered and for which they seek redress goes far beyond a single condition imposed against them under the scheme. Rather, in addition to challenging the general constitutionality of the scheme and all its conditions to licensure for ordinary citizens (save only for the requirement that a person is "not disqualified from exercising Second Amendment rights," as construed in *Heller*, 554 U.S. at 635), Plaintiffs have challenged the undisputed shutdowns, delays, backlogs, understaffing, underfunding, and other unnecessarily onerous and complex application procedures that have resulted in major delays and, for months at a time, have completely cut off the ability of ordinary people to obtain a LTCF in the exercise of their carry rights under the Second Amendment. Plaintiffs have likewise alleged Defendant

Commissioner's active enforcement of the Commonwealth's statutory scheme has infringed upon Plaintiffs' right to bear arms, because it expressly criminalizes the only manner of lawfully exercising their carry rights in the absence of the licenses they have been prevented from obtaining from the City Defendants' GPU—i.e., unlicensed carry.

These are real and redressable injuries, and ones likely to recur, not just in light of City Defendants' historical practices of operating the GPU in this manner until just recently but also particularly in light of the prevailing COVID-19 pandemic which they use as justification for "the closures and delays" they readily admit have occurred. (City MTD 15, 18.) And it is evident that Defendant Commissioner fully intends to continue his enforcement of the Commonwealth's statutory scheme throughout the pendency of the pandemic. Coupled with the real risk of repeated delays or closures at the GPU, all law-abiding who seek to obtain a LTCF but have not already been able to do so remain in jeopardy of being denied any ability to lawfully exercise their carry rights for so long as the statutory scheme is being enforced, particularly by and through the policies and practices of the GPU that have completely prohibited or severely limited access to LTCFs.

The resulting burden is severe. "Self-defense at home is no substitute for self-defense on a public sidewalk when the sidewalk is where you are attacked[.]" *Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L.Rev. at 1516, n. 310. "[S]econds count when one is attacked, especially in public, where one might not have the warnings that are sometimes available in the home (the breaking window, the barking dog, the alarm)." *Id.* at 1518. And,

as the *Heller* court emphasized, the handguns targeted by Defendants' regulatory scheme are "the quintessential" weapon of choice for self-defense. *Heller*, 554 U.S. at 594.

As the high court recently admonished, "even in a pandemic, the Constitution cannot be put away and forgotten," *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U. S. ____ (2020), 2020 WL 6948354, *3, and even though the "judicial impulse to stay out of the way in times of crisis … may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack," because "[t]hings never go well when we do," *id.* at 6 (Gorsuch, J., concurring). Thus, "our usual constitutional standards should apply during the current pandemic." *Id.*

*Heller* establishes the "usual standards" in this context, and it is clear that the historical procedures of the GPU completely foreclosing or severely limiting the necessary access to LTCFs do not pass constitutional muster under *Heller*—just as these standards show the statutory scheme itself is unconstitutional insofar as it mandates all law-abiding citizens obtain a license to carry without any evidence that the applicant has any dangerous or violent propensities. *See* FAC ¶ 213 ("Historically, under the Constitution's relevant history and tradition, only dangerous persons have historically been acceptably deprived of the right to bear arms. Peaceable persons have always been free to carry arms for self-defense and other lawful purposes." *See generally* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020).) The severe constraints and total roadblocks that Defendants' actions have individually and collectively erected against ordinary citizens seeking to lawfully exercise their Second Amendment carry rights are categorically unconstitutional. *Heller*, 554 U.S.

at 584 (the right to "bear arms" includes the "carry [of a firearm] ... in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person").

Even if the Defendants' actions are subject a tiers-of-scrutiny analysis, that analysis certainly demands more than the "intermediate" scrutiny test that Defendant Commissioner applies. At a minimum, strict scrutiny is necessary, requiring that the Commissioner demonstrate he is pursuing a compelling interest and using the least restrictive means available." *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 2020 WL 6948354 at *4. But even if one applies intermediate scrutiny, under the true test, the government "must, in some meaningful way, demonstrate that alternative measures that burden substantially less [protected conduct] would fail to achieve the government's interests."' *Bruni v. City of Pittsburgh*, 824 F.3d 353, 369 (3d Cir. 2016) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) & *McCullen v. Coakley*, 573 U.S. 464, 495 (2014), respectively).[2] Indeed, even Defendant Commissioner's own conception of the test at least requires that restrictions imposed on "the normal gun licensing process as a result of COVID-19" must not "do 'more … than is reasonably necessary' to adjust to the realities of the virus." (Comm. MTD 21 (quoting *Drake*, 724 F.3d at 436).)

As explained in the opposition to City Defendants' motion to dismiss the FAC, for their part, City Defendants have not even attempted to illustrate that their conduct burdens

---

[2]     While these cases concern free speech restrictions, "we look to other constitutional areas for guidance in evaluating Second Amendment challenges," "the First Amendment is the natural choice," and "the structure of First Amendment doctrine should inform our analysis of the Second Amendment." *U.S. v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

substantially less protected conducted than necessary. That they would completely shut down the GPU for *more than four months* based on an outbreak of COVID-19 among employees, when it is widely known that a mere *14-day period* of quarantining is more than sufficient to eliminate any risks that such individuals will further spread the virus, itself shows beyond cavil they have made no attempt whatsoever at tailoring their restrictive actions in a manner that actually serves their claimed interests.

For his part, Defendant Commissioner argues his enforcement policies and practices have remained unchanged throughout the COVID-19 pandemic, as have the underlying statutes, as if the *consistency* of his enforcement activities somehow negates any deprivation of rights or absolves him of any liability for it. (Comm. MTD 21.) To the contrary, it is that very consistency which creates the causal link establishing the constitutional liability because, again, but for Defendant Commissioner's active enforcement of the Commonwealth's statutory scheme, Plaintiffs would not be required to seek permits from the GPU in the first place and they could lawfully engage in *unlicensed* carry. It is also this consistency which shows the lack of any effort by Defendant Commissioner to investigate or even seriously consider any less restrictive alternatives to the enforcement of the Commonwealth's statutory scheme in meeting his claimed interest of protecting the public welfare against the supposed dangers of allowing law-abiding individuals like Plaintiffs to exercise their carry rights without a coveted license. Thus, even by his own conception of the burden he carries here, Defendant Commissioner has not demonstrated his enforcement activities are *no more* than "reasonably necessary."

**V.      The Relief Requested Against Defendant Commissioner is Both Appropriate and Necessary**

Consistent with his attempt to avoid any responsibility or liability here, Defendant Commissioner argues the injunctive relief Plaintiffs request is "overbroad" to the extent it would apply to him because, *assuming* the GPU is open and processing applications in a timely manner, no injunctive remedy against him is necessary. (Comm. MTD 23-24.) However, again, Defendant Commissioner's enforcement of the Commonwealth's statutory scheme was part and parcel of the constitutional injury already inflicted, and it remains part and parcel of the credible threat of further such injury for so long as there exists a real likelihood that City Defendants will continue or repeat the historical practices at the GPU that have completely prohibited or severely limited any access to LTCFs. That likelihood is very real, not just because of their long history of such practices, which changed *only* after being sued in this case, but also because of the prevailing pandemic which they have used to justify taking the very actions that form the heart of this claim.

As such, any truly *complete and effective* form of injunctive relief would bind both City Defendants and Defendant Commissioner, so as to ensure that (1) City Defendants comply with their constitutional obligation to consistently provide adequate and meaningful access to the GPU as the sole means of obtaining the LTCF necessary for ordinary law-abiding to lawfully exercise their carry rights in Philadelphia *and* that (2) Defendant Commissioner is precluded from enforcing the Commonwealth's general ban against unlicensed carrying to the extent such individuals are prevented from obtaining a LTCF due to City Defendants' failure or refusal to provide the necessary access.

Moreover, and notably, Defendant Commissioner does *not* challenge the requested *declaratory* relief as "overbroad" or as otherwise invalid. This requested relief is also appropriate and necessary given the inexorable tie between Defendant Commissioner's enforcement of the Commonwealth's statutory scheme and the constitutional injury already inflicted against Individual Plaintiffs and all similarly situated individuals.

### CONCLUSION

**WHEREFORE**, Plaintiffs respectfully request that this Court deny Defendant Commissioner's motion to dismiss the First Amended Complaint.

Date:  January 27, 2021

Respectfully Submitted,

/s/ Adam Kraut
Attorney Id. No. 318482
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 476-2342
E: akraut@fpclaw.org

Raymond DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com
*Appearing Pro Hac Vice*

*Attorney for Plaintiffs*
